UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

PERU McCARRA,

                                    Plaintiff,

v.                                                        1:25-cv-00991
                                                         (GTS/TWD)

SHEILA ANN SHERIDAN, et al.,

                                    Defendants.

_____

APPEARANCES:

PERU McCARRA
*Plaintiff, pro se*
20 Danker Avenue
Albany, NY 12206

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>REPORT-RECOMMENDATION AND ORDER</u>**

## I.    INTRODUCTION

The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff Peru McCarra ("Plaintiff").  Dkt. No. 1.  In lieu of paying the filing fee, Plaintiff submitted an application for leave to proceed *in forma pauperis* ("IFP").  Dkt. No. 2.

## II.    IFP APPLICATION

Upon review, Plaintiff's IFP application demonstrates economic need.  *See* Dkt. No. 2. Therefore, his IFP application is granted.

## III.    STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary

relief from a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).  The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised.  *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original).  But the "special solicitude" in *pro se* cases, *id*. at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true.  *Id*.  But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions.  *Id*. (citing *Twombly*, 550 U.S. at 555).  After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief.  *Id*. at 679.

**IV.    BACKGROUND** [1]

Plaintiff brings this action against the following named defendants: Sheila Ann Sheridan;

Maureen Alice Sheridan Chiaramonte; Gerard Maney; Samuel James Better; John Anthony

Chiaramonte; John B Chiaramonte; Jessica Sheridan Chiaramonte; Joseph Chiaramonte; Frank

W Lang; Matthew Joseph Mann; Roger Dermott Mcdonough; Lawrence Michael Mackey; Leah

Casey; Adriana D Anderson; Louis Dejoy; Lucian Pitu; Michael Nathan King; Yen Huynh;

Letita James; Kathy Hochul; Kathy Sheehan; Eric Hawkings; David Soares; William G Kelly;

Anthony Mancino; Jill Kehn; Richard Rivera; Sherri Brooks-Morton; Jill Faison; Monica Duffy;

China Jonas; Jasmine Whitbeck; Lawrencia Colon; Michael S Monteleone; William M Rice;

Craig Apple; Robert Evers; Kerry B Thompson; Leon A Bormann; and Jean Freedman.  Dkt. No.

1 at 1.

In the form civil complaint, Plaintiff invokes the Court's federal question jurisdiction:

> SHEILA ANN SHERIDAN, MAUREEN ALICE SHERIDAN
> CHIARAMONTE, GERARD E MANEY ET AL
> CONSPIRED/ENABLED/AND/OR ABETTED IN
> COMMITTING FEDERAL OFFENSE OF 18 U.S. Code § 1708 –
> Theft or receipt of stolen mail generally.  BEGINNING IN 2022
> AND CONTINUING IN 2025, ALL DEFENDANTS
> FRAUDULENTLY TAMPERED WITH MY MAIL AND/OR
> UNLAWFULLY MISREPRESENTED/FRAUDED MY
> ADDRESS.  DEFENDANTS CRIMES ARE
> CONTINUAL/ONGOING INTO 2026

*Id*. at 3.  In the civil cover sheet, Plaintiff identifies the Racketeer Influenced and Corrupt

Organizations Act ("RICO") as the nature of the suit.  Dkt. No. 1-1 at 1; *see also id*. (describing

the cause of action as follows: "18 U.S. Code Chapter 96 Part 1 – Racketeer Influenced and

---

[1] Citations to Plaintiff's complaint will refer to the pagination generated by CM/ECF, the Court's electronic filing system.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Corrupt Organizations, 18 U.S. Code § 1708 – Theft or receipt of stolen [mail] . . .

FRAUDING/POSSESSING/TAMPERING/ABETTING FRAUD OF MY MAIL WITHOUT

MY CONSENT"). Plaintiff demands $20,000. *Id.*

Plaintiff's statement of the claim in its entirety is as follows:

> 18 U.S. Code Chapter 96 Part I - RACKETEER INFLUENCED
> AND CORRUPT ORGANIZATIONS ACT SHEILA ANN
> SHERIDAN, MAUREEN ALICE SHERIDAN CHIARAMONTE,
> GERARD E MANEY ET AL CONSPIRED/ENABLED/AND/OR
> ABETTED IN COMMITTING FEDERAL OFFENSE OF 18 U.S.
> Code 1708 – theft or receipt of stolen mail generally.
> BEGINNING IN 2022 AND CONTINUING IN 2025, ALL
> DEFENDANTS FRAUDULENTLY TAMPERED WITH MY
> MAIL AND/OR UNLAWFULLY MISREPRESENTED/
> FRAUDED/ENABLED IN FRAUDING MY ADDRESS.
> DEFENDANTS CRIMES ARE CONTINUAL/ONGOING INTO
> 2026

*Id.* at 4. As relief, Plaintiff states:

> I COMPEL THE NORTHERN DISTRICT OF NEW YORK TO
> IMPLEMENT AND GRANT A RESTRAINING ORDER
> AGAINST DEFENDANTS FROM POSSESSING MY MAIL
> WITHOUT MY CONSENT/AND/OR BEING DEMANDED TO
> BE RESTRAINED FROM MISREPRESENTING,
> COMMITTING PERJURY, AND OR STOPPING FROM
> FRAUDULENTLY HANDLING MY MAIL INFORMATION
> BECAUSE I HAVE NEVER GIVEN CONSENT FOR THEM TO
> POSSESS/FRAUD/ENABLE FRAUD OF/AND OR TAMPER
> WITH MY MAIL.
>
> I ALSO COMPEL THE COURT TO GRANT 20,000 IN
> COMPENSATION FOR MY MAIL BEING
> TAMPERED/OBSTRUCTED/POSSESSED UNLAWFULLY BY
> DEFENDANTS.

*Id.* Attached to the form civil complaint appears to be two photographs of two individuals

delivering and/or touching mail next to a mailbox. *See id.* at 6-7.

## V.    DISCUSSION

Upon review, even afforded a liberal construction, the complaint fails to comply with the pleading requirements set forth in the Federal Rules of Civil Procedure and fails to state a claim upon which relief may be granted.

### A.    Rules 8 and 10 of the Federal Rules of Civil Procedure

As set forth above, Rule 8 of the Federal Rules of Civil Procedure requires a pleading contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief . . . . " Fed. R. Civ. P. 8(a)(2). "The purpose of [Rule 8] is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotations and citations omitted). Therefore, allegations "so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009). As set forth in *Iqbal*:

> [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.

*Iqbal*, 556 U.S. at 678 (internal citations, quotation marks, and alteration omitted).

Here, Plaintiff's complaint does not comply with Rule 8 because his allegations do not suggest a viable claim against any of the defendants. Plaintiff also engages in so-called "group pleading." *See Canon U.S.A., Inc. v. F & E Trading LLC*, No. 15-CV-6015, 2017 WL 4357339, at *7 (E.D.N.Y. Sept. 29, 2017) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group

5

pleading,' fails to give each defendant fair notice of the claims against it."); *McClean v. Cnty. of Westchester*, No. 17-CV-4492, 2018 WL 6329420, at *6 (S.D.N.Y. Dec. 3, 2018) (noting that courts in this circuit dismiss claims where group pleading is insufficient to provide defendants fair notice); *see, e.g.*, *Cipriani v. Buffardi*, 9:06-CV-0889 (LEK/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (citation omitted) ("A complaint cannot be maintained against a defendant who is listed in the caption, but against whom no facts are alleged in the body of the complaint.").

Additionally, Rule 10 of the Federal Rules of Civil Procedure provides, *inter alia*, "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances . . . ." Fed. R. Civ. P. 10.

A complaint that fails to comply with these pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims," and may properly be dismissed by the Court. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). Such is the care here.

Accordingly, the Court recommends dismissal of Plaintiff's complaint for failure to state a claim on which relief may be granted and for failure to comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**B.    RICO**

In the civil cover sheet, Plaintiff identified RICO as the nature of the action. Dkt. No. 1-1. The civil provision of RICO "creates a private right of action for individuals to enforce the RICO statute." *Mathon v. Feldstein*, 303 F. Supp. 2d 317, 322 (E.D.N.Y. 2004). The civil RICO enforcement provision states that "[a]ny person injured in his business or property by reason of a

violation of [18 U.S.C. § 1962] . . . may sue . . . in any appropriate United States district court and shall recover threefold the damages[.]"  18 U.S.C. § 1964(c).

In order to state a violation of Section 1962, and thus, a claim under the civil RICO enforcement provision, a plaintiff must allege facts showing: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c)).  Such a person must also "allege that he was 'injured in his business or property *by reason of* a violation of section 1962.'" *Id.* (quoting 18 U.S.C. § 1964(c) (emphasis in original)).

To state a claim of a civil RICO conspiracy under Section 1962(d), a plaintiff must allege facts showing that the defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999).  A plaintiff must also show that "if the agreed upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Id.* at 244-45.  Racketeering activity is defined to include a wide variety of criminal offenses, such as wire fraud, mail fraud, commercial bribery, bank fraud, and money laundering. 28 U.S.C. § 1961(1).

In addition, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to RICO claims predicated on fraud.  *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *Scalercio-Isenberg v. Goldman Sachs Mortg. Co.*, No. 21-CV-4124 (KPF), 2022 WL 3227875, at *9 (S.D.N.Y. Aug. 9, 2022) (holding that "even when a plaintiff proceeds *pro se*,

courts apply the Rule 9(b) pleading standard and dismiss complaints that do not meet its

heightened requirements").  A plaintiff must "specify the time, place, speaker, and content of the

alleged misrepresentations, explain how the misrepresentations were fraudulent[,] and plead

those events which give rise to a strong inference that [each] defendant[ ] had an intent to

defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Murrey v. Minc*, No. 21-

CIV-320, 2022 WL 1910127, at *3 (S.D.N.Y. June 3, 2022) (quoting *Jus Punjabi, LLC v. Get*

*Punjabi US, Inc.*, 640 F. App'x 56, 58 (2d Cir. 2016)) (quotation marks and citations omitted).

"Where multiple defendants are asked to respond to allegations of fraud, the complaint should

inform each defendant of the nature of his alleged participation in the fraud."  *DiVittorio v.*

*Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

 Even when liberally construed, Plaintiff does not allege facts that would support any

claim under civil RICO, because he has not plausibly alleged that any defendant has engaged in a

criminal offense.  *See generally* Dkt. No. 1.  His assertion that "DEFENDANTS

FRAUDULENTLY TAMPERED WITH MY MAIL AND/OR UNLAWFULLY

MISREPRESENTED/FRAUDED/ENABLED IN FRAUDING MY ADDRESS" is unsupported

by specific facts, and thus is vague and conclusory.  *Id*. at 4.  In short, the complaint does not

meet Rule 9's heightened pleading standard, and is therefore insufficient to suggest a violation of

the RICO statute.

 The Court therefore recommends dismissal of Plaintiff's claims under the civil RICO

statute for failure to state a claim on which relief may be granted.  *See* 28 U.S.C. §

1915(e)(2)(B)(ii); *see, e.g.*, *Joseph v. JRF Income Tax Bus. Servs.*, No. 21-CV-3869, 2021 WL

3516421, at *5 (E.D.N.Y. Aug. 10, 2021) ("A complaint that offers nothing more than 'an

unadorned, the-defendant-unlawfully-harmed-me accusation' or that 'tenders naked assertions devoid of further factual enhancement' is insufficient.") (quoting *Iqbal*, 556 U.S. at 678).

### C.    18 U.S.C. § 1708

To the extent Plaintiff seeks to press a separate claim against the defendants under 18 U.S.C. § 1708, that claim must also be dismissed.  Section 1708 is a criminal statute that makes the theft or receipt of stolen mail punishable by imprisonment, fine, or both.  *See* 18 U.S.C. § 1708.  As a private party, Plaintiff lacks standing to bring a criminal action under this provision. *See Leeke v. Timmerman*, 454 U.S. 83, 85-87 (1981); *Ostrowski v. Mehltretter*, 20 F. App'x 87, 91 (2d Cir. 2001); *see also Sheehy*, 335 F. App'x at 104 ("[F]ederal criminal statutes do not provide private causes of action."); *see also*, *e.g.*, *Kashelkar v. Bluestone*, 306 F. App'x 690, 692 (2d Cir. 2009) (finding no private right of action for mail fraud); *McFarlane v. Roberta*, 891 F. Supp. 2d 275, 285 (D. Conn. 2012) (finding no private cause of action for mail theft under 18 U.S.C. § 1708 because it is a criminal statute and there is no indication that Congress intended to create a private right of action under the statute); *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 322 (E.D.N.Y. 2001) (finding no private right of action exists for mail fraud).

Therefore, to the extent Plaintiff is attempting to assert a claim under 18 U.S.C. § 1708, the Court recommends it be dismissed for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### D.    Leave to Amend

Based on the foregoing, the Court recommends dismissal of the complaint in its entirety. "Generally leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim."  *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up).  Accordingly, the Court recommends that the

complaint be dismissed, but that Plaintiff be afforded an opportunity to amend to cure the deficiencies identified herein.

The Court advises Plaintiff that should he be permitted to amend his complaint, any amended pleading he submits must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any such amended complaint, which shall supersede and replace in its entirety the previous complaint filed by Plaintiff, must contain sequentially numbered paragraphs containing only one act of misconduct per paragraph. Plaintiff is further cautioned that no portion of his prior complaint shall be incorporated into his amended complaint by reference. Any amended complaint submitted by Plaintiff must set forth all of the claims he intends to assert against the defendants and must demonstrate that a case or controversy exists between the Plaintiff and the defendants which Plaintiff has a legal right to pursue and over which this Court has jurisdiction. If Plaintiff is alleging that the named defendant violated a law, he should specifically refer to such law.

## VI.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**;[2] and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH LEAVE TO AMEND**; and it is further

---

[2] Plaintiff should note that, although his IFP application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: October 7, 2025
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[3] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 12 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

🚩 KeyCite Yellow Flag

Distinguished by  Josie Maran Cosmetics, LLC v. Shefa Group LLC,
E.D.N.Y.,  August 22, 2022

2017 WL 4357339
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

CANON U.S.A., INC., Plaintiff,

v.

F & E TRADING LLC, a New York Limited Liability
Company; F & E TRADING LLC, a New Jersey Limited
Liability Company; Big Value Plus LLC d/b/a Big Value
Inc.; Another Deal Site LLC; Platinum Capital Growth
LLC d/b/a Electronics Valley; Electronics Basket LLC;
Elite IT Group LLC d/b/a DavisMax, Netsales, Web
Offers, and Brand Specials; 6th Avenue Express LLC
d/b/a Gadget Circuit; and Albert Houllou, Defendants.

2:15-cv-6015 (DRH)(AYS)
|
Signed 09/29/2017

**Attorneys and Law Firms**

DORSEY & WHITNEY LLP, 51 West 52nd Street, New
York, NY 10019-6119, By: Richard H. Silberberg, Esq.,
Bruce R.M. Ewing, Esq., Dai Wai Chin Feman, Esq., Jonathan
Richard Montcalm, Esq., Attorneys for Plaintiffs.

GOLDBERG & RIMBERG PLLC, 115 Broadway Suite 302,
New York, NY 10006, By: Efrem Tobias Schwalb, Esq.,
Robert L. Rimberg, Esq., Steven Eric Frankel, Esq., Attorneys
for Defendants.

**MEMORANDUM AND ORDER**

Denis R. Hurley, Senior District Court Judge

**I. INTRODUCTION**

\*1  By notice of motion filed on October 14, 2016,
defendants Another Deal Site LLC, Electronics Basket LLC,
and Elite IT Group LLC's ("Moving Defendants") move
pursuant to Federal Rule of Civil Procedure 12(b)(6) to
dismiss all claims against them in the two-count Second
Amended Complaint ("SAC"). The SAC was filed against

them, other corporate defendants (F & E Trading LLC,
Big Value Plus LLC, Platinum Capital Growth LLC, and
6th Avenue Express LLC, collectively the "Answering
Defendants,") and individual defendant Albert Houllou
("Houllou") (collectively the "Defendants") by Plaintiff
Canon U.S.A., Inc. ("Canon-USA"). The SAC alleges
trademark infringement and unfair competition under the
Lanham Act, 15 U.S.C. § 1125(a)(1)(A), as well as common
law unfair competition. Canon-USA opposes the Moving
Defendants' Motion to Dismiss.

By notice of motions filed on October 14, 2016 and February
22, 2017, Cannon-USA also moves to strike or dismiss
pursuant to Rule 12(f) and 12(b)(6), Answering Defendants'
and Houllou's counterclaims ("Counterclaims") each of
which seeks a declaratory judgment that certain "disclaimers
preclude liability under Section 43(a)(1)(A) of the Lanham
Act or Common Law Unfair Competition[.]" (Counterclaim
at ¶ 46.)

For the reasons that follow, Moving Defendants' Motion to
Dismiss is denied, and Cannon-USA's Motion to Strike or
Dismiss is also denied.

**II. BACKGROUND**

Canon-USA alleges that Defendants have violated the
Lanham Act as well as common law unfair competition
for selling "Gray Market Cameras," which are CANON
photographic products that were either intended by CANON
for use and resale in Asia or Europe or are otherwise
materially different from Genuine CANON Cameras sold in
the United States.

*A. Factual Background*

1. Canon-USA's Claims

The following facts are taken from the SAC and deemed to
be true for purposes of the present motion.

Canon-USA is the exclusive licensee of the CANON
trademark ("CANON Mark") from its parent, Canon Inc.
(SAC at ¶ 31.) The CANON Mark has come to be associated
with high quality products, including, *inter alia*, printing,
photographic and imaging equipment, and related goods.
(*Id.* at ¶ 2.) Among other business, Canon-USA imports,

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 13 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

markets, distributes, and sells CANON-brand cameras and photographic products for use and resale in the United States (hereafter, "Genuine CANON Cameras"). (*Id.* at ¶ 33.) As with other Canon-brand products sold under the CANON Mark, Canon-USA extensively advertises Genuine CANON Cameras using multiple avenues to reach consumers, *to wit*: the Internet, television, printed media, trade shows, and other promotional means. (*See id.* at ¶ 34.) Over time, the CANON Mark has acquired substantial goodwill among consumers, which is very valuable to Canon-USA. (*Id.* ¶ 38.) To maintain and ensure its continued goodwill, Canon-USA: (1) sells its exclusively licensed Genuine CANON Cameras directly to authorized retailers; and (2) monitors markets, investigating the distribution and sale of non-genuine goods at unauthorized retail locations, which may raise consumer safety concerns, threaten Canon-USA's long-established goodwill, and violate Canon-USA's trademark rights. (*Id.* at ¶ 39.)

**\*2** Genuine CANON Cameras are manufactured for sale and use in the United States. They: (1) carry unique serial numbers, appearing as barcodes on both the cameras themselves and their accompanying packaging, and which are utilized for quality-control purposes; (2) are covered by robust, enforceable Canon-USA warranties; (3) are sold in packaging which provides accurate, specific descriptions of the products contained therein; (4) are accompanied by genuine, original operating manuals; and (5) are equipped with CANON-brand power supplies and accessories, which are engineered to comply with U.S. safety regulations, governmental requirements and certifications. (*Id.* ¶¶ 44–51.)

Moving Defendants together with Answering Defendants are wholesalers and retailers of consumer electronics, including cameras. (*Id.* at ¶ 8–15.) None are authorized retailers, dealers, or resellers of Genuine CANON Cameras. (*Id.* at ¶ 52.) Houllou is "a principal of each of the Corporate Defendants," and is listed as a principal by the State of New Jersey for most of the Answering Defendants (6th Avenue Express LLC, Big Value Inc., F&E Trading LLC, and Platinum Capital Growth LLC) as well as two of the three Moving Defendants (Another Deal Site LLC and Electronics Basket LLC). (*Id.* at ¶ 20.)

The Defendants conduct business primarily on the Internet through various domain names and on Internet marketplaces. (*See id.* at ¶ 17.) Within the past five years, part of the Defendants' marketing, selling, and distribution of photographic products included products bearing the

CANON Mark. (*Id.* at ¶ 25.) At least some of these CANON photographic products were either intended for use and resale in Asia or Europe or are otherwise materially different from Genuine CANON Cameras sold in the United States (hereafter "Gray Market Cameras"). (*Id.*)

Canon-USA alleges that the material differences in the Gray Market Cameras advertised on the Defendants' websites and sold by them are that those cameras: (a) either lack or carry marred serial numbers (both on the cameras and the packaging); (b) either lack warranty coverage or carry significantly inferior warranties (*e.g.*, with stricter compliance requirements and for shorter durations); (c) arrive in incorrect packaging; (d) are accompanied by inferior photocopied manuals; and (e) come with power supplies and accessories which are not CANON-manufactured, resulting in the same not being guaranteed for safety and quality. (*Id.* at ¶ 4.) Canon-USA claims that Defendants' sales of and related actions regarding the Gray Market Cameras deprive Canon-USA of the opportunity to earn profits from the sale of Genuine CANON Cameras to consumers. (*See* SAC at ¶ 56.)

### 2. Answering Defendants' and Houllou's Counterclaim

Defendants include a disclaimer on their website, as well as attached directly to the boxes of CANON cameras that are sold to customers in the United States. (Answering Def.'s Counterclaim at ¶¶ 28, 29.) The website disclaimer provides that Defendants carry "both USA as well as imported products[,]" and that imported products may be different and may not be eligible for a manufacturer warranty in the United States. (*Id.* at ¶ 28.) Additionally, the disclaimer attached directly to the CANON cameras provides that:

> In accepting this product, you acknowledge and agree that: (1) this may be an imported product not originally intended for sale in the USA; (2) seller is not an authorized dealer of the manufacturer; (3) if it is an international version of the product, it may differ from USA versions in its packaging, charger, AC adapters, printed manual, and manufacturer warranty; (4) if you purchased a "body only" offer, other parts such as the lens may have been removed from

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 14 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

this box; (5) if you purchased a lens only, it is a new lens, but if it arrived in a white/plain box, it is not original manufacturer packaging; (6) if needed, a third party AC adapter and/ or battery charger is included with the product; (7) the product may or may not include the original manual, but an English manual may be found on the internet; (8) Import items may not be eligible for manufacturer warranty. In accepting this product, you agree that if you resell this product in the USA, you will advertise at the point of sale a notice containing the information set forth above.

**\*3**  (*Id.* at ¶ 33.)

### B. Procedural Background

On October 20, 2015, Canon-USA commenced this action alleging trademark infringement and unfair competition. The Defendants sought permission to file a motion to dismiss, but, on December 4, 2015, Canon-USA filed the First Amended Complaint, which named additional Defendants and added factual allegations. On March 7, 2016, individual defendant Houllou moved to dismiss.

On May 31, 2016, after court-ordered initial discovery that led to the subsequent disclosure of affiliated entities, and a so-ordered stipulation between Canon-USA and the defendants listed in the First Amended Complaint, Canon-USA filed the SAC naming the disclosed affiliate entities as actual defendants, not as "d/b/a's". Pursuant to the stipulation, both Houllou's motion to dismiss and Canon-USA's opposition thereto (which had been fully briefed and were *sub judice*) were deemed applicable to the SAC. To avoid confusion regarding citations to the Complaint, the Court directed the filing of corrected briefs (*see* Electronic Order dated June 2, 2016), which were filed on June 14, 2016. The Court ultimately denied Hollou's motion to dismiss on the basis that Canon-USA's allegations sufficiently stated plausible claims against Houllou for trademark infringement and unfair competition at the pleading stage. *Canon U.S.A., Inc. v. F&E Trading LLC*, 2017 WL 112515 (E.D.N.Y. 2017).

On September 23, 2016, Moving Defendants made the present motion to dismiss the SAC for failure to state a claim against Moving Defendants. (Moving Def.'s Mem. in Support of Motion to Dismiss at 4.) Specifically, Moving Defendants argue that Canon-USA's allegations are conclusory and therefore insufficient as a matter of law. (*Id.* at 6.) Moreover, Moving Defendants claim that Canon-USA's use of group pleadings is improper and insufficient because of a lack of any specific factual allegations against Moving Defendants. (*Id.* at 8–9.) Canon-USA opposed the Motion to Dismiss, stating that (i) the SAC states valid claims that are non-conclusory; and (ii) the group pleading provides fair notice for Moving Defendants because all of the Defendants are an identically situated group of affiliated companies and with a common principal. (Plaintiff's Mem. in Opposition at 5–10.)

On October 14, 2016, Plaintiff moved to strike or dismiss the declaratory judgment counterclaim ("Answering Def.'s Counterclaim") asserted by Answering Defendants as "duplicative, redundant, and [serving] no purpose." (Plaintiff's Mem. in Support at 2.) In the alternative, Canon-USA posits that the Court should decline to exercise jurisdiction over the Answering Defendants' Counterclaim. (*Id.* at 6.) Answering Defendants opposed the motion, asserting that their Counterclaim is not redundant because it is necessary to ensure that the full dispute between the parties is resolved in this litigation. (Answering Def.'s Mem. in Opp. at 7.) Additionally, Answering Defendants state that the Court should not strike their Counterclaim because it seeks a judicial determination that is relevant to claims Canon-USA has threatened to bring and has in fact brought in this action. (*Id.* at 8.)

**\*4**  On January 25, 2017, Houllou answered the SAC asserting the same counterclaim ("Houllou's Counterclaim") as Answering Defendants. (Houllou Counterclaim at ¶ 1.) On February 22, 2017, Canon-USA moved to strike or dismiss Houllou's Counterclaim by re-filing the same memoranda of support as well as Answering Defendants' opposing papers that were filed for the Answering Defendants' Counterclaim. For this reason, we will consider the two Counterclaims and the attendant Motions to Strike or Dismiss simultaneously.

## III. MOVING DEFENDANTS' MOTION TO DISMISS

### A. Legal Standard for Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 15 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

The plausibility standard is guided by two principles. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009). First, the principle that a court must accept all allegations as true does not apply to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Therefore, a plaintiff must provide facts which are sufficient to allow each named defendant to have a fair understanding what it is the plaintiff is complaining about and as to whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

Further, "[i]n making its Rule 12(b)(6) determinations, the court 'may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference ... and documents possessed by or known to the plaintiff and upon which [he] relied in bringing the suit.' " *Live Face on Web, LLC v. Five Boro Mold Specialist Inc., et al.*, No. 15-cv-4779 (LTS)(SN), 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (quoting *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

*B. Discussion*

The Court will first consider and address the separately made argument that Canon-USA's allegations in the SAC are insufficient as a matter of law. The Court will then consider the separate argument that the SAC violates Rule 8's pleading requirements by impermissibly employing group pleading.

1. Regarding the First Cause of Action: Conclusory Allegations and the Trademark Infringement and Unfair Competition Claim under the Lanham Act

**\*5** In their Motion to Dismiss, Moving Defendants claim that Canon-USA's allegations in the SAC are conclusory and therefore insufficient as a matter of law. Under *Twombly,* to survive a motion to dismiss a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." 127 S.Ct. at 1974. The Supreme Court has explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964–65 (citations and internal quotation marks omitted). The Second Circuit has found that *Twombly* does not require a universally heightened standard of fact pleading, but "instead requir[es] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir. 2007). In other words, *Twombly* " 'require[s] enough facts to 'nudge [plaintiffs'] claims across

Case 1:25-cv-00991-GTS-TWD   Document 4   Filed 10/07/25   Page 16 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly,* 127 S.Ct. at 1974)

To successfully allege a trademark infringement claim, a plaintiff must establish that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale ... or advertising of goods or services,' (5) without the plaintiff's consent." *1–800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 406 (2d Cir. 2005), *cert denied,* 546 U.S. 1033 (2005) (quoting 15 U.S.C. § 1114(1)(a)). Additionally, "the plaintiff must show that defendant's use of that mark 'is likely to cause confusion ... as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff].' " *1–800 Contacts,* 414 F.3d at 406 (quoting 15 U.S.C. § 1125(a)(1)(A)); *see also Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1508–09 (2d Cir. 1997); *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072 (2d Cir. 1993). This effectively establishes a two prong test in which the first prong has five elements. *See id.*

Here, Moving Defendants do not contest that Canon-USA has a valid mark or that Canon-USA did not give Moving Defendants permission to use the CANON Mark, therefore elements 1 and 5 of the first prong of the Lanham Act test are not in dispute. However, Moving Defendants seem to challenge whether Canon-USA has made sufficient allegations as to the remaining three elements; namely whether Moving Defendants used the CANON Mark in commerce in connection with the sale or advertising of goods. (*See* Moving Def.'s Mem. in Support at 2–3.)

Here, Canon-USA has defined the term "Corporate Defendants" in the SAC to include all Answering Defendants and Moving Defendants. (SAC at 2.) The SAC then goes on to make numerous factual allegations against the Corporate Defendants—including Moving Defendants—that they have used the CANON Mark, in commerce, in connection with the sale or advertising of goods or services. For example, SAC ¶ 62 states:

> **\*6** After importing Asian and European Gray Market Cameras, the Corporate Defendants (at Houllou's direction) are marketing, distributing

and selling the Gray Market Cameras to U.S. Customers as Genuine CANON Cameras through Internet advertising, the Websites, and the Marketplaces under the identifies of the Corporate Defendants and the DBAs.

(SAC at ¶ 62.) This sufficiently alleges all of the remaining elements of the first prong of the Lanham Act test. There are additional allegations against all "Defendants," [1] including that "Defendants have knowingly and in bad faith marketed, distributed, offered for sale and/or sold in the United States materially different products[.]" (*Id.* at ¶ 52.) These factual allegations are sufficient under *Twombly* "to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." 127 S.Ct. at 1974. Therefore, Canon-USA has met the threshold for the first prong of the Lanham Act test. The question of whether these allegations are permissibly pled with sufficient specificity against Moving Defendants is addressed in further detail in the following section regarding group pleading.

[1] "Defendants" is defined in the SAC to include the Corporate Defendants and individual defendant Houllou. (SAC at 2.)

The second prong of the Lanham Act test requires a showing that Moving Defendants' use of the mark is likely to cause confusion. The Second Circuit set out a test for determining the likelihood of confusion as a factual matter in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir. 1961). Numerous district courts have stressed that "[t]he likelihood of confusion test is a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss." *FragranceNet.com, Inc. v. FragranceX.com, Inc.,* 493 F.Supp.2d 545, 551 n.8 (E.D.N.Y. 2007) (quoting *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.* 425 F.Supp.2d 402, 412 (S.D.N.Y. 2006)); *see also Eliya, Inc. v. Kohl's Dep't Stores,* No. 06-CV-195 (GEL), 2006 WL 2645196, at *3–4 (S.D.N.Y. Sept. 13, 2006) ("an application of the so-called *Polaroid* factors on [a] motion to dismiss would be inappropriate because it would involve premature factfinding."); *Hearts on Fire Co., LLC v. L C Int'l Corp.,* No. 04–CV–2536 (LTS), 2004 WL 1724932, at *4 (S.D.N.Y. July 30, 2004) ("proof of a likelihood of confusion requires an analysis of the *Polaroid* factors, resolution of which would constitute premature fact finding inappropriate upon a motion to dismiss.").

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

As the Second Circuit has previously held, "[t]he task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Merck & Co.*, 425 F.Supp.2d at 412 (quoting *Cooper v. Parksy*, 140 F.3d 433, 440 (2d Cir. 1998)). Thus, on this Motion to Dismiss, the Court need only consider whether Canon-USA has sufficiently pled a likelihood of confusion.

Here, Canon-USA has clearly alleged a likelihood of confusion and the Court must accept such allegations as true for purposes of a motion to dismiss. (*See, e.g.*, SAC at ¶ 53 ("Defendants'[2] bad faith and intentional marketing, distribution, and sale of Gray Market Cameras prominently featuring the CANON Mark, but containing material differences ... are intended to, and are likely to, cause confusion"); SAC at ¶ 59 ("Defendants' conduct has also resulted in customer confusion, as consumers who purchase the Gray Market Cameras believe they are Genuine CANON Cameras when that is not the case"); SAC at ¶ 70 ("These material differences in warranty coverage damage the goodwill inherent in [Canon-USA's] well-regarded CANON brand and cause consumers to believe, wrongly, that it is CUSA providing such nonexistent or inferior warranty coverage"); etc.) Since Canon-USA has unequivocally alleged the existence of a likelihood of confusion, they have met the threshold for the second prong of the Lanham Act Test.

[2]   Defined to include Moving Defendants, *see* footnote 1 supra. (SAC at 2.)

**\*7**  Therefore, Moving Defendants' Motion to Dismiss the first cause of action for trademark infringement and unfair competition under the Lanham Act on the basis that these claims are insufficient as a matter of law is denied.

### 2. Regarding the Second Cause of Action: Group Pleading and the Trademark Infringement and Unfair Competition Claim under the Lanham Act

Moving Defendants also allege that Canon-USA impermissibly employs group pleading in the SAC in violation of the requirements of Rule 8(a). Canon-USA acknowledges that the SAC employs group pleading, referring to all of the Defendants as Defendants or Corporate Defendants. (*See, e.g.*, SAC at ¶¶ 61–66, 68,

72 ("*Corporate Defendants* (at the direction of defendant Houllou) are importing Gray Market Cameras[;]" "the *Corporate Defendants* (at Houllou's direction) are marketing, distributing and selling the Gray Market Cameras[;]" "*Many of Defendants'* Gray Market Cameras either lack serial numbers, contain defects, [etc.]") (emphasis added).)

It is well-established in this Circuit that plaintiffs cannot simply "lump" defendants together for pleading purposes. *Ritchie v. Northern Leasing Systems, Inc.*, 14 F.Supp.3d 229, 236 (S.D.N.Y. 2014). "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at \*22 (S.D.N.Y. Jan. 27, 2012) (citing *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F.Supp.2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8.)).

However, "nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each." *Vantone Group Limited Liability Co. v. Yangpu NGT Industrial Co., LTD. et al.*, No. 13-CV-7639, 2015 WL 4040882, at \*4 (S.D.N.Y. July 2, 2015). " 'The key to Rule 8(a)'s requirements is whether adequate notice is given,' and that 'fair notice' is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." *Ritche, 14* F.Supp.3d at 236–37 (citing *Hudak v. Berkeleye Grp., Inc.*, No. 13-Cv-89, 2014 WL 354676, at \*4 (D. Conn. Jan. 23, 2014)).

Both parties cite numerous cases in support of their positions, and seek to distinguish the cases cited by the opposing party. One of the cases that Moving Defendants cite in which group pleading was held to be improper relates to constitutional deprivations under § 1983, which has a heightened pleading standard and is not applicable. *See Thomas v. Venditto*, 925 F.Supp. 2d 352, 363 (E.D.N.Y. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). The thrust of all of the non-constitutional cases that both Canon-USA and Moving Defendants cite is that, to meet the notice-pleading requirements of 8(a), the complaint must either distinguish between the defendants or plead the allegations with sufficient specificity so that each individual defendant

Case 1:25-cv-00991-GTS-TWD   Document 4   Filed 10/07/25   Page 18 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

is on notice of the particular claims asserted against it and the grounds for such claims. *See, e.g., Aghaeepour v. N. Leasing Sys. Sys., Inc.,* No. 14-CV-5449, 2015 WL 7758894, at *4 (S.D.N.Y. Dec. 1, 2015) (allowing group pleading because "the Complaint in the instant case contains numerous allegations pleaded with specificity as to particular defendants"); *Vantone Group,* 2015 WL 4040882, at *4 (while plaintiff referred to all 24 defendants collectively in ten of the eleven claims asserted in the complaint, the complaint did "make factual allegations that distinguish between the conduct of the Moving Defendants, listing specific actions taken by each of them.")

**\*8** Here, Canon-USA has met the standard notice requirements of Rule 8(a). In the SAC, Canon-USA defines the term "Corporate Defendants" to include both the Moving and Answering Defendants. (SAC at 2.) The SAC also defines the term "Defendants" to include Corporate Defendants and individual defendant Houllou. (*Id.*) The SAC then goes on to make allegations separately against Corporate Defendants, Defendants, and individual defendant Houllou. (*See, e.g.,* SAC at ¶ 54 ("Defendants' unauthorized use of the CANON Mark falsely communicates to consumers that Defendants are authorized resellers of Genuine CANON Cameras"); SAC at ¶ 61 ("Corporate Defendants (at the direction of Houllou) are importing Gray Market Cameras bearing the Canon Mark from Asia and Europe"); etc.). It is very clear that where the SAC includes an allegation against "Corporate Defendants," that allegation is made identically against each of the Corporate Defendants, and that where the SAC includes an allegation against "Defendants," that allegation is made identically against each of the Corporate Defendants and Houllou.

Given that, (1) Canon-USA has defined the term Defendants and Corporate Defendants; (2) Moving Defendants and Answering Defendants are alleged to be similarly situated companies; (3) Moving Defendants and Answering Defendants share a common principal (Houllou); and (4) identical allegations are pled against all Defendants, Canon-USA has plead the allegations with sufficient specificity that each individual defendant is on notice of the particular claims asserted against it and the grounds for such claims. Thus, the SAC provides adequate notice to meet the notice pleading requirements of Rule 8(a), even though it contains allegations against Defendants and Corporate Defendants collectively. *See, e.g., Ritchie,* 14 F.Supp.3d at 237.

Therefore, Moving Defendants' Motion to Dismiss the first cause of action is denied.

### 3. Regarding the Second Cause of Action: Common Law Unfair Competition

"It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims." *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F. Supp.2d 448, 456 (S.D.N.Y. 2005). *See also Elastic Wonder, Inc. v. Posey,* No. 13-cv-5603 (JGK), 2015 WL 273691, at *5 n.5 (S.D.N.Y. Jan. 22, 2015) (quoting *Lorillard Tobacco*); *Telebrands Corp. v. Del Labs., Inc.,* 719 F. Supp.2d 283, 298-99 (S.D.N.Y. 2010) (state law statutory and common law unfair competition claims "stand or fall with the federal unfair competition claim"); *Info. Superhighway, Inc., v. Talk Am., Inc.,* 395 F. Supp.2d 44, 56 (S.D.N.Y. 2005) ("The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims.") (citing *TCPIP Holding Co. v. Haar Commc'ns,* No. 99-cv-1825 (RCC), 2004 WL 1620950, at *6 (S.D.N.Y. July 19, 2004); further citations omitted).

Thus, since the Court finds Canon-USA has plead sufficient facts to state a plausible claim against Moving Defendants for trademark infringement and unfair competition under the Lanham Act (its first cause of action), it follows that Canon-USA's common law unfair competition claim (its second cause of action) is also sufficiently pled. The same logic applies to the Court's determination that Canon-USA has permissibly employed group pleading. Therefore, the Motion to Dismiss the unfair competition claims against Moving Defendants is also denied.

## IV. CANON-USA'S MOTIONS TO STRIKE OR DISMISS THE COUNTERCLAIM

*A. Answering Defendants' and Houllou's Counterclaims*
Answering Defendants and Houllou separately asserted the same counterclaim seeking declaratory judgment that the disclaimers provided on its website and attached to CANON cameras:

> [A]re sufficient to prevent any customer confusion as to: (a) the lack

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 19 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

of affiliation between CUSA and the Counterclaim Plaintiffs and (b) that the Canon Cameras sold by Counterclaim Plaintiffs may be Import versions which may contain differences from the U.S. version which may contain differences from the U.S. versions of the products; and that as a result the disclaimers preclude liability under Section 43(a)(1)(A) of the Lanham Act or Common Law Unfair Competition as alleged in the Complaint.

**\*9** (Answering Def.'s Counterclaim at ¶ 46); (Houllou's Counterclaim at ¶ 48). Answering Defendants and Houllou also claim in their opposing papers that the SAC alleges a threat of litigation when it states that "it is possible if not likely, that further violations ... will come to light as this litigation progresses. Thus, Defendants' wrongdoing as described herein should not be viewed as an exhaustive recitation of all of Defendants' ongoing violations of [Plaintiff's] rights." (Answering Def.'s Mem. in Opp. at 6 (quoting SAC at ¶ 6).)

Canon-USA has moved to strike or dismiss the Counterclaims on the grounds that they do nothing more than mirror Canon-USA's claims and are duplicative, redundant, and would serve no purpose. (Plaintiff's Mem. in Support at 2.) In the alternative, Canon-USA asks the Court to decline exercise jurisdiction over the Counterclaims. Canon-USA also argues that the standard for a default judgment is not met because there is no future threat of litigation. (*Id.* at 5.)

*B. Canon-USA's Motion to Strike*

### 1. Rule 12(f) Motion to Strike Standard

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading ... any redundant ... matter." It is well-settled in the Second Circuit, that a motion to strike will be denied "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). To prevail, the movant must demonstrate that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations

to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Securities Litigation*, 891 F.Supp.2d 458, 471 (S.D.N.Y. 2012) (citing *S.E.C. v. Lee*, 720 F.Supp.2d 305, 340–44 (S.D.N.Y. 2010) (quoting *Roe v. City of New York*, 151 F.Supp.2d 495, 510 (S.D.N.Y. 2001))). Motions to strike are generally disfavored. *Roe*, 151 F.Supp.2d at 510 (citing *Lipsky*, 551 F.2d at 893).

### 2. Discussion

Canon-USA does not dispute elements 1 and 2 above, nor does it argue that permitting the Counterclaims to stand would prejudice it. Its failure to meet these burdens is fatal. *See In re Fannie Mae*, 891 F.Supp.2d at 340–44. Moreover, all of the precedent that Canon-USA cites for the supposed "other" motion to strike standard for counterclaim cases, do not in fact support Canon-USA's position.[3]

[3]    Rather, these are cases in which the courts dismissed counterclaims under Rule 12(b)(6), even though they cited or referred to Rule 12(f). *See, e.g., Interscope Records v. Kimmel*, No. 07-CV-0108, 2007 WL 1756383, at \*4 n.2 (N.D.N.Y. June 18, 2007) ("The case of *Capitol Records, Inc. v. Foster*, No. 04-1569 (W.D. Okla. Oct. 5, 2005) ... involved a motion to strike pursuant to Rule 12(f). The *Foster* court denied the motion on the ground that it was 'loath to grant a motion to strike for redundancy absent some showing of confusion or prejudice to the moving party.' *Id.* at 2. Here, the Court is not striking the counterclaim pursuant to Rule 12(f), but dismissing it for [sic] pursuant to Rule 12(b)(6)[.]"); *Arista Records LLC v. Usenet.com, Inc.*, No. 07-CV-8822, 2008 WL 4974823, at \*2–5 (S.D.N.Y. Nov. 24, 2008) (citing Rule 12(f) for the proposition that a court may strike redundant matters from a pleading, but then citing Rule 12(b)(6) and ultimately granting "Plaintiff's motion to dismiss [Defendant's] counterclaims" rather than a motion to strike).

Accordingly, Canon-USA's motion to strike the Counterclaims is denied.

*C. Motion to Dismiss*

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 20 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

**\*10** "A party has a right to seek a declaratory judgment where a reasonable apprehension exists that if it continues an activity that it will be sued by another party." *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 132 (S.D.N.Y. 1994); *see also Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). Additionally, the Second Circuit has held that "[i]n order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 289 (2d Cir. 2005).

There are two Second Circuit cases that are particularly instructive on the question of when a counterclaim for a declaratory judgment should withstand a motion to dismiss. In *Leach v. Ross Heater and Manufacturing Co.*, the plaintiff asserted a cause of action for patent infringement against the defendant for selling infringing products. 104 F.2d 88, 89 (2d Cir. 1939). The defendant counterclaimed seeking a declaratory judgment for invalidity of plaintiff's patents and non-infringement. *Id.* The district court dismissed the counterclaim, and the Court of Appeals reversed, primarily on the basis that if plaintiff voluntarily dismissed its suit, a case or controversy would remain regarding defendant's declaratory judgment counterclaim. *Id.* at 89–92. Given that the plaintiff had threatened defendant's customers with infringement actions, the Second Circuit noted that:

> The need for declaratory judgment is diminished, it is true, by the fact that the patentee has commenced this suit, but the need cannot be said to have wholly disappeared; the patentee may, for all that the defendant knows, withdraw his suit without prejudice and continue broadcasting assertions of infringement.

*Id.* at 91. In other words, the continued threat of litigation can provide a basis for a declaratory judgment counterclaim.

By contrast, in *Larson v. General Motors Corp.*, the Court of Appeals found that it was proper to dismiss defendant's counterclaim for a declaratory judgment. 134 F.2d 450 (2d Cir. 1943). In *Larson*, the district court retained jurisdiction over a counterclaim for a declaratory judgment after dismissing the plaintiff's infringement claim on the merits. *Id.* The Court of Appeals found that the judgment dismissing the action on the merits barred a future claim, and that "the plaintiffs had not threatened the defendant with suits against any future designs of cars which it might make[.]" *Id.* at 453–54. The Court of Appeals reversed because there was no controversy left. *Id. Leach* and *Larson* jointly stand for the proposition that "a counterclaim seeking a declaratory judgment is not duplicative or redundant if it asserts an independent case or controversy which would remain viable after a dismissal of the plaintiff's claim." *Ferring B.V. v. Fera Pharmaceuticals, LLC*, 2014 WL 4829053, at *6 (E.D.N.Y. 2014) (citing *Marvel Worldwide, Inc. v. Kirby*, 756 F.Supp.2d 461, 467 (S.D.N.Y. 2010) ("a counterclaim is not duplicative or redundant if it asserts an independent case or controversy that survives the dismissal of plaintiff's claim.")).

Here, the Court disagrees with Canon-USA that the Counterclaim is a mirror image of the claims in the SAC. A mirror image counterclaim is generally the exact opposite of the original claim with no added nuances. For example, in *Maverick Recording Co.*, the court found that a defendant's counterclaim was the mirror image when "[t]he central issue in these cases is whether defendants committed copyright infringement, and the defendants' counterclaim [sought] a declaratory judgment that they did not[.]" Nos. 07-CV-200, 07-CV-640, 2008 WL 3884350, at *1 (E.D.N.Y. 2008); *see also Interscope Records*, 2007 WL 1756383, at *4 (The court found that "Defendant's counterclaim is that he did not engage in the acts alleged in Plaintiff's Complaint or that the Complaint fails to state a claim upon which relief can be granted." The court dismissed the counterclaim because there was no continuing threat of litigation and no claims of ongoing infringement so if plaintiff's infringement claim were withdrawn there would be no continuing case or controversy.)

**\*11** Here, Answering Defendants and Houllou have raised an independent controversy; whether the disclaimers are sufficient to prevent customer confusion. [4] Even if Canon-USA withdraws its claims of trademark infringement and unfair competition under the Lanham Act and common law unfair competition, the question of whether the disclaimers prevent customer confusion will still stand.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 21 of 76

Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)

2017 WL 4357339

Pursuant to the Court of Appeals' holding in *Leach*, the possibility that Canon-USA "for all the defendant knows, [could] withdraw his suit without prejudice and continue broadcasting assertions of infringement" means that the need for declaratory judgment cannot be said to have wholly disappeared. 104 F.2d at 91. Moreover, despite Canon-USA's contentions to the contrary, there does appear to be a continued threat of litigation for both Answering Defendants, Houllou, and their current or future associated entities as long as they continue to sell Gray Market cameras. Therefore, Canon-USA's motion to dismiss is denied.

4      The question of whether the Counterclaims should be dismissed on the merits was not raised as one of the grounds to dismiss.

*D. Exercising Jurisdiction*

Canon-USA also requests that the Court, in the alternative, decline to exercise discretionary jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). It is well established that the Act "confers discretion on the courts [to issue a declaratory judgment] rather than an absolute right upon the litigant" to obtain such a determination. *The New York Times Co. v. Gonzales*, 459 F.3d 160, 165 (2d Cir. 2006) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)). The Second Circuit has outlined five factors for courts to consider before entertaining a declaratory judgment action:

(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata;' " (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.

*New York Times Co.*, 459 F.3d at 167 (quoting *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003)).

Application of these factors warrants entertaining the declaratory judgment. A judgment here could serve a useful purpose in clarifying or settling the legal issue of whether there has been trademark infringement, and more specifically, whether the disclosures prevent confusion (as discussed supra). The second factor also appears to weigh in favor,

because a judgment could finalize the controversy; if the disclaimers are sufficient then Canon-USA would have no ground for its claims. The third factor also weighs in favor, as the continued threat of litigation from Canon-USA suggests that the proposed remedy is not merely procedural fencing or a race to res judicata. The fourth factor is neutral in that there is no reason to believe that a declaratory judgment would increase friction between sovereign legal systems or encroach on the domain of a state or foreign court. The final factor may weigh against entertaining the declaratory judgment Counterclaims because the better or more effective remedy could be resolving the underlying litigation concerning whether Defendants have committed trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), as well as common law unfair competition. However, as stated above, under *Leach* the possibility that Canon-USA could still withdraw its suit without prejudice bring similar or the same claims in the future means that declaratory judgment may be an effective remedy. *See* 104 F.2d at 91. Thus, at this pleading stage, this last factor does not counterbalance the first three factors that weigh in favor of exercising jurisdiction over the declaratory judgment Counterclaims.

**\*12** Furthermore, in both of the cases that Canon-USA cites as examples in which courts have declined to exercise jurisdiction over counterclaims, there were mirror counterclaims that could have been dismissed as such under Rule 12(b)(6). *See Interscope Records*, 2007 WL 1756383, at *5 (the Court declined to exercise jurisdiction over the first counterclaim "seeking a declaration of non-infringement"); *Amusement Industry Inc. v. Stern*, 639 F.Supp.2d 301, 310–11 (S.D.N.Y. 2010) (dismissing a claim for declaratory judgment that (a) no attorney-client relationship existed, (b) third-party defendant had no authority to act on defendant's behalf in transactions in question; and (c) defendant did not ratify any of the representations or conduct made on his behalf by third-party defendant). As we have already discussed supra, the Counterclaims do not simply mirror Canon-USA's claims.

Therefore, the Court shall exercise its jurisdiction over the Counterclaims.

**V. CONCLUSION**

For the foregoing reasons, Moving Defendants' Motion to Dismiss is denied and Plaintiff's Motion to Strike or Dismiss the Counterclaims is also denied.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 22 of 76
**Canon U.S.A., Inc. v. F & E Trading LLC, Not Reported in Fed. Supp. (2017)**
2017 WL 4357339

**All Citations**

**SO ORDERED.**

Not Reported in Fed. Supp., 2017 WL 4357339

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

2018 WL 6329420
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rahsi MCCLEAN, Plaintiff,

v.

The COUNTY OF WESTCHESTER, The City of
Mount Vernon, Former Mount Vernon Police Detective,
Daniel Ibanez, Mount Vernon Police Detectives Brent
Gamble, David Clarke, Former Mount Vernon Lt.
Vincent Manzione, and Mount Vernon Sgt. Gregory
Addison, in Their Individual and Official Capacity,
Investigator Marecia Baltimore, in Her Individual and
Official Capacity, as a Former Mount Vernon Police
Detective and an (Investigator) of the Westchester County
District Attorney's Office, and Assistant District Attorney
Jean Prisco in Her Official Capacity as a Westchester
County Assistant District Attorney, Defendants.

17-CV-4492 (CS)
|
Signed 12/03/2018

## Attorneys and Law Firms

Pamela D. Hayes, Law Office of Pamela D. Hayes, Esquire,
New York, New York, Counsel for Plaintiff.

Justin R. Adin, Westchester County Attorney's Office, White
Plains, New York, Counsel for the County Defendants.

Andrew C. Quinn, Steven J. Bushnell, The Quinn Law
Firm, PLLC, White Plains, New York, Counsel for the City
Defendants.

## OPINION & ORDER

Cathy Seibel, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are the motions to dismiss of
Defendants Westchester County and Assistant District
Attorney ("ADA") Jean Prisco (collectively the "County
Defendants"), (Doc. 27), and Defendants the City of Mount
Vernon, Former Detective Daniel Ibanez, Detective Brent
Gamble, Detective David Clarke, Former Lieutenant Vincent
Manzione, Sergeant Gregory Addison, and Former Detective
Marecia Baltimore (collectively the "City Defendants"),
(Doc. 31).

## I. BACKGROUND

I accept as true the facts, but not the conclusions, set forth in
Plaintiff's Amended Complaint. (Doc. 20 ("AC").)

### A. Facts

On August 8, 2011, at 9:40 p.m., there was a shooting on
South 12th Avenue between Second and Third Streets in the
City of Mount Vernon, New York. (*Id.* ¶ 15.) Two individuals
– Gloria Nartey and Clifton Wells – were shot. (*See id.*)
Although Wells survived the shooting, Nartey never regained
consciousness and was pronounced dead at the hospital. (*Id.*
¶¶ 15, 17.)

The next day, officers of the Mount Vernon Police Department
("MVPD") interviewed Wells at Montefiore and Jacobi
Hospitals and later at the MVPD lockup. [1] (*Id.* ¶ 16.) Wells
reported he and three other people – Ricky Young, Antoinette
"AJ" Brown, and Jasmine Smith – were outside smoking
marijuana in front of a house before the shooting occurred.
(*See id.* ¶¶ 16, 24, 39; Doc. 32 ("City Ds' Mem.") at 3.) He
further told the police that it was dark, that he ran from the
scene, and that he did not see who shot him. (AC ¶ 16.)

[1] After Wells was released from the hospital, he was
taken to the MVPD and was arraigned at the Mount
Vernon Municipal Court on an outstanding warrant.
(AC ¶ 16.)

That same day, MVPD Lieutenant Manzione assigned
Detectives Baltimore and Ibanez to retrieve video tapes from
70 West Third Street and 109 South 12th Avenue. (*Id.* ¶ 19.)
While the detectives retrieved the tapes and viewed them
with Manzione and Clarke, [2] the tapes were not vouchered
or secured for safekeeping. (*Id.*) Detectives Baltimore and
Addison were directed to return to 70 West Third Street
for additional footage. (*Id.* ¶ 20.) Although the detectives
retrieved additional tapes, they did not voucher or preserve
them. (*Id.*) In all, at least three sets of tapes were not
vouchered or preserved. (*Id.* ¶ 23.)

[2] The Court presumes that all references in the AC
to "Detective Clark" are references to Defendant
Clarke given the similarity of the names and
the City Defendants' seeming acceptance that the
allegations pertain to Defendant Clarke. (*See* City
Ds' Mem. at 5-6.) The Court notes, however, that

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Plaintiff references a "Detective Neil Clark" in one of his opposition briefs, (Doc. 36 ("P's County Ds' Opp.") at 2), so the misspelling in the AC is particularly careless.

As of August 9, 2011, MVPD officers had canvassed the area where the shooting occurred and obtained several descriptions of the shooter. (*Id.* ¶ 21.) They also interviewed two witnesses, Brown and Smith, (*id.* ¶ 24), but no one identified or said they recognized the shooter, (*id.* ¶¶ 21, 24). Six days later, Smith told an MVPD officer that the shooter was Plaintiff and that she was afraid to make the identification. (*Id.* ¶ 25.) At that time, Smith had outstanding bench warrants and open cases. (*Id.*)

**\*2** On September 30 and October 1, 2012, Detectives Gamble and Clarke traveled to South Carolina to interview Wells. (*Id.* ¶ 26.) Gamble brought a photo array, which included a picture of Plaintiff, while Clarke brought pictures of other individuals. (*Id.*) The interview was recorded by South Carolina authorities. (*Id.* ¶ 27; *see* Doc. 20-11.) Wells told the detectives that he thought he saw "Zimmy" – a nickname for Plaintiff, (Doc. 20-8 at 1; Doc. 20-9 at 2) – before the shooting when Wells was walking around the neighborhood. (Doc. 20-11 at 5:16-17.) He further reported that the shooter was "a dude with a hoodie," (*id.* at 8:8-23), and that Wells ran from the scene after he was shot, (*see, e.g., id.* at 10:4-13). Wells also told the detectives that at some point after the shooting, his cousins and other people told him that "Zimmy" had shot him and was sorry for what happened. (*Id.* at 15:6-15; *see* AC ¶ 27.) He also informed the detectives that he had seen Plaintiff since the shooting and that Plaintiff would not look at him. (Doc. 20-11 at 15:15-17.) At some point after Wells provided his account, Detective Gamble showed Wells a photo array, pointed to Plaintiff's picture, and told Wells to "write [his] initials there." (AC ¶ 27.)[3] Wells then asked, "[C]an I write that's the one who supposed to have shot me?" (*Id.*) Wells wrote a statement to that effect on the photo array as Detective Gamble continued to point to Plaintiff's picture. (*Id.*)

[3]     The exhibit attached to the AC is sixteen pages of a transcript of the Wells interview. The alleged conversation concerning that identification is not captured within those sixteen pages, and the transcript appears incomplete, given that the portion provided does not contain the conversation alleged to have taken place regarding the identification and because the end of the

transcript lacks the common niceties associated with the conclusion of an interview. Thus, there is a reasonable inference that the identification occurred later on during the interview, after Plaintiff informed the detectives that he saw Plaintiff on the night of the shooting and heard that Plaintiff was the shooter.

In 2013, Detectives Gamble and Clarke asked their supervisor, Lieutenant Manzione, what they should do with the photo array, the other pictures, and the video tape (presumably of the interview, but the AC does not make that clear). (*Id.* ¶ 28.) According to Clarke, Manzione replied, "[D]on't lose it and don't do anything with it," which Plaintiff alleges constitutes a violation of MVPD rules and regulations. (*Id.*) At some point prior to Plaintiff's subsequent criminal trial arising from the August 8, 2011 incident, the original array was lost and was not presented to the Court, although a photocopy of the photo array exists. (*Id.* ¶¶ 27 n.3, 28.)

On December 2, 2013, MVPD Detective Christopher DiMase interviewed Tyshawn ("Cali") Burroughs, who, despite previously stating that he had no knowledge of the shooting, reported that he was a witness and that Plaintiff was the shooter. (*See id.* ¶ 45; Doc. 20-8.) In his report dated December 5, 2013, DiMase noted several inconsistencies in Burroughs's account and that Burroughs admitted to telling DiMase what he wanted to hear so that DiMase would help Burroughs get out of two outstanding warrants. (AC ¶ 48; Doc. 20-8.) When DiMase turned in his report, ADA Prisco of the Westchester County District Attorney's Office told DiMase not to put his opinion in his reports. (AC ¶¶ 46-47.)

On or about April 7, 2016, ADA Prisco filed a material witness application for Burroughs to procure his grand jury testimony. (Doc. 20-9.) When Plaintiff's counsel requested a copy of that application, ADA Prisco initially produced a redacted copy of the affidavit and did not produce an unredacted version until trial. (AC ¶¶ 51-52.) Plaintiff likewise did not receive a copy of DiMase's December 5, 2013 report until trial and asserts that it should have been produced when Plaintiff demanded it in an omnibus motion. (*Id.* ¶ 49.)

Testimony was presented to a grand jury, (*see id.* ¶ 48), Plaintiff was indicted for the shooting, and the case proceeded to a jury trial beginning in April 2017, (*see id.* ¶ 52).[4] ADA Prisco turned over unredacted copies of material witness applications during the trial, but Plaintiff alleges, without further explanation, that by that time "it was too late." (AC ¶ 52.) He further asserts that ADA Prisco admitted in her

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 25 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

closing argument that the City of Mount Vernon and its police officers were liable for losing evidence when she stated, among other things, that their actions were "inexcusable" and that disciplinary action should be taken. (*Id.* ¶¶ 53, 62; Doc. 20-12 at 34:22-36:7.)

4    Although Plaintiff does not explicitly allege in his AC that he was indicted by a grand jury, he references the grand jury proceedings, (*see* AC ¶ 48; *see also* Doc. 20-9 (application for Material Witness Order to secure attendance of Burroughs before grand jury) ), and the subsequent trial, (*see* AC ¶ 52, Doc. 20-1), and murder charges can only be brought by indictment, (*see* N.Y. Const. art. I, § 6; N.Y. Crim. Pro. Law § 195.10(1)(b) ), so he must have been indicted. Plaintiff concedes as much. (*See* P's City Opp. at 2, 9.)

**\*3** On or about May 16, 2017, the jury rendered a verdict of not guilty, (AC at 36 n.1), and the court ordered that the matter be sealed pursuant to New York Criminal Procedure Law § 160.50, (Doc. 20-1).

### B. Procedural History

Plaintiff commenced the instant action on June 14, 2017, asserting claims under 42 U.S.C. §§ 1983 and 1988 against Westchester County; Anthony Scarpino, the District Attorney for Westchester County; the City of Mount Vernon; Ibanez; Gamble; Clarke; Manzione; Addison; and Baltimore. (Doc. 1.) A pre-motion conference was held on September 11, 2017, at which time the parties and the Court discussed Defendants' anticipated motions to dismiss. (Minute Entry dated Sept. 11, 2017.) At that conference, the Court granted Plaintiff leave to file an amended complaint, (*id.*), which Plaintiff filed on November 13, 2017, (Doc. 18). The Amended Complaint removes Scarpino as a defendant, adds ADA Prisco, and asserts the following claims: (1) deprivation of civil rights under 42 U.S.C. § 1983; (2) false arrest and false imprisonment; (3) malicious prosecution; (4) malicious abuse of process; (5) denial of the right to a fair trial; (6) § 1983 conspiracy; (7) failure to intervene; (8) municipal liability; (9) negligent hiring, retention, supervision, and training; (10) malicious prosecution in violation of New York law; (11) negligent infliction of emotional distress in violation of New York law; (12) negligent hiring, supervision, and retention in violation of New York law; and (13) negligent training and supervision in violation of New York law. (AC at 1; *id.* ¶¶ 64-152.) All claims seem to be advanced against all Defendants.

On April 18, 2018, Defendants filed their bundled motion papers, including the County Defendants' motion to dismiss, (Doc. 27), and memorandum of law in support of that motion, (Doc. 28 ("County Ds' Mem.") ); the City Defendants' motion to dismiss, (Doc. 31), and memorandum of law in support of that motion, (City Ds' Mem.); the County Defendants' reply, (Doc. 30); and the City Defendants' reply, (Doc. 34). Plaintiff filed his opposition briefs on November 8 and 9, 2018, (Doc. 35 ("P's City Opp.") ; Doc. 36 ("P's County Opp.") ), although hard copies of both briefs were provided to the Court well before that date.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

**\*4** In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 26 of 76

– but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2) ). [5]

[5]     In his opposition briefs, Plaintiff repeatedly faults Defendants for citing cases addressing motions for summary judgment. (*See, e.g.,* P's City Opp. at 12; P's County Opp. at 12.) Although the legal standards governing motions for summary judgment and motions to dismiss differ, Defendants rely on summary-judgment decisions merely to recite the elements of the claims, the plausibility of which the Court is to assess. Accordingly, Plaintiff's attempts to distinguish those cases solely on the basis that they are summary-judgment decisions is unavailing.

**B. Documents Properly Considered**

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint ..., and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). To be incorporated by reference, the complaint must make "a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation marks omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotation[s] from the document is not enough." *Goel*

*v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alteration in original) (citation and internal quotation marks omitted).

I may consider the exhibits attached to Plaintiff's AC: (1) a certification of acquittal dated May 16, 2017, (Doc. 20-1); (2) Plaintiff's initial complaint dated May 31, 2017, (Doc. 20-2); (3) excerpts from the MVPD Department Manual, (Doc. 20-3); (4) complaints filed in two other lawsuits against the City of Mount Vernon, Ibanez, and others, (Docs. 20-4, 20-5, 20-6); (5) a list of cases in which Plaintiff asserts courts have found violations of constitutional rights, based on facts similar to those alleged by Plaintiff, on the part of prosecutors or police officers (most of whom are not identified in the decisions cited, and none of whom are identified as Defendants in this action), (Doc. 20-7); (6) DiMase's report dated December 5, 2013 concerning his interview of Burroughs, (Doc. 20-8); (7) redacted and unredacted versions of ADA Prisco's April 7, 2016 material witness application concerning Burroughs, (Doc. 20-9); (8) a copy of a photo array in which Plaintiff alleges that "Clifton Wells [i]dentified Plaintiff," (AC at 20; Doc. 20-10); (9) an excerpt of the transcript of the October 1, 2012 audio recorded interview of Wells, (Doc. 20-11); (10) transcript excerpts from the underlying criminal case, including portions of sworn witness testimony and ADA Prisco's summation, (Doc. 20-12); and (11) an April 25, 2017 letter from ADA Prisco to Plaintiff's counsel and another attorney concerning statements made by Young and an excerpt of ADA Prisco's examination of Young at an unspecified proceeding, (Doc. 20-13).

**\*5** The Court notes, however, that the exhibits attached to Plaintiff's AC total over 150 pages. Some of the exhibits are not cited in the paragraphs of the AC, while others are referenced generally and without any pincites. "While the Federal Rules of Civil Procedure do not categorically bar the practice of attaching exhibits to a complaint," *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 422, 466 n.78 (E.D.N.Y. 2007), the Court is under no obligation to scour the exhibits attached to a complaint "with no guidance as to which specific allegations are intended to be deemed incorporated," *id.* at 466; *see Cleveland v. Breslin*, No. 97-CV-486, 1997 WL 275101, at *2 (N.D.N.Y. May 16, 1997) ("Plaintiff may, of course, attach exhibits to his amended complaint, however, the Court will not independently examine exhibits that [he] does not specifically reference (by the exhibit's page number) in his amended complaint."). This is particularly true where, as here, the plaintiff is represented by counsel.

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

The County Defendants attached seven exhibits to the declaration of their counsel (Doc. 29 ("Adin Decl.") ): (1) a transcript dated September 27, 2017 of an examination of Plaintiff pursuant New York General Municipal Law § 50-h, (*id.* Ex. 1); (2) the Notice of Claim that Plaintiff served on the County of Westchester, (*id.* Ex. A); (3) the Demand for Examination served by the County on Plaintiff, (*id.* Ex. B); (4) a September 20, 2017 letter from the County Defendants' counsel to Plaintiff's counsel, (*id.* Ex. C); (5) a September 22, 2017 letter from Plaintiff's counsel to counsel for the County Defendants, (*id.* Ex. D); (6) a September 6, 2017 letter from the County Defendants' counsel to Plaintiff's counsel, (*id.* Ex. E); and (7) a September 22, 2017 letter from the County Defendants' counsel to Plaintiff's counsel, (*id.* Ex. F).

The City Defendants attached fifteen exhibits to the declaration of their counsel, (Doc. 33 ("Bushnell Decl.") ): (1) a copy of Plaintiff's AC, excluding the exhibits, (*id.* Ex. A); (2) the Molineux/Ventimiglia Application of the Westchester County District Attorney's Office in the underlying criminal proceeding, (*id.* Ex. B); (3) the Westchester County Court Judge's May 4, 2017 "Decision After Hearing" on the prosecution's *Sirois* motion in the underlying criminal case, (*id.* Ex. C); (4) portions of transcripts from pre-trial hearings in the underlying criminal action, (*id.* Ex. D); (5) excerpts of transcripts from the trial in the underlying criminal case, (*id.* Ex. E); (6) the indictment in the underlying criminal case, (*id.* Ex. F); (7) the transcript of the Westchester County Court Judge's decision denying Plaintiff's motion for a Trial Order of Dismissal in the underlying criminal action, (*id.* Ex. G); (8) an MVPD Incident Report dated August 8, 2011, (*id.* Ex. H); (9) an MVPD Supplementary Report dated August 12, 2011 concerning the Wells interview at Jacobi Medical Center, (*id.* Ex. I); (10) Wells's statement to the MVPD dated August 8, 2011, (*id.* Ex. J); (11) Smith's statement to the MVPD dated August 9, 2011, (*id.* Ex. K); (12) Smith's statement to the MVPD dated August 15, 2011, (*id.* Ex. L); (13) Brown's statement to the MVPD dated August 9, 2011, (*id.* Ex. M); (14) an MVPD supplemental report dated May 13, 2013 concerning the Wells interview in South Carolina, (*id.* Ex. N); and (15) Jason Dulyx's statement to the Criminal Investigation Unit of the Westchester County District Attorney's Office dated November 13, 2015, (*id.* Ex. O).

The Court need not determine whether Defendants' exhibits are properly considered in deciding the instant motion because, aside from the AC (which is, of course, properly considered), the documents submitted have no bearing on the Court's analysis.[6]

[6]   The Court notes, however, that the City Defendants seem to want the Court to rely on at least some of these documents for the truth of the matters asserted therein. While the Court may take judicial notice of public documents, it may do so only for the fact of their existence, not for their truth. *See, e.g., Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## III. DISCUSSION

### A. Rule 8

**\*6** Rule 8(a) of the Federal Rules of Civil Procedure provides that a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). " 'When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that ... are redundant or immaterial ... or to dismiss the complaint.' " *Lafurno v. Walters*, No. 18-CV-1935, 2018 WL 2766144, at \*3 (E.D.N.Y. June 8, 2018) (alteration in original) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ) (collecting cases). Nevertheless, "[d]ismissal under Rule 8 is 'usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " *Warner Bros. Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 269 (S.D.N.Y. 2007) (citing *Salahuddin*, 861 F.2d at 42).

The County Defendants contend that the AC should be dismissed pursuant to Rule 8 because it employs group pleading and fails to notify each Defendant of the specific allegations asserted against him or her. (County Ds' Mem. at 15.) "It is well-established in this Circuit that plaintiffs cannot simply 'lump' defendants together for pleading purposes." *Canon U.S.A., Inc. v. F & E Trading LLC*, No. 15-CV-6015, 2017 WL 4357339, at \*7 (E.D.N.Y. Sept. 29, 2017); *see Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 236 (S.D.N.Y. 2014). Indeed, "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." *Canon U.S.A.*, 2017 WL 4357339, at \*7 (internal quotation marks omitted). But Rule 8 "does not demand that a complaint be a model of clarity," *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order), and "nothing in Rule 8

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each," *Canon U.S.A.*, 2017 WL 4357339, at *7 (internal quotation marks omitted). Whether a complaint should be dismissed based on impermissible group pleading hinges on "whether adequate notice is given" that "will enable the adverse party to answer and prepare for trial ... and identify the nature of the case." *Id.* (internal quotation marks omitted); *see Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004).

Plaintiff's claims here are inexcusably asserted against all Defendants or all individual Defendants. (*See* AC ¶¶ 64-152.) "[T]his technique muddles the clarity of the allegations," *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-CV-7639, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015), particularly because Plaintiff has not pleaded factual allegations that would support some of the claims against certain Defendants and because he "asserts his claims in conclusory fashion without tying them to the facts he has recited," *Lobban v. Cromwell Towers Apartments, LP*, No. 18-CV-247, 2018 WL 5447544, at *6 (S.D.N.Y. Oct. 29, 2018). Nevertheless, the factual allegations preceding the claims largely specify which Defendant did what, thereby putting the Defendants on notice of Plaintiff's claims. Thus, while the AC is far from clear, and while Plaintiff's carelessness put a needless burden on Defendants and the Court in determining what Plaintiff intended to allege, the group pleading alone does not rise to the level of a Rule 8 violation sufficient to dismiss the AC in its entirety. *See Vantone Grp.*, 2015 WL 4040882, at *4. To the extent Plaintiff's allegations underlying a particular cause of action are insufficient to provide notice to a particular defendant, the Court will dismiss that claim accordingly.

**\*7** Group pleading is not the only problem with the Complaint. It is written as if intended for a reader fully familiar with the ins and outs of the underlying criminal prosecution. Little effort has been made to provide a comprehensible narrative. Likewise, Plaintiff's briefs are rambling, disorganized, conclusory, and lacking in authority. Were Plaintiff *pro se* and entitled to "special solicitude," *e.g.*, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006), the hours spent unraveling his claims and arguments would have been appropriate. But the Court should not have to make such efforts when the plaintiff is represented by counsel.

**B. Absolute Immunity for ADA Prisco**

ADA Prisco argues that she is immune from suit under § 1983. (County Ds' Mem. at 5-7.) "It is by now well established that a state prosecuting attorney who acted within the scope of [her] duties in initiating and pursing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of N.Y.*, 424 F.3d 231, 236 (2d Cir. 2005) (citation and internal quotation marks omitted) (collecting cases). "Because the immunity attaches to the official prosecutorial function and because the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions, the prosecutor has absolute immunity for the initiation and conduct of a prosecution unless [she] proceeds in the clear absence of all jurisdiction." *Id.* at 237 (citations and internal quotation marks omitted). Prosecutorial functions include "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas." *Simon v. City of N.Y.*, 727 F.3d 167, 171 (2d Cir. 2013). "A prosecutor is ... entitled to absolute immunity despite allegations of h[er] 'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information,' " notwithstanding the " 'reprehensible' " nature of that conduct. *Shmueli*, 424 F.3d at 237 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976) ); *see Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009) (prosecutor absolutely immune from liability under § 1983 for alleged *Brady* violation).

If, however, a prosecutor acts in an administrative or investigative capacity, she may claim only qualified immunity. *See Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987); *see also Green v. County of Monroe*, 423 F. App'x 98, 100 (2d Cir. 2011) (summary order) ("[A] prosecutor is entitled only to qualified immunity where she 'performs the investigative functions normally performed by a detective or police officer.' ") (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ). "[T]here are no bright lines between quasi-judicial absolutely immune conduct, on the one hand, and investigative and administrative equally immune behavior, on the other...." *Day v. Morgenthau*, 909 F.2d 75, 77 (2d Cir. 1990) (internal quotation marks omitted). But pursuing charges against a particular individual clearly falls within the prosecutorial phase of a criminal proceeding, while arrests and searches are typically police functions and are not prosecutorial simply because a prosecutor is involved. *Id.* at 77-78.

ADA Prisco asserts that she is immune from suit because she is sued only in her official capacity and the allegations against

her pertain to actions taken within the scope of her duties in initiating and pursing a criminal prosecution. (County Ds' Mem. at 5-7.) Those actions include telling Detective DiMase in or around December 2013 not to put his opinion in reports detailing witness accounts, (*see* AC ¶¶ 46-47; Doc. 20-8); procuring witness testimony before the grand jury notwithstanding witness credibility issues, (*see* AC ¶ 48); failing to disclose DiMase's December 5, 2013 report of his conversation with Burroughs when it was demanded in an omnibus motion, (*id.* ¶ 49); disclosing a redacted copy of a material witness order application, (*id.* ¶¶ 51-52); and making certain statements during her closing argument at trial, (*id.* ¶ 53). In his opposition brief, Plaintiff contends that ADA Prisco is not absolutely immune insofar as the claims pertain to her giving advice to police during the investigation and her failure to turn over exculpatory evidence. (P's County Opp. at 3-5.)

**\*8** Plaintiff is correct that "absolute immunity does not protect a prosecutor's actions during the early stages of a case, such as 'when a prosecutor gives advice to police during a criminal investigation.' " *Fiorito v. DiFiore*, No. 13-CV-2691, 2014 WL 4928979, at \*6 (S.D.N.Y. Oct. 2, 2014) (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) ); *see Simon*, 727 F.3d at 172 ("Absolute immunity is ... not available for the act of giving legal advice to the police in the investigative phase of a criminal case....") (internal quotation marks omitted). As the Supreme Court has stated, "advising the police in the investigative phase of a criminal case is [not] so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity." *Burns v. Reed*, 500 U.S. 478, 493 (1991) (internal quotation marks omitted). Additionally, the Second Circuit has explained that a prosecutor's "supervision of and interaction with law enforcement agencies in *acquiring* evidence which might be used in a prosecution ... are of a police nature and are not entitled to absolute protection." *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987) (emphasis in original).

Here, Plaintiff alleges that in or around December 2013, ADA Prisco advised MVPD Detective DiMase not to include his opinion in his investigative reports. (AC ¶¶ 46-48.) [7] This seemingly was in response to DiMase's decision to note that Burroughs, a self-identified witness to the shooting, presented credibility problems. (*See id.* ¶¶ 45-48; Doc. 20-8 at 1-2.) Using my "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, I regard ADA Prisco's directive to Detective DiMase as prosecutorial, not investigative. An ADA is aware that reports of interviews will, if the witness is called at trial or the information is exculpatory, eventually be turned over to the defendant. Thus, in cautioning a police officer against including the officer's analysis in the report – which would give the defendant a benefit to which he is not entitled and in a sense do defense counsel's work for him or her – the ADA would be wearing her prosecutorial hat, not her investigative one. Nothing about such an instruction affects the collection or preservation of evidence, and it cannot plausibly be regarded as investigative.

[7]     Plaintiff also asserts that ADA Prisco was acting in an investigative capacity when she directed Detective DiMase to interview Burroughs. (P's County Opp. at 4.) Although the AC includes allegations that ADA Prisco had a conversation with DiMase after he submitted his report of the interview, (*see* AC ¶ 47), Plaintiff does not allege in his AC that Prisco directed DiMase to interview Burroughs. Because Plaintiff is not permitted to amend his AC through his opposition brief, *see, e.g., Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) (collecting cases), the Court declines to consider whether the directive constitutes a prosecutorial or investigative function (although it seems likely to be the latter). In any event, it is hard to see how directing a police officer to interview a potential witness could violate anyone's rights.

Further, even if ADA Prisco's directive to DiMase was of police nature, thereby precluding absolute immunity, she would at the very least be qualifiedly immune, because there is no clearly established law that such an instruction is unconstitutional. *See, e.g., Buckley*, 509 U.S. at 268 (government officials entitled to qualified immunity and "are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (internal quotation marks omitted). Indeed, there is no claim at all. There is no right to have an officer's opinion in a police report and, in any event, Plaintiff received the report at issue containing Detective DiMase's opinion, (*see* AC ¶ 49; Doc. 20-8 at 1-2), and does not specify any harm from the timing of its receipt.

**\*9** Plaintiff's contentions concerning alleged *Brady* violations arising from ADA Prisco's failure to disclose exculpatory or impeachment evidence arising from Detective DiMase's interview of Burroughs are similarly without merit. Prior to Plaintiff's indictment, ADA Prisco had no obligation

Case 1:25-cv-00991-GTS-TWD     Document 4     Filed 10/07/25     Page 30 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

to disclose *Brady* material and thus Plaintiff is not entitled to damages. *See Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (*Brady* obligation is to disclose "material evidence favorable to *the defendant in a criminal prosecution*") (emphasis added) (internal quotation marks omitted); *United States v. Smith*, 824 F. Supp. 420, 424 (S.D.N.Y. 1993) (noting absence of precedent for proposition that government is obligated to turn over *Brady* material before indictment is even filed). Further, assuming for the sake of argument that ADA Prisco did not timely disclose the report – which is not pleaded, *see United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001) (government suppresses evidence within meaning of *Brady* only if exculpatory material not disclosed in time for effective use at trial); *see also* AC ¶ 49 (Plaintiff received DiMase report of Burroughs interview during trial); P's City Opp. at 6 (Burroughs did not testify at trial) – Plaintiff likewise cannot obtain damages under § 1983 for any alleged *Brady* violations that occurred post-indictment because a prosecutor is absolutely immune from liability under § 1983 for such violations. *Warney*, 587 F.3d at 125. [8]

[8] Furthermore, most courts have held that "an acquittal extinguishes a Section 1983 plaintiff's due process claim for nondisclosure of *Brady* material." *Ambrose v. City of N.Y.*, 623 F. Supp. 2d 454, 469 (S.D.N.Y. 2009) (collecting cases). Finally, there would be no claim, even absent immunity, for what Plaintiff alleges Prisco did: until she sought a material witness warrant for Burroughs in 2016, she "sat on" the fact that Burroughs lied in his 2013 interview. (P's County Opp. at 5; *see id.* at 4.) How this violated *Brady*, when Burroughs never testified at trial, (*id.* at 6), and when the allegedly false account was inculpatory, remains a mystery.

As for the other alleged conduct, Plaintiff fails to respond to ADA Prisco's arguments that she is immune from suit for procuring witness testimony before the grand jury, responding to defense counsel's requests, or for statements during her closing argument at trial. Accordingly, Plaintiff has abandoned his claims against Prisco arising from these allegations. *See Div. 1181 Amalgamated Transit Union v. R&C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, at *4 (E.D.N.Y. Feb. 7, 2018) (court has discretion to deem claim abandoned when defendant moves to dismiss that claim and plaintiff fails to address defendant's arguments in opposition brief); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where

review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."). Moreover, such actions are quintessentially prosecutorial, thereby giving rise to absolute immunity. *See Flagler v. Trainor*, 663 F.3d 543, 548-49 (2d Cir. 2011) (prosecutor absolutely immune for conduct in seeking material witness warrant); *Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995) ("[P]rosecutors are immune from § 1983 liability for their conduct before a grand jury."); *Mosley v. McIntosh*, No. 08-CV-9635, 2009 WL 1542546, at *3 (S.D.N.Y. May 29, 2009) ("[I]t is firmly established that a prosecutor cannot be sued under § 1983 on the basis of statements made in court during criminal proceedings against a defendant.").

Thus, Plaintiff's claims against ADA Prisco are dismissed.

### C. Failure to State a Claim

The City and the County Defendants move to dismiss each cause of action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). [9]

[9] Although, as stated above, ADA Prisco is immune from suit, the Court will address whether dismissal is also warranted as to her on the alternative ground that Plaintiff fails to state a claim.

#### 1. Deprivation of Civil Rights under 42 U.S.C. § 1983

**\*10** Plaintiff's first cause of action is a standalone claim for "deprivation of civil rights." (AC ¶¶ 64-70.) "If a civil rights complaint is to survive a motion to dismiss, it must make specific factual allegations indicating a deprivation of rights." *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) (collecting cases). Where a plaintiff fails to make specific factual allegations concerning the illegal conduct and the resultant harm, the complaint fails to state a claim for deprivation of civil rights under § 1983. *See Neustein v. Orbach*, 732 F. Supp. 333, 346 (E.D.N.Y. 1990). Additionally, because "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted), " 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the

Case 1:25-cv-00991-GTS-TWD   Document 4   Filed 10/07/25   Page 31 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Constitution,' " *Thomas v. Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) (quoting *Iqbal*, 556 U.S. at 676).

Here, Plaintiff summarily states that all of the Defendants violated his rights under the First, Fifth, Sixth, and Fourteenth Amendments. (AC ¶ 66; *see id.* ¶ 67.) This is plainly insufficient. It is entirely unclear which of his rights under those Amendments he alleges were violated and how the first cause of action is distinct from Plaintiff's other claims. *See Folk v. City of N.Y.*, 243 F. Supp. 3d 363, 371 (E.D.N.Y. 2017) (dismissing similar standalone § 1983 claim). Accordingly, Plaintiff's first cause of action is dismissed as to all Defendants.

### 2. False Arrest and False Imprisonment

Defendants also seek to dismiss Plaintiff's second cause of action, which is for false arrest and false imprisonment under § 1983. In New York, false arrest and false imprisonment claims are synonymous causes of action. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *Brome v. City of N.Y.*, No. 02-CV-7184, 2004 WL 502645, at *3 (S.D.N.Y. Mar. 15, 2004). In determining whether a plaintiff has sufficiently pleaded a claim for false arrest or false imprisonment under § 1983, courts look to state law. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

To plead a false arrest or false imprisonment claim under New York law, a plaintiff must establish: "(1) that the defendants intentionally confined plaintiff, (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged." *Liu v. N.Y. State Dep't of Health*, No. 16-CV-4046, 2017 WL 3319944, at *5 (S.D.N.Y. Aug. 7, 2017); *see Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003); *Singer*, 63 F.3d at 118. "An arrest is justified or privileged if ... it is based on probable cause." *LaFontaine v. City of N.Y.*, No. 08-CV-1555, 2009 WL 3335362, at *5 (S.D.N.Y. Oct. 14, 2009); *see Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). Once a law enforcement

officer "has a reasonable basis for believing there is probable cause" to arrest a suspect, "he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997), and "the validity of an arrest is not contingent upon an ultimate finding of guilt or innocence," *Bulanov v. Town of Lumberland Constable Meehan*, No. 00-CV-4292, 2002 WL 181365, at *4 (S.D.N.Y. Feb. 6, 2002).

**\*11** The City Defendants argue that, as a threshold matter, Plaintiff was never arrested because he was already serving an unrelated sentence when he was indicted. (City Ds' Mem. at 13-14.) Although "[a] claim for false arrest must be premised on an actual arrest," *Bissinger v. City of N.Y.*, No. 06-CV-2325, 2007 WL 2826756, at *8 (S.D.N.Y. Sept. 24, 2007) (collecting cases), and the AC is silent as to whether Plaintiff was arrested, a claim for false imprisonment need not be premised on an arrest, *see Emanuel v. Griffin*, No. 13-CV-1806, 2015 WL 1379007, at *11 n.3 (S.D.N.Y. Mar. 25, 2015). [10] Thus, dismissal on this basis is unwarranted.

10        Defendants concede that after his unrelated sentence was over, Plaintiff was detained for some months until his acquittal for the August 8, 2011 shooting. (City Ds' Mem. at 8 n.9.)

The City and County Defendants assert that the claim should be dismissed because there was probable cause to arrest or confine Plaintiff, particularly because Smith, a witness to the shooting, identified Plaintiff as the shooter and Wells relayed that others had told him that Plaintiff had shot him. (*See* City Ds' Mem. at 14-15; County Ds' Mem. at 8-9.) Although Plaintiff acknowledges the legal standard for determining whether the alleged lack of probable cause is plausible, he completely fails to address Defendants' arguments. (*See* P's City Opp. at 10; P's County Opp. at 8.) He states that probable cause determinations are based on the totality of the circumstances and that "the Court should utilize these factors" – factors that he does not specify – but provides no more than a conclusory assertion that probable cause was lacking. (*See* P's City Opp. at 10.)

Plaintiff alleges in his AC that Smith initially told police that she did not see the shooter, but later identified Plaintiff as the shooter and reported that she had been afraid to identify Plaintiff. (AC ¶¶ 24-25.) Although Plaintiff pleads that Smith had outstanding bench warrants and open cases at the time she identified Plaintiff as the shooter, he does not allege that

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

the officers had reason to believe she was lying when she made that identification,[11] nor is it plausible to infer that she was being untruthful merely from the fact that matters were pending against her or because she was too afraid to identify Plaintiff initially. (*See id.*) To the contrary, "[u]nder New York law an identified citizen informant is presumed to be reliable." *Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002). Plaintiff further alleges that Wells, the victim who survived the shooting, informed MVPD detectives on October 1, 2012, that he had seen Plaintiff the night of the shooting and that he had heard from his cousins and others both that Plaintiff was the shooter and that he was trying to apologize to Wells. (*See* AC ¶¶ 26-27; Doc. 20-11 at 5:13-18, 15:6-15.)[12] Plaintiff does not allege that Wells was lying or mistaken or had been given false information, let alone that the officers had reason to believe that any of that was the case. Nor does he allege facts that would otherwise have led, let alone required, the officers to discount the veracity of Smith's and Wells's accounts. Instead, Plaintiff contends that probable cause was lacking simply because Burroughs lacked credibility. (*See* P's County Opp. at 8.) But Burroughs's lack of reliability has no bearing on the trustworthiness of other witnesses, and that allegation is insufficient to plead that Defendants pursued Plaintiff in the knowing absence of probable cause. *Cf. Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (rejecting argument that conflicting accounts negates probable cause).

[11]  Indeed, Plaintiff does not even allege in the AC that Smith was in fact lying.

[12]  Hearsay may be considered in connection with probable cause to arrest even if it would be inadmissible at trial. *Draper v. United States*, 358 U.S. 307, 311-12, 312 n.4 (1959).

**\*12** Plaintiff goes on at length about the trial evidence, (*see, e.g.*, P's City Opp. at 2-8), but whether there was probable cause to arrest or charge, and whether there was proof beyond a reasonable doubt, are two entirely different things. *See, e.g., United States v. Traylor*, No. 07-CR-6125, 2009 WL 87470, at \*10 (W.D.N.Y. Jan. 12, 2009) (adopting report and recommendation), *aff'd*, 396 F. App'x 725 (2d Cir. 2010) (summary order); *Dale v. Kelley*, 908 F. Supp. 125, 135 (W.D.N.Y. 1995), *aff'd*, 95 F.3d 2 (2d Cir. 1996). "The same evidence can be insufficient for one but sufficient for the other." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 453 (D. Conn. 2002). In any event, the "[i]dentification of the suspect by a victim or eyewitness can constitute, by itself, probable cause to prosecute." *Nnodimele v. Derienzo*, No.

13-CV-3461, 2016 WL 337751, at \*8 (E.D.N.Y. Jan. 27, 2016); *see Rodriguez v. State of New York*, No. 95-CV-3639, 1996 WL 197749, at \*2 (S.D.N.Y. Apr. 23, 1996) ("[T]he identification of an individual as the perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth.").[13] Nor does the existence of potentially exculpatory evidence negate probable cause, as long as there are "facts and circumstances supporting a reasonable belief that a prosecution could succeed." *Nnodimele*, 2016 WL 337751, at \*10 (internal quotation marks omitted). Here, Smith made an eyewitness identification of Plaintiff as the shooter, and the information provided by Wells corroborated her. At the very least, an officer involved in the arrest would be entitled to qualified immunity, because it cannot be said that all reasonable officers would agree that Smith's initial reluctance to identify the perpetrator of a violent act and her open cases made her so incredible that her information should be disregarded. *See, e.g., Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (officer qualifiedly immune if reasonable officers could disagree on whether probable cause test was met). Certainly no clearly established law required that conclusion. *See Buckley*, 509 U.S. at 268; *Amore*, 624 F.3d at 530.[14]

[13]  "[T]he testimony of a single, uncorroborated eyewitness is" even "generally sufficient to support a conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979).

[14]  Although Defendants have not advance a qualified-immunity defense, the court can address the issue *sua sponte. See Ottati v. City of Amsterdam*, No. 06-CV-1370, 2011 WL 1204763, at \*2 (N.D.N.Y. Mar. 28, 2011); *Doyle v. Coombe*, 976 F. Supp. 183, 187 (W.D.N.Y. 1997), *aff'd*, 159 F.3d 1346 (2d Cir. 1998).

Based on the allegations in the AC, reasonably trustworthy information existed that was sufficient to warrant a person of reasonable caution in the belief that Plaintiff had committed a crime, *see Escalera*, 361 F.3d at 743, or at the very least reasonable officers could disagree on the point. Thus, Plaintiff's second cause of action is dismissed as to all Defendants.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 33 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

### 3. Malicious Prosecution

Plaintiff's third cause of action is for malicious prosecution under § 1983. Like claims for false arrest, "[c]laims for ... malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for ... malicious prosecution under state law." *Jocks*, 316 F.3d at 134 (quoting *Weyant*, 101 F.3d at 852). To prevail on a malicious prosecution claim under New York law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 136 (internal quotation marks omitted). A plaintiff bringing a § 1983 malicious prosecution claim must also plead a post-arraignment seizure, although "the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score," *id.*, and that the "the criminal proceedings against him were terminated in a manner indicating his innocence," *Lanning v. City of Glens Falls*, No. 17-970, 2018 WL 5810258, at *7 (2d Cir. Nov. 7, 2018).

The City Defendants contend that Plaintiff's malicious prosecution claim should be dismissed as to them because Plaintiff has failed to plead that the City Defendants initiated the prosecution, that they lacked probable cause, or that they were motivated by actual malice. (City Ds' Mem. at 15-19.) Plaintiff's response is difficult to follow. In "Point Two" of his opposition brief, the heading for which states that he has pleaded sufficient facts for malicious prosecution, Plaintiff addresses only the third element of a malicious prosecution claim, (P's City Opp. at 11-12), and states that "his complaint for False Arrest and False Imprisonment should be allowed to go forward," (*id.* at 12). Subsections A and B to Plaintiff's "Point Eight," which pertains to Plaintiff's *Monell* claim, appear to contain additional arguments as to why Plaintiff's § 1983 malicious prosecution claim should proceed. (*See id.* at 18-19.) Specifically, he asserts that the great lengths the City Defendants took to investigate show that they initiated the prosecution and states, without explanation, that his claim is plausible. (*See id.*)

**\*13** With respect to the first element of a malicious prosecution claim, "[t]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." *Culpepper*

*v. City of N.Y.*, No. 14-CV-6585, 2016 WL 5334978, at *5 (S.D.N.Y. Sept. 21, 2016) (internal quotation marks omitted). That presumption may be rebutted where an officer "ha[d] the plaintiff arraigned, ... fill[ed] out complaining and corroborating affidavits, [or] sign[ed] felony complaints," *Mitchell v. Victoria Home*, 434 F. Supp.2d 219, 227 (S.D.N.Y. 2006); *see Llerando-Phipps v. City of N.Y.*, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005), where an officer "play[ed] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act," or where an officer withheld material exculpatory evidence from the prosecutor or knowingly prepared a false confession that formed the basis for the prosecution, *Manganiello v. City of N.Y.*, 612 F.3d 149, 163 (2d Cir. 2010) (alterations and internal quotation marks omitted); *see Stukes v. City of N.Y.*, No. 13-CV-6166, 2015 WL 1246542, at *9 (E.D.N.Y. Mar. 17, 2015) (collecting cases). Therefore, "[t]o initiate a prosecution, a defendant must do more than report the crime or give testimony." *Manganiello*, 612 F.3d at 163; *see Stukes*, 2015 WL 1246542, at *9 (no initiation of prosecution where officer merely had "typical interaction[s]" with the prosecutor's office by forwarding audio and video tapes to the office and reviewed those tapes with a prosecutor); *Smith v. City of N.Y.*, No. 04-CV-3286, 2010 WL 3397683, at *9 (S.D.N.Y. Aug. 27, 2010) (no initiation of prosecution where officer's "only involvement in the prosecution was relaying to the ADA his observations and the facts known to him regarding plaintiff's arrest and testifying before the grand jury"), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013) (summary order).

In light of these principles, the allegations concerning the conduct of Defendants Ibanez, Gamble, Clarke, Manzione, Adison, and Baltimore are insufficient to overcome the presumption that the Westchester County District Attorney's Office acted with independent judgment. There are no allegations that these officers had Plaintiff arraigned, filled out complaining or corroborating affidavits, signed any felony complaints, pressured or encouraged prosecutors to act, or otherwise played an active role in the prosecution. Indeed, the only officers specifically alleged to have interacted with the District Attorney's Office in connection with Plaintiff's criminal case are a Detective or Sergeant named "Wuttke," (AC ¶¶ 39-40), and Detective DiMase, (*id.* ¶¶ 45-48), neither of whom is a defendant in this action. Further, Plaintiff cites no authority for his contention that the extensive nature of the City Defendants' investigation renders it plausible that the City Defendants initiated or continued the

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 34 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

criminal proceeding against Plaintiff, and the Court has found none.

To the extent Plaintiff alleges that the presumption that the Westchester County District Attorney's Office acted with independent judgment is rebutted by MVPD officers' alleged suppression of exculpatory material or forwarding of fabricated evidence to prosecutors, his allegations are conclusory. He provides no facts whatsoever regarding fabricated evidence. Plaintiff alleges that Defendants lost a series of tapes and a thumb drive. (*Id.* ¶¶ 20-23, 28-31, 42, 44.) [15] He alleges that those tapes never revealed a time, (*id.* ¶ 21); that they "would have shown what type of day it was on the date in question and how people were dressed," (*id.* ¶ 28); that they would have provided Plaintiff an opportunity to "show contradictions of Sgt. Wuttke, *i.e.*, Clifton did not know the girls," (*id.* ¶ 41); and that "[f]rom the time that the police obtained the evidence, no one has ever seen it again," (*id.* ¶ 30). Whatever Plaintiff means by these statements, none of these allegations render it plausible that the evidence was exculpatory; indeed, Plaintiff does not even allege that the cameras at issue would have captured the crime. And he provides no information about what might have been contained in the thumb drive. There are simply no facts from which the Court can infer that the missing evidence would have had any effect on the prosecutor's decision-making, and thus the loss of the items – although inexcusable – cannot be said to amount to suppression of exculpatory evidence [16] sufficient to make the officers initiators of the prosecution.

[15]   Plaintiff also alleges that the officers lost the original copy of a photo array by failing to voucher and safeguard the evidence in accordance with MVPD protocols, (AC ¶ 28), but he does not appear to contend that the array was exculpatory, (*see id.* ¶ 27 (alleging that Wells wrote that Plaintiff was the "one who supposed to have shot [him]" on the array) ), or that the loss of the original, when a copy was preserved, harmed him.

[16]   Plaintiff does not even allege that the loss of the items was intentional as opposed to negligent.

**\*14**  To the extent Plaintiff alleges that the presumption is rebutted because he alleges that Detective Gamble manufactured Wells's identification of Plaintiff, the facts in the AC do not make that conclusion plausible. Plaintiff alleges that Detective Gamble pointed to Plaintiff's picture in a photo

array and instructed Wells to "write your initials there" after Wells had informed Detectives Gamble and Clarke that he saw Plaintiff the night of the shooting and "had heard on the street that [Plaintiff] was the shooter." (*Id.* ¶ 27.) That Gamble pointed to Plaintiff's photo made the identification useless, but does not amount to the fabrication of evidence. Indeed, Plaintiff concedes that the interaction between Gamble and Wells was captured on video, (*id.*), and does not allege that that video was withheld from the prosecutors. [17] Absent such an allegation, that Gamble botched a photo identification does not plausibly suggest that the District Attorney's decision to prosecute was not independent. [18]

[17]   Nor does he allege that the array or the video was withheld from him. To the contrary, he concedes that the trial judge suppressed the identification and the array was not used at trial. (P's City Opp. at 3.)

[18]   For reasons that elude the Court, Plaintiff attached to the AC a photo array other than the one initialed by Wells. (Doc. 20-10.) Plaintiff alleges that Wells asked if he could indicate on the array that Plaintiff was "the one who supposed to have shot me," and that he then wrote "that statement" on the array. (AC ¶ 27.) On the array attached to the AC, the photo of one individual (presumably Plaintiff) is circled and the following is written next to the photo: "I saw him run down the block with the gun and shoot it at Cliff." (Doc. 20-10.) That is clearly not Wells's array because it lacks his statement and because he would not have referred to himself in the third person. The AC implies that Ricky Young picked Plaintiff out of a photo array, (AC ¶ 43), and if the array attached to the AC is Young's, that identification – which Plaintiff alleges was repeated by Young before the grand jury, (*id.*) – only strengthens the probable cause to charge Plaintiff.

Because Plaintiff has not plausibly overcome the presumption that the initiation of the prosecution was an independent decision of the Westchester County District Attorney's Office, his malicious prosecution claim is dismissed as to the City Defendants. The Court therefore need not address the City Defendants' arguments concerning other deficiencies with respect to this claim.

The County Defendants also move to dismiss Plaintiff's malicious prosecution claim, arguing that Plaintiff has failed

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 35 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

to plead the absence of probable cause or actual malice. (County Ds' Mem. at 9-11.) With respect to the absence of probable cause, Defendants contend that the AC alleges that probable cause existed in 2015. Indeed, the AC does seem to imply that the police and prosecutors had probable cause at some point in 2015, (see AC ¶ 29), which is before the grand proceedings were commenced in April 2016, (see id. ¶ 48). The County Defendants further argue that the grand jury indictment establishes probable cause and that the witness identifications of Plaintiff as the shooter also establish probable cause. (County Ds' Mem. at 9-10.) As for malice, Defendants contend that Plaintiff's allegations that "Defendants misrepresented and falsified evidence before the District Attorney of the County of Westchester County [sic]," (AC ¶ 77), and that "Defendants did not make a complete, full and truthful statement of facts to the District Attorney," (id. ¶ 78), defeat any argument that Plaintiff has plausibly pleaded that ADA Prisco acted with malice. (County Ds' Mem. at 10-11.) Although the phrase "malicious prosecution" does not appear in Plaintiff's opposition to the County Defendants' motion, he seems to argue that ADA Prisco lacked probable cause because she knew since December 2013 that Burroughs was not being truthful and that he has properly pleaded that ADA Prisco acted with malice because she failed to turn over *Brady* material for the two-and-a-half years preceding the grand jury proceedings, prosecuted Plaintiff notwithstanding her knowledge concerning Burroughs's untruthfulness, and made certain statements during her summation – statements that do not appear in the AC and that Plaintiff does not clearly identify in his opposition brief. (See P's County Opp. at 8-10.) [19]

[19] The only reference in the AC to Prisco's summation is to her argument that the City officers' incompetence in connection with the missing video evidence should not deprive the deceased of justice, (AC ¶ 53; Doc. 20-12 at 33-36), an argument that Plaintiff somehow construes as an admission of the City's liability, (AC ¶ 53).

*15  In the malicious prosecution context, a grand jury indictment creates a presumption of probable cause. *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003). That presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Id.* (emphasis in original) (quoting *Colon v. City of N.Y.*, 455 N.E.2d 1248, 1251 (N.Y. 1983) ). The burden of rebutting that presumption lies with the plaintiff, *id.* at 73, and a malicious prosecution

claim may be "dismiss[ed] ... at the pleading stage where the plaintiff has failed to allege facts sufficient to rebut the presumption of probable cause flowing from a grand jury indictment," *Hadid v. City of N.Y.*, 730 F. App'x 68, 71 n.1 (2d Cir. 2018) (summary order) (collecting cases).

Here, Plaintiff's indictment by a grand jury creates a presumption of probable cause. The facts alleged in the AC do not rebut that presumption. Plaintiff does not provide specific allegations concerning the evidence presented to the grand jury that would allow the court to draw the reasonable inference that the indictment was a product of fraud or other misconduct. *See Lewis v. City of N.Y.*, 591 F. App'x 21, 22 (2d Cir. 2015) (summary order). To the contrary, as discussed in connection with Plaintiff's second cause of action, the facts alleged in the AC show that there was probable cause to initiate a criminal proceeding against Plaintiff notwithstanding issues pertaining to Burroughs's credibility, and Plaintiff does not allege that anything developed during the course of the prosecution that would have dissipated probable cause. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996); *Gaston v. City of N.Y.*, 851 F. Supp. 2d 780, 793-94 (S.D.N.Y. 2012). Plaintiff contends in his opposition brief that "Jason was a liar and Cliff, Ricky and Jasmine," (P's County Opp. at 9), from which the Court understands Plaintiff to assert that Jason Dulyx, Clifton Wells, Ricky Young, and Jasmine Smith provided false statements. But the AC does not plausibly allege that the Defendants had any reason to believe that any of these witnesses gave false accounts (indeed, there are no allegations concerning Dulyx or his account), [20] and Plaintiff cannot amend a pleading through an opposition brief. *See, e.g., Maxim Grp. LLC*, 690 F. Supp. 2d at 308. Accordingly, Plaintiff's malicious prosecution claim is dismissed as to the County Defendants.

[20] That a witness may have given inconsistent accounts or have a criminal record hardly makes that person necessarily incredible. Were that the case, many crimes – particularly violent crimes – could never be prosecuted. Certainly no clearly established law requires an officer or prosecutor to disbelieve such a witness, and the Defendants would be entitled to qualified immunity even assuming the witnesses were lying.

Further, given the "broad investigative function [of] the grand jury," *United States v. Suleiman*, 208 F.3d 32, 40 (2d Cir. 2000), and the fact that "one of [its] chief functions [is] the evaluation of the strength of the evidence and the credibility

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

of witnesses," *United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990), it is hardly surprising that prosecutors sometimes present witnesses to the grand jury to see what they will say "once placed in the solemn atmosphere of the grand jury room," *United States v. Chen*, 933 F.2d 793, 798 (9th Cir. 1991). Indeed, it is not misconduct even if the prosecutor anticipates that the witness may lie. *Id.*

#### 4. Malicious Abuse of Process

The Defendants also move to dismiss Plaintiff's fourth cause of action, which is for malicious abuse of process. The elements of a claim for malicious abuse of process under § 1983 are derived from state law. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* " '[A] malicious motive alone does not give rise to a cause of action for abuse of process.' " *Savino*, 331 F.3d at 77 (alteration omitted) (quoting *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984) ). A plaintiff "must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.*

**\*16** The City and County Defendants contend that Plaintiff has failed to plead that they aimed to achieve a collateral objective beyond Plaintiff's prosecution. (City Ds' Mem. at 19-21; County Ds' Mem. at 10-11.) The City Defendants further argue that Plaintiff has failed to plead a malicious motive. (City Ds' Mem. at 19-21.) Plaintiff fails to address these arguments. Instead, he points to how the City Defendants lost evidence, contends that ADA Prisco elicited perjury (although it is not clear from the complaint when or how she did this), and reiterates the standard for deciding a motion to dismiss in general terms. (*See* P's City Opp. at 12-13; P's County Opp. at 10.) But it does not plausibly follow that merely losing evidence or eliciting testimony from a witness with credibility problems indicates that a defendant acted with the intent to do harm. Likewise, "tampering with evidence is not considered abuse of process because the goal or purpose – convicting the defendant – is a legitimate use of process." *Kraft v. City of N.Y.*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011) (summary order). Thus, even intentionally losing evidence or suborning perjury, absent a collateral purpose beyond

the desire to convict Plaintiff, is insufficient to state a claim for abuse of process. Because Plaintiff has failed to plausibly plead either bad intent or that Defendants were pursuing any objective other than convicting Plaintiff, his claim for malicious abuse of process is dismissed as to all Defendants. [21]

[21]  Having dismissed Plaintiff's abuse-of-process claim for failure to plead malice or a collateral objective, the Court need not address the City Defendants' contention that probable cause is a complete defense to an abuse-of-process claim. (City Ds' Mem. at 20.)

#### 5. Right to a Fair Trial

Plaintiff's fifth claim is for the denial of his right to a fair trial under § 1983. He alleges that Defendants created and suborned false evidence, that MVPD forwarded false evidence to prosecutors, and that Defendants misled the judges and prosecutors by providing false testimony and proffering false evidence. (AC ¶¶ 91-95.) Although it is apparent that Plaintiff asserts his fifth cause of action against the City Defendants, it is not clear whether he brings this claim against ADA Prisco as well.

"The Second Circuit has held that '[i]t is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer.' " *Morse v. Spitzer*, No. 07-CV-4793, 2013 WL 359326, at \*3 (E.D.N.Y. Jan. 29, 2013) (alteration in original) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ). To prevail on a claim for denial of a fair trial based on fabricated evidence, a plaintiff must prove that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order) (citing *Jocks*, 316 F.3d at 138); *see Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279-80 (2d Cir. 2016); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394-95 (S.D.N.Y. 2016). Probable cause is not a defense to a denial of a fair trial claim. *Morse*, 2012 WL 3202963, at \*5.

The City Defendants contend that this claim must be dismissed as to them because Plaintiff's allegations that the City Defendants falsified evidence and forwarded it to prosecutors are conclusory. (City Ds' Mem. at

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 37 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

21-22.) Plaintiff responds that he has plausibly pleaded a constitutional violation, asserting that he "has placed all these items in the [f]acts of the complaint with references to the trial transcripts for an exhibit for the Court to make it's [*sic*] conclusion." (P's City Opp. at 14.) Plaintiff further contends that he has properly pleaded a conspiracy to support his fair trial claim; that Defendants had "Tyshawn Burroughs, or Cliff Webb [*sic*], or Ricky Young" lie to help the District Attorney's Office indict Plaintiff and deprive him of a fair identification procedure; [22] and that Defendants lost evidence, thereby depriving Plaintiff of an alibi and his ability to testify at trial. (*Id.* at 14-15.) [23]

[22]    The Court assumes that Plaintiff's reference to "Cliff Webb" was a typographical error and that Plaintiff intended to refer to Clifton Wells. To the extent Plaintiff meant to refer to "Cliff Webb," there is no reference to such a person in the AC.

[23]    Plaintiff's opposition brief contains incomplete sentences and is confusingly worded. This is the Court's best attempt to discern Plaintiff's argument as to why he believes that he has properly pleaded a claim for denial of a fair trial.

**\*17** Plaintiff's response is emblematic of the problem with his AC: it is conclusory. Although Plaintiff states that he has properly pleaded a cause of action for the denial of a fair trial, he fails to cite a single paragraph of the AC to support that assertion. Instead, he seems to expect the Court to sift through his AC and the exhibits attached thereto to divine a claim. That, however, is not the role of the Court on a motion to dismiss.

Moreover, as previously discussed, Plaintiff has not plausibly alleged that the lost evidence was exculpatory. He also has not plausibly alleged in his AC that any of the City Defendants fabricated – that is "invent[ed], forge[d], or devise[d] falsely" – any evidence. *Fabricate*, Black's Law Dictionary (10th ed. 2014). Instead, he pleaded that Detective DiMase (who is not a defendant) candidly identified the inconsistencies in Burroughs's account. (AC ¶¶ 45, 48; Doc. 20-8.) [24] Plaintiff's allegations concerning Ricky Young's account, which are nearly impossible to follow, concern Officer Wuttke, not any of the Defendant officers. (*See* AC ¶¶ 39-44.) With respect to Wells, Plaintiff alleges that on August 9, 2011, unnamed officers obtained a statement that Wells did not see who shot him and that Wells told Detectives Gamble and Clarke in the fall of 2012 that, among other things, he heard on the

street that Plaintiff was the shooter. (AC ¶¶ 16, 27; Doc 20-11 at 15:6-18, 16:4-7.) Plaintiff does not allege that the Defendants concocted those aspects of Wells's account or even that they were false. The closest Plaintiff comes to pleading that evidence was fabricated is his allegation that Detective Gamble pointed to Plaintiff's picture in a photo array and said, "[W]rite your initials there," after Wells had stated that he had seen Plaintiff before the shooting and had heard that Plaintiff was the shooter. (AC ¶ 27.) But, as previously stated, this conduct does not implicate either to the fabrication of evidence and even if it did, Plaintiff concedes that the allegedly manufactured evidence was not used at his trial. (P's City Opp. at 3.)

[24]    Plaintiff concedes that Burroughs did not testify at trial. (P's City Opp. at 6.)

As for Plaintiff's contention that he has sufficiently pleaded the claim "via a conspiracy," (*id.* at 13), the allegations contained in his AC concerning his denial of a fair trial claim make no reference to a conspiracy, (*see* AC ¶¶ 92-95), and amendment by opposition brief will not be permitted, *see, e.g., Maxim Grp. LLC*, 690 F. Supp. 2d at 308. Moreover, as discussed below in connection with the § 1983 conspiracy claim, Plaintiff has failed to plausibly plead that the City Defendants were part of a conspiracy. Accordingly, Plaintiff's fifth cause of action is dismissed as to the City Defendants.

The County Defendants also seek dismissal of Plaintiff's denial of a fair trial claim, arguing that such a claim cannot arise absent a conviction and thus Plaintiff's acquittal extinguished the claim. (*See* County Ds' Mem. at 11.) In so arguing, Defendants point to *Schiavone Construction Co. v. Merola*, where the court concluded in the context of prejudicial pre-trial publicity that "no denial of a fair trial can be shown where the plaintiff was acquitted of the crime charged." 678 F. Supp. 64, 66 (S.D.N.Y.), *aff'd*, 848 F.2d 43 (2d Cir. 1988) (*per curiam* ). Plaintiff responds, without citing any authority, that an acquittal does not preclude his claim. (P's County Opp. at 10-11.)

**\*18** As a preliminary matter, the contours of Plaintiff's denial of a fair trial claim as to the County Defendants are unclear. Plaintiff alleges that "Defendants created suborned and created [*sic*] false evidence," (AC ¶ 92), but there are no specific allegations that ADA Prisco falsified evidence. He further asserts that "Defendants misled the judges and prosecutors by providing false testimony and proffering false evidence," (*id.* ¶ 94), but there are no specific allegations as to what evidence ADA Prisco presented that she knew was false.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 38 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Instead, Plaintiff alleges that ADA Prisco belatedly turned over evidence. (*See id.* ¶¶ 48-49, 52.) Courts have categorically rejected denial of a right to fair trial claims based on *Brady* violations where the plaintiff was not convicted in the underlying criminal trial. *See Tiscareno v. Frasier*, 603 F. App'x 672, 679 (10th Cir. 2015) (unpublished) (collecting cases); *see also Ambrose*, 623 F. Supp. 2d at 471 ("[T]he verdict acquitting Plaintiff of the criminal charges against him negates any violation of his *Brady* rights and extinguishes any Section 1983 due process claim that might arise from Defendants' alleged suppression of exculpatory evidence."). "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a *different verdict.*" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (emphasis added). Thus, where an individual is acquitted, he cannot establish that, had the exculpatory or impeachment evidence not been suppressed, there is a reasonable probability that the verdict would have been different.

Accordingly, Plaintiff has failed to state a claim for the denial of a right to a fair trial against the County Defendants as well.

6. Conspiracy

Plaintiff's sixth cause of action is a § 1983 conspiracy claim, which requires that he plausibly allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (internal quotation marks omitted).

The City and County Defendants contend that Plaintiff has failed to plead facts to plausibly allege a meeting of the minds sufficient to sustain a § 1983 conspiracy because he offers no more than conclusory, vague, and general allegations of a conspiracy to deprive him of his constitutional rights. (City Ds' Mem. at 22-23; County Ds' Mem. at 11-12.) With respect to the City Defendants, Plaintiff responds that he has sued several state actors and a private party, that the City Defendants had witnesses lie so they could help the

District Attorney's Office make a case against Plaintiff, and that they acted "[i]n furtherance of goals" – goals that Plaintiff does not specify. (P's City Opp. at 14-15.) He further asserts that the Court should consider what was pleaded in the AC, such as "how all the evidence which could have exculpated [P]laintiff which was in Defendants' possession was lost in each instance" as well as "the evidence which was lost by former Police Det[ective] Ibanez in an unrelated case to establish this was a § 1983 conspiracy." (*Id.* at 15-16 (emphasis omitted).) The relevance of such evidence to a conspiracy claim is unclear. Regardless, Plaintiff makes no argument, and alleges no facts, to plausibly suggest that the City Defendants agreed to act in concert to inflict a constitutional injury. Instead, the AC contains only boilerplate allegations of a conspiracy. (AC ¶¶ 97-99.) This is fatal to Plaintiff's conspiracy claim. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011). [25]

[25]    Plaintiff argues in his opposition to the County Defendants' motion that the standard articulated by the Second Circuit in *Gallop* – that "claims of conspiracy containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss," 642 F.3d at 369 (internal quotation marks omitted) – "is not proper in the current proceeding," (Ps' County Ds' Opp. at 10). But he does not explain what he means by this, or why that precedent is inapplicable, nor does he point to specific portions of his AC that demonstrate how the plausibility standard is met.

**\*19**  For similar reasons, Plaintiff's claim must be dismissed as to the County Defendants. In response to their motion to dismiss, Plaintiff contends that

[t]he meeting of the minds clearly is shown when Defendants and their witnesses such as [Burroughs] and Jason [Dulyx], and Cliff and Jasmine and Ricky meet at the bequest [*sic*] of the Prosecution and come up with agreements which allow them to receive benefits such as receiving benefits for lying, to get themselves out of bench warrants, or to get favorable treatment for outstanding

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 39 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

cases or get monies for living arrangements.

(P's County Opp. at 11.) He further contends that he "has alleged these violations in his amended complaint and has provided testimony and accompanying exhibits." (*Id.*) But Plaintiff cannot amend a pleading through his opposition brief, *see, e.g., Maxim Grp. LLC*, 690 F. Supp. 2d at 308, and the AC contains no allegations that plausibly support an agreement between the County Defendants and any witnesses. If anything, the AC suggests Prisco was lied to. (*See* AC ¶¶ 77-78.) Further, it is ludicrous to suggest that the everyday event of a prosecutor making deals with witnesses – even if the AC were to describe any such deals, which it does not – would plausibly suggest a conspiracy. *See Gordon v. City of N.Y.*, No. 10-CV-5148, 2012 WL 1068023, at *13 (E.D.N.Y. Mar. 29, 2012) (cooperation agreement with witness insufficient to plausibly suggest conspiracy); *cf. San Filippo v. U.S. Tr. Co. of N.Y.*, 737 F.2d 246, 256 (2d Cir. 1984) (prosecutor preparing witnesses is "routine and necessary," and if sufficient to suggest impropriety, would subject every government witness to "burden of defending a costly civil suit charging 'conspiracy' to give false testimony"). The AC contains no facts plausibly suggesting that ADA Prisco agreed with others to inflict unconstitutional harm on Plaintiff, and thus the claim is dismissed as to the County Defendants as well.

### 7. Failure to Intervene

Plaintiff's seventh cause of action is for failure to intervene, which he asserts against each "individual defendant." (AC ¶¶ 101-03.) "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012) (summary order).

The City Defendants contend that this claim should be dismissed as to them because Plaintiff's AC is conclusory and "bereft of any facts to support the notion that any of the City Defendants had a duty or an opportunity to intervene." (City Ds' Mem. at 23.) In opposition, Plaintiff argues, without citing to a single paragraph of his AC, that "it should be abundantly clear that the police had a reasonable opportunity to intervene to prevent the harm from occurring" and that "if these police officers could have simply done their job and followed the patrol guide and properly voucher [*sic*] the evidence that would have prevented any harm happening [*sic*] and defendant would have been able to put forth defenses such as an alibi or possibly even testify [o]n his own behalf." (P's City Opp. at 16.) Plaintiff also contends that "[c]learly" there were doubts about the truthfulness of Burroughs, Dulyx, and "Webb [*sic*]" and thus the officers should have gathered more information. (*Id.*)

**\*20** The County Defendants argue that the claim should be dismissed because there is no underlying constitutional violation, the claim is asserted against all "individual defendants" and ADA Prisco is sued only in her official capacity, and Plaintiff has failed to plead that the County Defendants had a realistic opportunity to intervene. (County Ds' Mem. at 12-13.) In his opposition, Plaintiff asserts, without citing any authority, that "ADA Prisco had an affirmative duty to intervene to [p]rotect Plaintiff once she found out that her witnesses were untruthful and were being reported by Det[ective] DiMase," that a reasonable person would know that Plaintiff's rights were being violated, that "Prisco took no steps to intervene in December of 2013," and that she had plenty of time to investigate further because Plaintiff was not indicted until May 2016. (P's County Opp. at 11.)

Plaintiff's responses to the arguments put forth by both sets of Defendants are, to the extent comprehensible, unavailing. Although it is inexcusable that certain officers lost evidence, it does not plausibly follow that the other officers or ADA Prisco had an opportunity to prevent that loss or any constitutional harm that might flow from it. Indeed, absent plausible allegations that the evidence was exculpatory or how the other Defendants might know of it, it is impossible to see how they could know that Plaintiff's constitutional rights were being violated.

To the extent Plaintiff is suggesting that putting witnesses with credibility issues in the grand jury is improper, the suggestion is farcical. *See supra* note 20. A grand jury is an

2018 WL 6329420

investigative body entitled to weigh witness credibility. *See, e.g., United States v. Calandra*, 414 U.S. 338, 343-44 (1974); *United States v. O'Connor*, 750 F. Supp. 90, 93 (W.D.N.Y. 1990); *New York v. Taylor*, 870 N.Y.S.2d 791, 792 (App. Div. 1st Dep't 2009). Indeed, even using a witness with credibility issues at trial – which happens every day – is not a constitutional violation unless the prosecutor knows or should know that the witness is lying, *see Perkins v. Le Fevre*, 691 F.2d 616, 619 (2d Cir. 1982), which is not plausibly alleged here. Law enforcement officials must routinely assess witness credibility. If probable cause exists, as it did here, that a jury ultimately finds that the beyond-a-reasonable-doubt standard was not met hardly suggests that the prosecutor knowingly elicited false testimony.

Plaintiff's contentions concerning the City Defendants' and ADA Prisco's alleged failure to investigate do not save his claim. The cases upon which Plaintiff relies do not pertain to claims for failure to intervene, nor do they demonstrate that prosecutors have a duty to investigate or that police must continue to investigate once they are in possession of facts sufficient to establish probable cause. To the contrary, where, as here, probable cause is established, there is no constitutional right to demand further investigation before arrest or prosecution. *Virgil v. Town of Gates*, 455 F. App'x 36, 40 (2d Cir. 2012) (summary order) (collecting cases); *see Panetta v. Crowley*, 460 F.3d 388, 398 (2d Cir. 2006) ("Once an officer has probable cause, he or she is [not] required ... to continue investigating, sifting and weighing information.") (internal quotation marks omitted).

In any event, it is well settled that "a failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Case v. City of N.Y.*, 233 F. Supp. 3d 372, 401 (S.D.N.Y. 2017) (internal quotation marks omitted). Plaintiff's failure to intervene claim appears to be contingent on his false arrest and malicious prosecution claims, (*see* AC ¶ 103), which have been dismissed. To the extent his failure to intervene claim pertains to another cause of action, those claims, too, have been dismissed.

Accordingly, Plaintiff's failure-to-intervene claim is dismissed for failure to state a claim against all Defendants.

8. Negligent Hiring, Retention, Supervision & Training

**\*21** Defendants also move to dismiss Plaintiff's cause of action for negligent hiring, retention, supervision,

and training. As a preliminary matter, it is not readily apparent against which Defendant(s) the claim is asserted. Plaintiff alleges that unspecified defendants failed to use reasonable care in hiring, training, and supervising unspecified defendants, (AC ¶¶ 120, 122), and then states that "Defendant Mount Vernon Police Department[ ] knew or should have known in the exercise of reasonable care, the propensities of the defendants to engage in the wrongful conduct heretofore alleged in this Complaint," (*id.* ¶ 121). So while the claim appears to be asserted only against the City Defendants, it is unclear which Defendants were negligent in hiring, retaining, supervising, and training which officers. Additionally, although the "wrongful conduct" at issue seems to be the loss of evidence, that is far from clear. Because the allegations in Plaintiff's AC fail to give each Defendant fair notice of the claims against them, the claim is dismissed pursuant to Rule 8. *Canon U.S.A.*, 2017 WL 4357339, at \*7.

Even assuming that the AC provides fair notice to the City Defendants, it must be dismissed for failure to state a claim. "A claim for negligent hiring, retention, supervision, and training is based on the employer's direct negligence." *Cruz v. New York*, 24 F. Supp. 3d 299, 311 (W.D.N.Y. 2014) (internal quotation marks omitted). "Claims for negligent hiring and retention arise from an employer having placed the employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in making its decision concerning the hiring and retention of the employee." *Id.* (internal quotation marks omitted). "Similarly, claims for negligent supervision and training arise when an employer has notice of the employee's tendency for the bad conduct and its lack of supervision or inadequate training is the proximate cause of a plaintiff's injuries." *Id.* (internal quotation marks omitted). "[A]n essential element of a cause of action in negligent hiring, retention, supervision, and training is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Bouche v. City of Mount Vernon*, No. 11-CV-5246, 2012 WL 987592, at \*9 (S.D.N.Y. Mar. 23, 2013).

The City Defendants argue the Plaintiff's allegations are conclusory. (*See* City Ds' Mem. at 24-25.) Plaintiff responds that discovery is needed. (P's City Opp. at 17.) But "*Twombly* and *Iqbal* require that [Plaintiff] plead specific facts showing that [he] is entitled to more discovery." *P&S Printing LLC v. Tubelite, Inc.*, No. 14-CV-1441, 2015 WL 4425793, at \*6 (D. Conn. July 17, 2015) (collecting cases); *see Anguilo v. Cty. of Westchester*, No. 11-CV-7823, 2012 WL 5278523, at

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 41 of 76

*3 n.4 (S.D.N.Y. Oct. 25, 2012) ("[A]s *Iqbal* makes clear, a plausible claim must come *before* discovery, not the other way around.") (emphasis in original). Additionally, Plaintiff, at the very least, has not alleged facts sufficient to infer that the City of Mount Vernon or any individual Defendants who were supervisory officers knew of the officers' propensity to act in the manner alleged and thus the claim must be dismissed. *See Cruz*, 24 F. Supp. 3d at 311; *Bouche*, 2012 WL 987592, at *9. [26]

[26]   The closest Plaintiff comes is noting that Ibanez lost video evidence in another case. (AC ¶ 60.) But Plaintiff presents no allegations that any other individual Defendant was aware of that fact, and a single instance is generally insufficient to provide notice to the municipal employer. *See Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) (pattern of similar violations generally necessary to put employer on notice). Further, the failure to properly voucher the video evidence in this case apparently occurred in August 2011. (AC ¶¶ 19-23.) But the other case to which Plaintiff points was filed in 2013 and refers to a loss of evidence occurring in October or November 2011, *see Sudu v. City of Mount Vernon*, No. 13-CV-5557, (S.D.N.Y. Aug. 9, 2013), Doc. 1, so that case could not have provided notice to anyone at the time of the misconduct alleged here. *See Kucera v. Tkac*, No. 12-CV-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013) (cases filed after conduct alleged by plaintiff cannot serve as notice).

**22** To the extent Plaintiff asserts a claim for negligent hiring, retention, supervision, and training against the County Defendants, the claim must be dismissed as to them as well. He asserts no factual allegations as to how ADA Prisco or the County of Westchester were negligent in hiring, retaining, supervision, and training employees. In opposing the County Defendants' motion, Plaintiff points to allegations in the AC concerning the conversation between ADA Prisco and MVPD Detective DiMase [27] and asserts for the first time in his opposition brief that Plaintiff did not receive any documentation of this conversation (as opposed to the report itself) until the underlying criminal trial. (P's County Opp. at 12.) [28] Plaintiff does not explain how these allegations

support a claim for negligent hiring, retention, supervision, and training against the County Defendants, nor can the Court discern one. [29] Accordingly, to the extent Plaintiff asserts his ninth cause of action against the County Defendants, it is dismissed as to them as well.

[27]   Plaintiff cites to paragraph 48 of the AC as describing this conversation, (P's County Opp. at 12), but that paragraph does not mention any such conversation. The Court assumes Plaintiff meant to refer to paragraph 46.

[28]   Plaintiff cites paragraph 52 of the AC in support of his contention that he did not receive any documentation of the conversation until trial. (P's County Opp. at 12.) Paragraph 52, however, makes no reference to Detective DiMase or the conversation he allegedly had with ADA Prisco.

[29]   If Plaintiff means to assert that Prisco was training DiMase in how to write reports, the claim fails for the reason stated on page 16-17 above: there is no right to have an officer's analysis in a report, and advising an officer to stick to the facts is entirely appropriate.

### 9. *Monell* Liability

Defendants also move to dismiss Plaintiff's municipal liability claim. "To hold a [municipal defendant] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (alteration and internal quotation marks omitted). To allege such a policy or custom, the plaintiff may assert:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 42 of 76

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014). "[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015). Further, while "[i]t is well settled that 'the inadequacy of police training may serve as the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact,' " "[t]he deliberate indifference standard is 'stringent' and requires 'proof that a municipal actor disregarded a known or obvious consequence of his action.' " *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *5 (N.D.N.Y. Nov. 26, 2014) (alteration omitted) (first quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989); and then quoting *Connick*, 563 U.S. at 61).

**\*23** I need not address *Monell* liability because no underlying constitutional claims survive. *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006). Even if they did, a municipal liability theory would fail. Plaintiff offers only conclusory allegations of "customs and practices of tolerating lawlessness and corruption" amounting to "deliberate indifference." (AC ¶ 110; *see id.* ¶¶ 58-60, 108, 111.) He provides no facts to plausibly support this conclusion. Instead, he points to a series of general and unrelated alleged shortcomings of the MVPD and its officers and attempts to unite them under a single policy of tolerating lawlessness and corruption. But these allegations do not constitute the "*pattern* of *similar* constitutional violations" that is ordinarily necessary to demonstrate deliberate indifference. *Connick*, 563 U.S. at 62 (emphases added). [30] "While a court may not apply a heightened pleading standard to *Monell* claims, 'boilerplate' conclusions as to municipal liability will not suffice, even at this early stage of the litigation." *Betts*, 2013 WL 311124, at *15

(citation omitted); *see Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("[T]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.") (second alteration in original) (internal quotation marks omitted); *Turczyn*, 2014 WL 6685476, at *6 (municipal liability insufficiently pleaded where complaint used label "deliberate indifference" and generically referenced failure to train, but did not "allege facts that support either conclusory notion"); *Guerrero v. City of N.Y.*, No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("[B]oilerplate claims do not rise to the level of plausibility required to state a viable *Monell* claim.") (internal quotation marks omitted). Accordingly, Plaintiff's *Monell* claim fails as to the City Defendants.

> [30] Most of Plaintiff's examples relate to officers other than the Defendants and, with the exception of Ibanez losing evidence, those that do describe wholly different kinds of alleged misconduct. (AC ¶ 60.) They thus cannot serve as notice to the City of any tendency on the part of the individual officers to commit the kinds of acts of which Plaintiff complains here.
>
> *Connick* illustrates the level of specificity required for a pattern. There the plaintiff pointed to four previous reversals for *Brady* violations, and the Supreme Court found that those could not have given the District Attorney notice of a need to train because they did not involve failure to disclose physical or scientific evidence, as the plaintiff's case did. *See* 563 U.S. at 62-63. If one type of *Brady* violation does not suffice as notice for other types of *Brady* violations, the scattershot claims of multiple unrelated types of misconduct here also cannot suffice. Plaintiff also relies on "contemporaneous or subsequent conduct [that] cannot establish a pattern of violations that would provide notice." *Id.* at 63 n.7 (internal quotation marks omitted).

The County Defendants assert that Plaintiff's *Monell* claim must be dismissed as to them because the AC does not identify any specific policies or customs of the County that would give rise to liability under *Monell*. (County Ds' Mem. at 14-15.) Plaintiff provides no response in his opposition brief. Accordingly, he has abandoned the claim insofar as it is asserted against the County Defendants. *Div. 1181 Amalgamated Transit Union*, 2018 WL 794572, at *4 (collecting cases); *Romeo & Juliette Laser Hair Removal,*

McClean v. County of Westchester, Not Reported in Fed. Supp. (2018)

2018 WL 6329420

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 43 of 76

*Inc.*, 2014 WL 4723299, at *7. Moreover, the AC does not plausibly plead any policy or custom of the County Defendants that violated his rights. Plaintiff's *Monell* claim against the County Defendants is therefore also dismissed for failure to state a claim.

#### D. State Law Claims

In addition to his § 1983 claims, Plaintiff asserts four claims arising under New York law. (AC ¶¶ 126-52.) The "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ). Having determined that the only claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3) ). Accordingly, Plaintiff's tenth, eleventh, twelfth, and thirteenth causes of actions are dismissed without prejudice.

#### IV. LEAVE TO AMEND

**\*24** Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962) ).

Plaintiff has already amended once, (Doc. 20), after having the benefit of a pre-motion letter from Defendant Westchester County and former Defendant Anthony Scarpino, (Doc. 9); the City Defendants' anticipated grounds for dismissal, which were stated during the September 11, 2017 conference; as well as the Court's observations during that conference. In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to

a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (alteration, footnotes, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam* ) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Plaintiff was largely on notice of the deficiencies with his original complaint and has failed to rectify them in his AC. [31] Further, although he has asked to amend again, he has not suggested that he is in possession of facts that would cure the deficiencies identified in this opinion. Accordingly, the Court declines to grant leave to amend. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop*, 642 F.3d at 369 (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

[31]  While the County Defendants' pre-motion letter did not specifically refer to ADA Prisco, as she was not then a named Defendant, that letter raised the issue of prosecutorial immunity. (Doc. 9.)

#### V. CONCLUSION

**\*25** For the reasons stated above, the motions to dismiss of the City Defendants and the County Defendants are granted. Claims One through Nine are dismissed with prejudice, and claims Ten through Thirteen are dismissed without prejudice.

2018 WL 6329420

The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 27, 31), and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6329420

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,

v.

Harry C. BUFFARDI, Sheriff; Schenectady County Jail;
Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

***DECISION and ORDER***

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** Presently before the Court is an amended complaint
filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl.
(Dkt. No. 10). This amended complaint was submitted
in compliance with the Memorandum-Decision and Order
issued by this Court on November 27, 2006 ("November
Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he
must set forth facts demonstrating that Defendants were
personally involved in a violation of Plaintiff's rights. *Id.* at 4.
Plaintiff was also advised that in order to establish the liability
of a municipality, he must allege a custom or policy which is
the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants
and asserts numerous claims against them arising from his
confinement at Schenectady County Jail. Amended Compl.
(Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady
County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in
his amended Complaint. Therefore, "Schenectady County
Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby
dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint
mentions "Mr. Booth" and "Mr. Purdy" only in the caption,
and fails to allege any act or omission by these individuals.
Dismissal is appropriate where a defendant is listed in the
caption, but the body of the complaint fails to indicate what
the defendant did to the plaintiff. *Gonzalez v. City of New
York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2
(S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96
CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16,
1998) (mere inclusion of warden's name in complaint
insufficient to allege personal involvement) and *Taylor v. City
of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because
plaintiff has failed to allege any personal involvement on the
part of defendants "Mr. Booth" and "Mr. Purdy", they are
hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining
Defendants committed various violations of his constitutional
rights, including inadequate medical care, breach of doctor-
patient confidentiality, excessive force, denial of due process
in a disciplinary proceeding, and interference with the
grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as
against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot
effect service on a "John Doe" defendant. In the event
that plaintiff wishes to pursue this claim against the "John
Doe" defendants named in the amended Complaint, he must
take reasonable steps to ascertain their identities. Plaintiff
may then file a Motion to amend his complaint and seek
leave of the Court to add such individuals, by name, as
defendants to this lawsuit. Plaintiff is further advised that if
these individuals are not timely served, the action will be
against them will be dismissed.

**\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady
County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are
**DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add
"Schenectady County," "Mr. Burns," "Mr. Jones," "Mr.
Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe
# 7," "John Doe # 10," and "Loraine Walker" as defendants
in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

[1] Plaintiff was granted leave to proceed with this action *in forma pauperis*. Mem.-Decision and Order (Dkt. No. 7).

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 47 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

2022 WL 3227875
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sherry SCALERCIO-ISENBERG, Plaintiff,

v.

GOLDMAN SACHS MORTGAGE COMPANY
and MTGLQ Investors LP, Defendants.

21 Civ. 4124 (KPF)

|

Signed August 9, 2022

**Attorneys and Law Firms**

Sherry Scalercio-Isenberg, Sparta, NJ, Pro Se.

Frank E. Morreale, Holland & Knight, Jacksonville, FL, for Defendants.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, United States District Judge

**\*1** *Pro se* Plaintiff Sherry Scalercio-Isenberg brings suit against Defendants Goldman Sachs Mortgage Company ("GSMC") and MTGLQ Investors LP ("MTGLQ," and together with GSMC, "Goldman Sachs"), asserting a variety of claims relating to Defendants' handling of Plaintiff's mortgage. Plaintiff asserts nine causes of action, the majority of which stem from Plaintiff's allegation that Defendants have inaccurately stated her mortgage balance. Defendants now move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed in the remainder of this Opinion, the Court grants Defendants' motion to dismiss.

**BACKGROUND** [1]

[1] This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #21)), the well-pleaded allegations of which are taken as true on this motion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court sources additional facts from the exhibits appended to the Amended Complaint, which are deemed part of the pleadings.

Fed. R. Civ. P. 10(c). The Court refers to Plaintiff's exhibits to her Amended Complaint (Dkt. #23-32) using the convention "Pl. Ex. [ ]," which is the same convention Plaintiff uses in her Rule 26 disclosure (Dkt. #22). The Court also considers the mortgage at issue ("Mortgage" (Dkt. #34, Ex. 1B)), which was attached to the Declaration of Frank Morreale submitted in support of Defendants' motion to dismiss (Dkt. #34). *See Chambers* v. *Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."). And the Court has considered certain of Plaintiff's assertions in her opposition submission, to the extent they are not inconsistent with her pleadings. *See Reid* v. *City of New York*, No. 20 Civ. 9243 (KPF), 2022 WL 2967359, at \*6 (S.D.N.Y. July 27, 2022).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #35); Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #36); and Defendants' reply memorandum of law as "Def. Reply" (Dkt. #37).

**A. Factual Background**

**1. The Mortgage**

Plaintiff is a New Jersey resident whose home is located in Sparta, New Jersey. (Mortgage ¶ Q). Plaintiff's interest in her residence is encumbered by a mortgage loan, the lender of which was Quicken Loans, Inc., a non-party to this lawsuit. (*Id.* at ¶ D). Plaintiff obtained the Mortgage in November of 2010. (*Id.* at ¶ A). Under the Mortgage, Plaintiff is required to make certain "Periodic Payments," which include amounts due on the principal and interest on the loan, as well as funds put towards an escrow account. (*Id.* at ¶ O; *see also id.*, § 2). [2] The Mortgage also states: "[a]t origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item." (*Id.*, § 3). Section 3 further notes that: "[i]f Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may ... pay such

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 48 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

amount and Borrower shall then be obligated ... to repay to Lender any such amount." (*Id.*).

[2]  Paragraph O defines Periodic Payments as the "regularly scheduled amounts due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument." (Mortgage ¶ O). Section 2 of the Mortgage reads:

> Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

(*Id.*, § 2).

## 2. Defendants' Alleged Mortgage Fraud

**\*2**  The relevant timeframe for Plaintiff's allegations begins in 2019. Plaintiff alleges that Metropolitan Life Insurance Co. ("MetLife") owned her mortgage and that Shellpoint Mortgage Servicing ("Shellpoint") serviced it from January 1, 2019, to March 31, 2019. (Am. Compl. 4 ¶ 1).[3] This arrangement is partially reflected by Plaintiff's payment of $3,131.19 to Shellpoint in March 2019. (Pl. Ex. 0).

[3]  The Amended Complaint does not use consecutively numbered paragraphs. For ease of reference, the Court cites to the Amended Complaint using both the relevant page number and paragraph number.

Plaintiff alleges that, on or about April 1, 2019, MTGLQ, a Goldman Sachs entity, acquired the loan from MetLife. (Am. Compl. 4 ¶ 3). Plaintiff claims that she was "informally" made aware of this transfer of ownership by means of an email from Shellpoint dated April 1, 2019, in which Shellpoint requested verification of Plaintiff's mailing address and the last four digits of her social security number. (*Id.* at 4 ¶ 4; Pl. Ex. 1). Shellpoint's email to Plaintiff then stated: "Additionally, your loan is no longer owned by MetLife. Your loan was sold back to MTGLQ Investors L.P." (Pl. Ex. 1).

After learning that her mortgage loan had been transferred to MTGLQ, Plaintiff became "concerned and alarmed" about the lack of formal notice given to her regarding the transfer of ownership of her loan. (Am. Compl. 4-5 ¶¶ 5-8). Between April and November of 2019, Plaintiff made several unsuccessful attempts to contact Goldman Sachs and MTGLQ to discuss her loan. (*Id.* at 5-6 ¶¶ 6-12). Plaintiff also visited the New York Attorney General's Office on two occasions to voice her concerns. (*Id.* at 5 ¶ 10).

On November 25, 2019, Plaintiff received a formal notice, dated November 22, 2019, alerting her that ownership of her loan had been transferred to Legacy Mortgage Asset Trust 2019-GS7. (Am. Compl. 5-6 ¶ 11; Pl. Ex. 8). The notice also stated that the mortgage servicer would continue to be Select Portfolio Servicing, Inc. ("SPS"). (Pl. Ex. 8).[4]  Though the notice appeared "legitimate" to Plaintiff at first, she alleges that she quickly spotted "inaccuracies" about the previous mortgage servicer in the notice, in addition to differences in the amount of money said to be due. (Am. Compl. 6 ¶ 11). Specifically, Plaintiff calls attention to the original principal balance on her loan, which the notice lists as $617,975.00 and which Plaintiff claims should have been $515,896.14. (Pl. Ex. 8). Plaintiff also alleges that SPS "demand[ed]" an immediate payment of over $75,000, the non-payment of which would result in the foreclosure of Plaintiff's residence. (Am. Compl. 6 ¶ 11). According to Plaintiff, she and her husband were "suddenly being held hostage" by Goldman Sachs and SPS, who were using "extortion tactics" and "demanding a form of Ransom[ ] money[.]" (*Id.*).[5]

[4]  Plaintiff's Amended Complaint and attached exhibits do not make clear the exact point at which SPS became the servicer of Plaintiff's loan. The Court intuits that SPS became the servicer of Plaintiff's loan at some point after March 2019, based on the March 2019 mortgage payment to Shellpoint provided by Plaintiff and Shellpoint's April 1, 2019 email to Plaintiff. (*See* Pl. Ex. 0, 1).

[5]  Despite a close review of the notice, which is a supporting exhibit attached by Plaintiff to her Amended Complaint (Pl. Ex. 8), the Court could not verify certain allegations made by Plaintiff, including those about SPS's threat of foreclosure or the demand for the immediate payment of $75,000.

**\*3**  Plaintiff alleges that she made an appointment to discuss the status of her mortgage payments with Karen Seymour,

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

then the General Counsel of Goldman Sachs, and further alleges that Seymour failed to appear for this meeting. (Am. Compl. 6 ¶ 12). By December 16, 2019, Plaintiff had grown "angry" about both the misrepresentations on her mortgage statements and Goldman Sachs's failures to discuss her concerns with her. (*Id.* at 6 ¶ 13). Plaintiff sent an additional email to Seymour on this date, copying also David Solomon, the CEO of Goldman Sachs. (*Id.* at 7 ¶ 14; Pl. Ex. 5).

On January 3, 2020, Plaintiff received a phone call from Frank Morreale, outside counsel for Goldman Sachs. (Am. Compl. 7 ¶ 15). During this phone call, Plaintiff reiterated her concerns about mortgage fraud, and Morreale stated that he would speak with Goldman Sachs's representatives and contact Plaintiff thereafter. (*Id.* at 7-8 ¶¶ 16-24). Plaintiff then sent Morreale an email on January 7, 2020, in which she stated that she had not received information about where to send her January 2020 mortgage payment. (Pl. Ex. 10).

### 3. The Settlement Agreement

One week later, on January 14, 2020, Plaintiff received a draft version of a Settlement Agreement from Morreale, on behalf of Goldman Sachs. (Am. Compl. 9 ¶ 27). After reviewing this draft document and making edits in blue pen, Plaintiff called Morreale to discuss her concerns further. (*Id.* at 9 ¶ 28). Eventually, after several conversations, Plaintiff and Morreale agreed on the "spirit and intent" of the contract, and Morreale added several "key" paragraphs to assuage specific concerns held by Plaintiff. (*Id.* at 9-10 ¶ 28).

The Settlement Agreement was signed by Plaintiff and her husband on January 15, 2020, and by a GSMC representative on January 21, 2020. (Pl. Ex. 14). "[W]ithout admitting any liability and solely to avoid litigation and to buy peace," GSMC agreed to pay the total sum of $2,500.00 (the "Settlement Payment") to Plaintiff and her husband within 30 days of the receipt of the settlement documents by Goldman Sachs's counsel. (*Id.* at ¶ 1). In consideration of this Settlement Payment, Plaintiff and her husband agreed to:

> unconditionally, irrevocably, forever and fully release, acquit, and forever discharge GSMC and its servicers, predecessors, successors, assigns, parents, affiliates, subsidiaries, and related entities, and each of their respective present

and former officers, employees, directors, shareholders, advisors, insurers, attorneys, representatives and agents ... of and from any and all claims, demands, actions, causes of action, suits, liens, debts, obligations, promises, agreements, costs, damages, liabilities, and judgments of any kind, nature, or amount whether in law or equity, whether known or unknown, anticipated or unanticipated, liquidated or unliquidated, relating to, arising out of, or in connection with the Loan, the Mortgage and the Property to the extent in any fashion arising from, or related to, events from the beginning of time up until, and through, the Effective Date (the "Released Claims"), including, without limitation, any and all Claims, and including, without limitation, any and all claimed or unclaimed compensatory damages, consequential damages, interest, costs, expenses and fees (including reasonable or actual attorneys' fees), that Releasors have, or may have, against the GSMC Releasees from the beginning of time up until and through the Effective Date.

(*Id.* at ¶ 3).

In her Amended Complaint, Plaintiff highlights two other sections of the Settlement Agreement that she believes to be relevant to her claims. The first is Section 8, which is entitled "Warranties and Representations" and which provides:

> **\*4** Each Party hereto warrants and represents that it has not assigned, transferred, conveyed, or purported to assign, transfer, or convey to any person or entity any right, claim, action, cause of action, suit (at law or in equity), defense, demand, debt, liability, account, or obligation herein

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 50 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

released, or any part thereof, or
which would, absent such assignment,
transfer or conveyance, be subject
to the releases set forth in this
Agreement.

(Pl. Ex. 14 ¶ 8). The second provision to which Plaintiff points
is Section 13, which is entitled "Further Assurances" and
which provides:

Each Party agrees to do all
acts and things and to make,
execute, acknowledge and deliver such
written documents, instructions and/or
instruments in such form as shall from
time to time be reasonably required
to carry out the terms and provisions
of this Agreement, including but not
limited to, the execution, filing or
recording of any reporting documents,
affidavits, deeds or agreements. Each
Party further agrees to give reasonable
cooperation and assistance to the other
Party in order to enable other the Party
to secure the intended benefits of this
Agreement.

(*Id.*, ¶ 13).

Plaintiff claims that she had an "uneasy feeling" about the
Settlement Agreement, but that she signed it nonetheless
because she was "desperate" to correct the inaccuracies in
her mortgage statements. (Am. Compl. 10 ¶ 29). According
to Plaintiff, she was comforted by the fact that Morreale
"led [her] to believe" that Goldman Sachs would contact
SPS upon the signing of the Settlement Agreement to
demand the correction of her mortgage statements and resolve
any outstanding issues pertaining to the loan. (*Id.* at 12
¶ 37). Plaintiff also cites Defendants' "harassment with
early morning, Saturday mail deliveries of Certified Letters,
requiring a signature" as a factor that induced her to sign the
contract. (*Id.* at 9-10 ¶ 28). Ultimately, Plaintiff claims that she
had "no other choice but to sign" the Settlement Agreement,
because doing so was her "only hope to get help as a Customer
of Goldman Sachs" and to obtain relief from the "harassment"
that she was experiencing. (*Id.* at 10 ¶ 29).

**4. Defendants' Post-Settlement Conduct**

Plaintiff's concerns persisted despite the execution of the
Settlement Agreement. Plaintiff asserts that, while she was
engaged in discussions with Morreale about the Settlement
Agreement, SPS was diverting her mortgage payments
into an "Unapplied Account" while reporting her payments
late, instead of making efforts to correct her allegedly
inaccurate mortgage statements. (Am. Compl. 10 ¶ 31).
Additionally, Plaintiff claims that Goldman Sachs sold her
loan to U.S. Bank National Trust Association soon after
the Agreement was effectuated, thereby preventing Plaintiff
from obtaining more information about and correcting the
inaccurate statements. (*Id.* at 11 ¶ 34). In Plaintiff's estimation,
Goldman Sachs made an "intentional" decision to transfer
ownership of her mortgage loan after she "called out" its fraud
and after it failed to correct her mortgage statements. (*Id.* at
12 ¶ 35).

Plaintiff also alleges that Defendants' counsel crafted a "false
Police report" following the execution of the Settlement
Agreement, which request prompted several police officers to
request to search her home for guns. (Am. Compl. 13 ¶ 39(c)).
An investigation revealed that a law firm, PIB, had filed "false
email documents" to obtain a TERPO (short for "Temporary
Risk Protective Order") Search Order in a township several
miles away from Plaintiff's own. (*Id.* at 13 ¶ 40). Plaintiff
contends that the Sparta Chief of Police, Neil Spidaletto,
opened an "Internal Affairs investigation" into the matter, but
does not explain what, if anything, came of the investigation.
(*Id.* at 14 ¶ 41).

**B. Procedural Background**

 **\*5**  Plaintiff filed this action on May 6, 2021. (Dkt. #1). On
June 14, 2021, Defendants submitted a letter requesting a pre-
motion conference to discuss their contemplated motion to
dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1),
12(b)(6), and 9(b), or, in the alternative, their contemplated
motion for a more definite statement pursuant to Rule 12(e).
(Dkt. #16). On July 7, 2021, the Court held a telephonic
pre-motion conference at which it set a briefing schedule for
Plaintiff to file an amended complaint and for Defendants to
file their anticipated motion to dismiss. (Dkt. #19).

Plaintiff filed her Amended Complaint on September 6,
2021 (Dkt. #21), attaching several exhibits (Dkt. #22-32).
Defendants filed their motion to dismiss and supporting
papers on October 15, 2021. (Dkt. #33-35). Plaintiff filed her

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

opposition to Defendants' motion to dismiss on November 29, 2021 (Dkt. #36), and Defendants filed their reply to Plaintiff's opposition on December 13, 2021 (Dkt. #37). Accordingly, Defendants' motion to dismiss is fully briefed and ripe for the Court's consideration. [6]

[6]    In April 2022, while the instant case was pending, Plaintiff brought a separate civil action in this District against SPS, Credit Suisse Group, and others. *See Scalercio-Isenberg* v. *Credit Suisse Grp.*, No. 22 Civ. 3208 (LTS). In May 2022, that case was transferred to the United States District Court for the District of New Jersey, where it remains pending. *See Scalercio-Isenberg* v. *Credit Suisse Grp.*, No. 22 Civ. 2705 (KM) (AME) (D.N.J.). An earlier action by Plaintiff against SPS in that District was dismissed with prejudice in January 2021. *See Scalercio-Isenberg* v. *Select Portfolio Servicing, Inc.*, No. 20 Civ. 4501 (AET) (LHG) (D.N.J.).

## DISCUSSION

### A. Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). In reviewing a Rule 12(b)(6) motion to dismiss, a court must "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

A court adjudicating a motion to dismiss under Rule 12(b) (6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Id.* (internal alterations

and citation omitted); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). Additionally, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). "In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may [also] rely on the plaintiff's opposition papers" to the extent they are consistent with the operative pleading. *Vlad-Berindan* v. *MTA N.Y.C. Transit*, No. 14 Civ. 675 (RJS), 2014 WL 6982929, at \*6 (S.D.N.Y. Dec. 10, 2014) (collecting cases); *see generally Walker* v. *Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013).

**\*6** "[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.' " *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (citing *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b) (6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413-14 (2d Cir. 1999)) (internal quotation marks and brackets omitted). "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Traguth* v. *Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

Still, a *pro se* plaintiff is required to include factual allegations that are "enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 52 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

conclusions masquerading as factual conclusions" (internal quotation marks omitted)).

**B. The Settlement Agreement Is a Valid and Enforceable Contract That Defendants Did Not Breach**

At the outset, the Court addresses the validity and enforceability of the Settlement Agreement between Plaintiff and Defendants. The Settlement Agreement is at the very heart of this case, because it potentially operates as a release of some or all of Plaintiff's claims against Defendants. Indeed, Defendants' motion is styled as both a "Motion to Dismiss First Amended Complaint, and Motion to Enforce Settlement Agreement." (Dkt. #33).

Plaintiff argues that her Settlement Agreement with Defendants is either void or voidable for three reasons. *First*, Plaintiff asserts that the Agreement is invalid because she signed it under duress. (Am. Compl. 10 ¶ 31). *Second*, Plaintiff alleges that she was fraudulently induced into signing the Agreement. (*Id.* at 12 ¶ 37; *see also id.* at 15). *Third*, Plaintiff argues that even if the Agreement were not flawed from its inception, Defendants materially breached the terms of the Agreement such that Plaintiff is excused from performance. (*Id.* at 15-16). The Court considers each argument in turn, but ultimately finds none of them to be availing.

"It is well established that '[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law.' " *Bldg. Serv. 32BJ Health Fund v. Nutrition Mgmt. Servs. Co.*, 789 F. App'x 248, 252 (2d Cir. 2019) (summary order) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)); *accord McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 237 (S.D.N.Y. 2006). Thus, a settlement agreement, just like any contract, requires "an offer, acceptance, consideration, mutual assent and intent to be bound" to be enforceable. *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) (internal quotation marks omitted).[7] Notably, "[f]ederal courts ... have 'articulated a strong policy in favor of enforcing settlement agreements and releases.' " *Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653 (ER), 2022 WL 836797, at \*4 (S.D.N.Y. Mar. 21, 2022) (quoting *Levine v. Bd. of Educ. of City of New York*, 152 F.3d 919, 1998 WL 386141, at \*2 (2d Cir. 1998) (summary order)). "Nevertheless, because settlement agreements are contracts,

they may be invalid when fraud, duress, illegality, or mutual mistake is shown." *Levine*, 1998 WL 386141, at \*2.

[7]    The Settlement Agreement contains a "Governing Law" provision stating that the Agreement "shall be governed by the laws of the State of New York and any questions arising hereunder shall be construed or determined according to such law." (Pl. Ex. 14 ¶ 12). The Court will enforce this provision and apply New York law to the dispute at hand. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (" 'Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.' ").

**1. Plaintiff Has Not Alleged Facts Demonstrating That She Entered into the Settlement Agreement Under Duress**

\*7    The Court begins by considering Plaintiff's argument that the Settlement Agreement is void because she signed it under duress. To review, Plaintiff alleges that, at the time of signing, she "was under Severe Duress and felt there was no other choice but to sign the contract[.]" (Am. Compl. 10 ¶ 31). Defendants contend that Plaintiff's allegations of duress are conclusory, and in any event are contradicted by Plaintiff's own recounting of the facts leading up to the signing of the Settlement Agreement. (Def. Reply 5). For example, Defendants point out that Plaintiff concedes that the "settlement negotiations included 'emails and phone conversations' " between the parties, which they claim evinces a fair process. (*Id.*).

Under New York law, repudiation of a contract based on duress requires a party to demonstrate "both [i] a wrongful threat and [ii] the effect of precluding the exercise of free will." *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 88 (2d Cir. 2011) (internal citations and emphases omitted). "In characterizing a 'wrongful threat,' New York 'law demands threatening conduct that is wrongful, *i.e.*, outside a party's legal rights.' " *Zuckerman v. Metro. Museum of Art*, 307 F. Supp. 3d 304, 318 (S.D.N.Y. 2018) (quoting *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011)).

Additionally, "[a] party claiming duress must act promptly to repudiate the contract at issue or that party will be deemed to have waived its right to do so." *Music Royalty Consulting,*

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 53 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

*Inc.* v. *Reservoir Media Mgmt., Inc.*, No. 18 Civ. 9480 (CM), 2022 WL 1137137, at *16 (S.D.N.Y. Apr. 18, 2022); *accord DiRose* v. *PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (collecting cases). Thus, "[a] party ratifies a contract entered into under duress 'by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.' " *Music Royalty Consulting, Inc.*, 2022 WL 1137137, at *16 (quoting *Twenty Miljam-350 IED Jammers*, 669 F.3d at 89). Ratification is possible because the existence of duress generally makes a contract *voidable*, rather than void, under New York law. *See Twenty Miljam-350 IED Jammers*, 669 F.3d at 89.

Plaintiff's attempt to invoke the defense of duress fails for several reasons. *First*, Plaintiff does not allege the existence of a wrongful threat. *See Twenty Miljam-350 IED Jammers*, 669 F.3d at 88. Plaintiff mentions an "uneasy feeling" she experienced while negotiating with Defendants about the Settlement Agreement, as well as her view that she had "no other choice but to sign" the Agreement due to her "desperate" need for assistance. (Am. Compl. 10 ¶ 29). Plaintiff also states that she felt pressured to sign the Settlement Agreement due to Defendants' unwillingness to meet with her in person to discuss her grievances. (*Id.* at 10 ¶ 31 ("The Plaintiff was under Severe Duress and felt there was no other choice but to sign the contract, as all her efforts for more than seven months had been ignored by all Goldman Sachs Lawyers!")). Lastly, Plaintiff discusses Defendants' "harassment with early morning, Saturday mail deliveries of Certified Letters, requiring a signature" as a relevant consideration in her ultimate decision to sign the Agreement. (*Id.* at 9-10 ¶ 28).

Though these pleadings may depict Plaintiff's general sentiment of unease and anxiety, they do not identify a wrongful threat made by Defendants. *See Goonewardena* v. *Forster & Garbus LLP*, No. 18 Civ. 29 (MKB), 2019 WL 121677, at *8 (E.D.N.Y. Jan. 7, 2019) ("Plaintiff alleges that he entered into the settlement agreements under duress, but he fails to allege how or what forced him to enter into the agreements, identify the alleged wrongful threat, or explain how the alleged threat prevented the exercise of his free will."); *cf. Mandavia* v. *Columbia Univ.*, 912 F. Supp. 2d 119, 129 (S.D.N.Y. 2012) ("Plaintiff invokes the magical word 'duress,' but in doing so he merely states a legal conclusion unsupported by enough facts to cross the line into the realm of the plausible."). Neither Defendants' alleged evasion of Plaintiff's requests to meet nor their weekend communications can be fairly described as sufficiently threatening to rise

to the level of duress. *See Mandavia*, 912 F. Supp. 2d at 128 ("Columbia's refusal to schedule meetings, disinterest in hearing his grievances, and generally hostile attitude in negotiations simply do not constitute wrongful threats sufficient to override a person's free will."). The Court cannot interpret any representation made by Defendants during the course of the parties' negotiations as a "wrongful threat" within the meaning of the phrase, even according a liberal reading to Plaintiff's allegations.

**\*8** Although Plaintiff does allege a $75,000 lump-sum-payment demand by her servicer, SPS, and a related threat of foreclosure (Am. Compl. 6 ¶ 11, 7 ¶ 17), neither allegation renders plausible Plaintiff's allegation that the Settlement Agreement is tainted by duress. For starters, the allegations are contradicted by Plaintiff's own statements and attachments to her Amended Complaint. SPS was not a "New Mortgage Servicer[,]" as Plaintiff claims — the November 2019 notice explicitly states that only ownership of the loan changed, not SPS's servicing of it. (Pl. Ex. 8). Further, SPS, as servicer of the loan, was a separate entity from Defendants, and it is unclear why SPS's alleged threat would be attributed to Defendants. Finally, courts within this Circuit have noted that foreclosure threats made pursuant to a loan contract are not "wrongful." *See, e.g., Comind Participacoes, S.A.* v. *Terry*, No. 91 Civ. 3803 (KMW), 1996 WL 651097, at *5 (S.D.N.Y. Nov. 7, 1996) ("Terry also alleges that he signed the assignments under the duress of Comind's threats to foreclose on the aircraft mortgages ... the 'threat' allegedly made by Comind was not unlawful."); *see also Grand Income Tax, Inc.* v. *HSBC Taxpayer Fin. Servs., Inc.*, No. 08 Civ. 346 (CBA), 2008 WL 5113646, at *6 (E.D.N.Y. Nov. 25, 2008) (noting that "the threat to exercise a legal or contractual right that the maker of the threat clearly holds, without more, is not generally considered improper," and citing authority for the proposition that "threats of loan foreclosure and default [do] not constitute duress" (internal quotations omitted)).

Even if the Court were to read Plaintiff's anxiety in relation to the Settlement Agreement negotiations as a sign that Defendants had made a "wrongful threat," Plaintiff's pleadings do not link such a threat to a preclusion of her ability to exercise free will, another necessary element of duress. Plaintiff does allege that she felt that she had "no other choice" but to sign the Settlement Agreement. (Am. Compl. 10 ¶ 29). But beyond merely asserting that she felt that she lacked other options, Plaintiff fails to put forward allegations suggesting that she in fact believed she had no choice but to sign the Settlement Agreement. Indeed, nothing

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 54 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

in the Amended Complaint suggests that her mortgage issues required immediate resolution.[8] And Plaintiff's post-notice conduct does not suggest that she was operating as if the foreclosure threat precluded her exercise of free will, as discussed below.

[8]    This remains true even as to SPS's alleged foreclosure threat. Plaintiff avers that the foreclosure threat was made alongside the notice in November 2019. But Plaintiff did not sign the Settlement Agreement until mid-January 2020; thus, two months elapsed between the alleged threat and the contract Plaintiff now seeks to void. (Pl. Ex. 14).

Plaintiff's claim of duress is further belied by the allegations she makes regarding her own conduct during the drafting of the Settlement Agreement. Plaintiff states that she made "many edits" to the Settlement Agreement during the negotiation process, as she and Morreale exchanged proposed revisions to the Agreement. (Am. Compl. 9-10 ¶ 28). Plaintiff also recalls that Morreale added a few "key paragraphs" to the Agreement specifically to assuage concerns that she had expressed to him. (*Id.*). This equal-opportunity negotiation process does not suggest that Plaintiff was experiencing a lack of agency in the drafting of the Settlement Agreement, especially given Plaintiff's acknowledged familiarity with financial information and institutions. (*Id.* at 2 ¶ 2, 10 ¶ 28). Thus, even liberally construing Plaintiff's allegations, the Court cannot conclude that (i) a wrongful threat existed; or (ii) even if it did, Plaintiff lacked the ability to exercise agency. The Court therefore rejects Plaintiff's argument that the Settlement Agreement is voidable based on duress.

### 2. Plaintiff Has Not Alleged Fraudulent Inducement [9]

[9]    Though Plaintiff does not specifically use the terminology of "fraudulent inducement" as a basis for voiding the Settlement Agreement in her Amended Complaint, the Court will nevertheless consider the argument, given Plaintiff's status as a *pro se* litigant. As stated earlier, the Court must interpret Plaintiff's allegations to raise the strongest arguments they may suggest. *See Cruz* v. *Gomez,* 202 F.3d 593, 597 (2d Cir. 2000) (citing *Graham* v. *Henderson,* 89 F.3d 75, 79 (2d Cir. 1996)). Additionally, Plaintiff does argue the existence of "fraud" in relation to the Settlement Agreement in her opposition briefing. (Pl. Opp. 8). *See Vlad-*

*Berindan* v. *MTA N.Y.C. Transit,* No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) ("In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may [also] rely on the plaintiff's opposition papers" to the extent they are consistent with the operative pleading. (collecting cases)).

**\*9** The Court turns next to Plaintiff's assertion that she was fraudulently induced into signing the Settlement Agreement. At several points in the Amended Complaint and in her opposition, Plaintiff catalogues potential misrepresentations made by Goldman Sachs that, she claims, induced her into signing the Settlement Agreement. For example, Plaintiff states that, in the run-up to her execution of the Agreement, Morreale "led [her] to believe" that her mortgage statements would be corrected upon her signature. (Am. Compl. 12 ¶ 37). In the Amended Complaint, Plaintiff appears to allege both that (i) Goldman Sachs induced her to sign the Settlement Agreement by falsely promising her that her concerns regarding her mortgage statements would be resolved, and (ii) this promise was in fact reflected in the Settlement Agreement that she signed. (*Compare* Am. Compl. 12 ¶ 37 (alleging that Goldman Sachs "led the Plaintiff to believe that by signing the Settlement ... that Goldman Sachs would ... demand the Mortgage Statements be corrected"), *with id.* at 13 ¶ 38 (noting the intent of the Settlement Agreement was to correct the mortgage statements)).

" 'A party has made out a claim of fraudulent inducement if [the party] has pled [i] a material misrepresentation of a presently existing or past fact; [ii] an intent to deceive; [iii] reasonable reliance on the misrepresentation ...; and [iv] resulting damages.' " *Goonewardena,* 2019 WL 121677, at *6 (*quoting Ipcon Collections LLC* v. *Costco Wholesale Corp.,* 698 F.3d 58, 62 (2d Cir. 2012)). "Fraudulent inducement claims are subject to the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure," which mandates that parties state with "particularity the circumstances constituting fraud or mistake." *Id.* at *7 (quoting *United States ex rel. Ladas* v. *Exelis, Inc.,* 824 F.3d 16, 25 (2d Cir. 2016) (internal quotation marks omitted)). Even when a plaintiff proceeds *pro se,* courts apply the Rule 9(b) pleading standard and dismiss complaints that do not meet its heightened requirements. *See, e.g., Goonewardena,* 2019 WL 121677, at *8 (dismissing a *pro se* plaintiff's claim of fraud that the court deemed as conclusory and that also failed to satisfy Rule 9(b)); *accord Edmond* v. *Live Well Fin., Inc.,* No. 19 Civ. 703 (VEC) (SN), 2020 WL 64747, at *1 (S.D.N.Y. Jan. 6, 2020); *Tasaka* v. *Bayview Loan Servicing,*

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 55 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

*LLC.*, No. 17 Civ. 7235 (LDH) (ST), 2022 WL 992472, at *7 (E.D.N.Y. Mar. 31, 2022).

As the Second Circuit has clarified, "Rule 9(b) places two further burdens [beyond Rule 8] on fraud plaintiffs — the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). With respect to this first burden, a plaintiff must "[i] detail the statements (or omissions) that the plaintiff contends are fraudulent, [ii] identify the speaker, [iii] state where and when the statements (or omissions) were made, and [iv] explain why the statements (or omissions) are fraudulent." *Id.* (quoting *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted)). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Polansky* v. *Pfizer, Inc.*, No. 04 Civ. 704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (internal quotations omitted).

With respect to the second burden imposed by Rule 9(b), "a fraud claim must be supported by allegations 'that give rise to a strong inference of fraudulent intent.' " *PetEdge, Inc.* v. *Garg*, 234 F. Supp. 477, 491 (S.D.N.Y. 2017) (quoting *S.Q.K.F.C., Inc.* v. *Bell Alt. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)). A plaintiff can meet this standard by "[i] alleging facts to show that [the] defendant[ ] had both motive and opportunity to commit fraud, or by [ii] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

To demonstrate motive and opportunity to commit fraud, "a plaintiff must allege that the defendant 'benefitted in some concrete and personal way from the purported fraud.' " *Goonewardena*, 2019 WL 121677, at *7 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). In the corporate context, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *PetEdge, Inc.*, 234 F. Supp. 3d at 494-95 (internal quotation marks omitted). "[T]his Circuit has held that a generalized motive that does not result in concrete benefits to the defendant is insufficient to plead scienter." *Stamelman* v. *Fleishman-Hillard, Inc.*, No. 02 Civ. 8318 (SAS), 2003 WL 21782645, at *6 (S.D.N.Y. July 31, 2003). By contrast, "[t]o show

'strong circumstantial evidence of conscious misbehavior or recklessness,' a plaintiff must demonstrate 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Goonewardena*, 2019 WL 121677, at *7 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

**\*10** Notably, " 'conclusory allegations of fraudulent inducement are insufficient to overcome a release's unambiguous language.' " *Consorcio Prodipe, S.A. de C.V.* v. *Vinci, S.A.*, 544 F. Supp. 178, 189 (S.D.N.Y. 2008) (citing *N.Y.C. Sch. Constr. Auth.* v. *Koren-DiResta Constr. Co.*, 671 N.Y.S.2d 738 (1st Dep't 1998)). It is also true that "[a]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *PetEdge, Inc.*, 234 F. Supp. 3d at 491 (quoting *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotations omitted)). However, "New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced." *CSX Transp., Inc.*, 471 F.3d at 416. In the contractual setting, if the promise in question were reflected in the contract, yet "insincere" when made, such insincerity can give rise only to a breach of contract claim; it is not "collateral or extraneous" as required to plead fraud. *Mexican Hass Avocado Importers Ass'n* v. *Preston/Tully Grp. Inc.*, 838 F. Supp. 2d 89, 98 (E.D.N.Y. 2012) (citing *D.S. Am. (E.), Inc.* v. *Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 798 (E.D.N.Y. 1995); *Caniglia* v. *Chi. Tribune-N.Y. Syndicate, Inc.*, 612 N.Y.S.2d 146, 147 (1st Dep't 1994); *Ross* v. *DeLorenzo*, 813 N.Y.S.2d 756, 760-61 (2d Dep't 2006); *Gosmile, Inc.* v. *Levine*, 915 N.Y.S.2d 521, 524-25 (1st Dep't 2010)).

Here, Plaintiff argues *both* that she was defrauded into signing an agreement that lacked a term she was promised, *and* that Defendants breached the contract by not performing that term. That term is the correction of Plaintiff's mortgage balance. At first blush, Plaintiff's fraudulent inducement claim would appear to be duplicative of her breach of contract claim. However, as just noted, a "claim for fraudulent inducement is separate and distinct from a claim for breach of contract under New York law, and a plaintiff may plead both causes of action." *Rosen* v. *Spanierman*, 894 F.2d 28, 35 (2d Cir. 1990). Further, Rule 8(d)(3) of the Federal Rules of Civil Procedure allows a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Because Plaintiff's complaint alleges that Defendants falsely

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 56 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

promised they would take action on her mortgage concerns —
and despite the incompatibility of this claim with her breach
of contract claim — the Court considers the argument that
this promise was extraneous to the contract and induced her
to sign away her legal claims in exchange for payment.

Plaintiff's fraudulent inducement claim still fails for the
simple reason that she has failed to satisfy the heightened
pleading standard of Rule 9(b). *First*, Plaintiff fails under
the first prong of the Rule 9(b) analysis: setting forth her
allegations with the requisite specificity. *See, e.g., Consorcio
Prodipe, S.A. de C.V.*, 544 F. Supp. 2d at 189; *Goonewardena*,
2019 WL 121677, at *6. In the Amended Complaint, the only
apparent allegation of a "material misrepresentation" made
by Defendants is that Morreale "led [Plaintiff] to believe"
that GSMC would correct her mortgage statements upon
her signing of the Settlement Agreement. (Am. Compl. 12
¶ 37). However, Plaintiff does not allege with specificity
what actual statement Morreale made that "led [her] to
believe" that GSMC would correct her mortgage statements,
nor does she state when or where such a statement was
made. *See Goonewardena*, 2019 WL 121677, at *7 ("To
satisfy [Rule 9(b)], a complaint alleging fraud must [i] specify
the statements that the plaintiff contends were fraudulent,
[ii] identify the speaker, [iii] state where and when the
statements were made, and [iv] explain why the statements
were fraudulent." (internal citations and quotation marks
omitted)).

**\*11** Plaintiff attempts to address this deficiency in
her opposition brief, but these allegations are likewise
insufficiently precise. Specifically, Plaintiff alleges that
Goldman Sachs represented to her that the Settlement
Agreement "was in good faith as a means to resolve
the serious loan issues[.]" (Pl. Opp. 11 ¶ 23). And she
alleges that Morreale represented the same to her in phone
conversations. (*Id.* at 12 ¶ 24). But Defendants rightly note
that Plaintiff does not support her allegation by pointing
to any specific statements made by Defendants during the
parties' phone conversations or email exchanges. (Def. Reply
5). Ultimately, even *pro se* litigants are required to allege
facts that "plausibly" support a claim for relief when liberally
construed, and on the issue of fraudulent inducement, Plaintiff
fails to do so. *Faber*, 648 F.3d at 104.

*Second*, Plaintiff does not adequately allege (i) that
Defendants had the motive and opportunity to commit
fraud; or (ii) strong circumstantial evidence of conscious
misbehavior or recklessness. That is, Plaintiff fails to

satisfy the second prong of the Rule 9(b) inquiry requiring
allegations that give rise to a strong inference of fraudulent
intent. Plaintiff suggests that Defendants were motivated to
get her to sign the Settlement Agreement to "buy time" to
transfer Plaintiff's mortgage to U.S. Bank. (Am. Compl. 27 ¶
6.4; *see also id.* at 12 ¶ 35). But Plaintiff never explains how
Goldman Sachs concretely benefitted by "buying time" or
how the Settlement Agreement would enable Goldman Sachs
to transfer the mortgage. *See, e.g., Bigsby v. Barclays Cap.
Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016)
("The Amended Complaint speaks vaguely of the corporate
entity itself.... If a mere allegation of corporate profit
were sufficient to allege scienter, the requirement would be
effectively eliminated." (internal citation omitted)). Indeed,
Goldman Sachs appears to have had every right to transfer the
mortgage irrespective of the Settlement Agreement.

Further, Plaintiff contradicts herself in her own opposition,
conceding that Defendants had already transferred Plaintiff's
mortgage to the "U.S. Bank National Association Trust"
before the parties entered into the Settlement Agreement.
(*See* Pl. Opp. 21 (noting that Goldman Sachs transferred the
mortgage "[i]n or around January 1, 2020")). Thus, Plaintiff's
key theory as to Defendants' motive is belied by her own
assertions. *See, e.g., Loreley*, 797 F.3d at 177 ("In determining
whether this strength-of-inference requirement is met, [w]e
consider the complaint in its entirety and take into account
plausible opposing inferences.").

Finally, Plaintiff's passing references to vague statements
made by Goldman Sachs do not provide the type of strong
circumstantial evidence required to prove Defendants were
acting recklessly or consciously misbehaving. Again, Plaintiff
relies on one principal theory of Defendants' intent, but that
theory is inadequately pleaded and fatally undermined by
other allegations in the Amended Complaint.

### 3. Defendants Did Not Breach the Settlement Agreement

In Count 4 of her Amended Complaint, Plaintiff contends
that Defendants breached the Settlement Agreement by not
correcting her mortgage statements. (Am. Compl. 15-18).
More specifically, Plaintiff alleges that Defendants breached
two provisions of the Settlement Agreement: Section 8 (the
"Warranties and Representations" provision) and Section 13
(the "Further Assurances" provision). (*Id.* at 17). In response,
Defendants argue that they had "no express obligations"
as part of the Settlement Agreement aside from issuing
the $2,500 payment to Plaintiff. (Def. Br. 13). According

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 57 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

to Defendants, "[n]owhere in the Settlement Agreement is there any obligation on, or undertaking by, GSMC to cure any alleged mortgage servicing issues or otherwise take any other express affirmative action other than payment of the settlement amount." (*Id.*). Defendants further argue that Plaintiff places undue reliance on Sections 8 and 13 of the Settlement Agreement. (*Id.*). According to Defendants, Section 8 is a standard contractual clause that assures that Plaintiff had not assigned the rights that she was releasing in the Settlement Agreement; only Plaintiff had made such a representation in the Agreement because only she was agreeing to release claims. (*Id.*). Defendants contend that Section 13 is similarly a standard clause that requires parties to fulfill their express obligations set forth by the Agreement. (*Id.*).

**\*12** "To make out a breach of contract claim, a plaintiff must plead '[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages.' " *Milligan v. GEICO Ins. Co.*, No. 20-3726, 2022 WL 433289, at \*2 (2d Cir. Feb. 14, 2022) (summary order) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Importantly, a plaintiff must "identify the specific provisions of a contract" that it alleges a defendant breached. *(RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*, No. 21 Civ. 11096 (LJL), 2022 WL 2441046, at \*7 (S.D.N.Y. July 5, 2022).

Furthermore, "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). "It is clear ... that the materiality of any particular breach is a question of fact under New York law." *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 513 (S.D.N.Y. 2018) (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015)).

Even construing her allegations liberally, Plaintiff has not adequately pleaded that Defendants breached the Settlement Agreement. *First*, Plaintiff's claim that Defendants breached the Agreement by failing to correct her mortgage statements is premised on an obligation to which Defendants did not explicitly agree when they signed the Settlement Agreement. The Settlement Agreement makes no mention of any alteration of Plaintiff's mortgage statements. (Def. Br. 13).

And while Plaintiff contends that she was "led ... to believe" that such an alteration would occur (Am. Compl. 12 ¶ 37), the Court does not find this allegation to be plausible, given Plaintiff's noteworthy lack of specificity regarding this alleged misrepresentation. For the purposes of an action on the Settlement Agreement itself, the Court also agrees with Defendants that correcting the mortgage statements would constitute a material obligation, and it is therefore unlikely that either party would sign a Settlement Agreement that did not make explicit reference to such an obligation. (Def. Reply 7 ("It remains utterly implausible that GSMC ... would incur the cost of preparing a fraudulent settlement agreement that omits the material obligations, make the agreed settlement payment, and expose itself to liability from the purchaser of the mortgage loan for no apparent benefit.")).

More fundamentally, the Court is unwilling to infer such a duty from the Settlement Agreement when its explicit terms — including the payment of $2,500 to Plaintiff and Plaintiff's release of all potential claims against GSMC — are clear and unambiguous. *See Fisher v. SD Prot. Inc.*, 948 F.3d 593, 606 (2d Cir. 2020) ("If the terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." (internal quotation marks omitted)). What is more, the Settlement Agreement contains an "Integration Clause," which makes clear that the contract "contains the entire agreement between and among the Parties, and supersedes all prior and contemporaneous discussions, negotiations, and understandings and agreements, whether oral or written, express or implied, between or among them relating to the subject matter of this agreement." (Pl. Ex. 14 ¶ 15). When such a clause exists, and the parties' obligations appear clear and unambiguous on a contract's face, the Court will not read in additional, unstated obligations, including Defendants' alleged obligation to correct Plaintiff's mortgage statements. Plaintiff thus fails to demonstrate the "existence of an agreement," a key element in establishing a *prima facie* case for breach of contract. *See Milligan*, 2022 WL 433289, at \*2.

**\*13** Plaintiff argues that the Settlement Agreement should be construed in accordance with the parties' intent, and that her intent in signing the Agreement was to get her mortgage statements corrected. (Pl. Opp. 12 ¶ 26). She claims that the $2,500 was paid by Defendants in "good faith" as a "Consulting fee" to compensate her for "the many hours she spent" on compiling her financial documents and engaging in

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 58 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

conversations with Defendants. (*Id.* at 12 ¶¶ 26-28). Though Plaintiff is correct that the Court should interpret the contract pursuant to the parties' intent, the Court's reading of the parties' intent "derive[s] from the contracts' unambiguous terms." *Hoover* v. *HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 241 (N.D.N.Y. 2014). Where, as here, "the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Matter of Wachovia Bank Com. Mortg. Tr.*, 375 F. Supp. 3d 441, 448 (S.D.N.Y. 2019) (quoting *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (internal quotation marks omitted)). The Court therefore cannot credit Plaintiff's assertions in her opposition brief that her intent was to have her mortgage statements corrected when evidence of such an intent cannot be found within the four corners of the Agreement.

*Second*, Plaintiff has not alleged Defendants' breach of either of Sections 8 or 13 of the Settlement Agreement. As to Section 8, Plaintiff suggests that the limitations on assignments and transfers discussed in that section meant that Defendants breached the contract when Defendants transferred the mortgage. (Pl. Opp. 6 ¶ 12). As to Section 13, Plaintiff alleges that Defendants failed to "give reasonable cooperation" as required by that section because they did not correct her mortgage statements. (*Id.* at 9 ¶ 17). But, as Defendants correctly assert, Sections 8 and 13 are merely standard contract provisions designed to ensure that both parties obtain the full benefit of their mutual promises. (Def. Br. 13-14). Plaintiff's Section 8 argument is premised on a misreading of the provision, which requires only that the parties have not "assigned, transferred, [or] conveyed ... any right, claim, [or] action ... *subject to the releases set forth in this Agreement.*" (Pl. Opp. 5 (emphasis added)). In truth, Goldman Sachs could not have violated Section 8, as it was not releasing any claims against Plaintiff, and, accordingly, was not precluded from assigning away particular rights. (Def. Br. 13). Section 13, by contrast, requires only that the parties take reasonable action to execute their obligations under the Agreement, which Defendants did by submitting the $2,500 payment to Plaintiff. (*Id.* at 13-14). "Standard Further Assurances provisions," such as Section 13, "do not create novel obligations for parties." *In re: Ampal-Am. Isr. Corp.* v. *Merhav Ampal Grp., Ltd.*, No. 15 Civ. 7949 (JSR), 2016 WL 859352, at *4 (S.D.N.Y. Feb. 28, 2016); *see also 97th St. Holdings, LLC* v. *E. Side Tenants Corp.*, 918 N.Y.S.2d 421, 422 (1st Dep't 2011) ("[t]o impute such obligations from generalized language found in the contract's further assurances clause ... would amount to a reformation of the

contract without basis"). There is, in short, no viable breach of contract claim that can be predicated on the Settlement Agreement.

### C. Plaintiff's Pre-Settlement Claims Fail

Separate and apart from her contractual claims, Plaintiff also alleges claims based on Defendants' pre- and post-Agreement conduct. The former category, which the Court addresses now, includes claims for (i) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1667f (Am. Compl. 14); (ii) violation of TILA's implementing regulation, 12 C.F.R. § 1026.39 (*id.* at 14-15); (iii) violation of 12 U.S.C. § 2605, a statutory provision that pertains to the "[s]ervicing of mortgage loans and administration of escrow accounts" (*id.* at 15; (iv) negligence, premised on Defendants' alleged failure to investigate and redress Plaintiff's mortgage statements (*id.* at 19); (v) mortgage fraud (*id.* at 19-20); and (vi) breach of fiduciary duty, premised on substantially similar allegations as Plaintiff's negligence claim (*id.* at 20-21). Because these claims pre-date execution of the Settlement Agreement, the Court refers to them as the "pre-settlement claims." Defendants move to dismiss all of these claims, arguing both release (Def. Br. 8-9), and failure to state a claim (*id.* at 10-13, 16, 19). For the reasons discussed below, the Court agrees with Defendants as to both points, and accordingly dismisses Plaintiff's pre-settlement claims.

### 1. The Settlement Agreement Bars Plaintiff's Claims Based on Conduct Pre-Dating the Settlement

**\*14** Plaintiff signed the Settlement Agreement on January 15, 2020, which is listed by the Agreement as its "Effective Date." (Pl. Ex. 14). As noted above, the Settlement Agreement is a valid and enforceable contract. The Agreement operates as a release of claims "from the beginning of time up until, and through, the Effective Date[.]" (Pl. Ex. 14 ¶ 3). Accordingly, Plaintiff's pre-settlement claims — which are based on facts predating the Effective Date (*i.e.*, January 15, 2020) — are barred by Section 3 of the Settlement Agreement. Beyond disputing the validity and enforceability of the Settlement Agreement or arguing about its scope, Plaintiff does not in fact dispute that these claims would be released by its terms. And because the Court has already ruled against Plaintiff on these antecedent arguments about enforceability and scope, the terms of the Agreement preclude her pre-settlement claims.

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

### 2. Plaintiff's Pre-Settlement Claims Are Inadequately Pleaded

In addition to being barred by the release provision of the Settlement Agreement, Plaintiff's pre-settlement claims are also inadequately pleaded, and fail for this independent reason.

### a. Plaintiff Fails to State a Claim for a Violation of 15 U.S.C. § 1641

In Count 1 of her Amended Complaint, Plaintiff contends that Defendants violated 15 U.S.C. § 1641(a)-(d) and (g). (Am. Compl. 14). This TILA provision, among other functions, requires that creditors make certain disclosures to borrowers pertaining to loan transfers. Plaintiff claims that the required notice given to her was "at least six months late" and that it "contained significant inaccuracies ... and stated incorrect information about who the previous Servicer was with a typo in the line," in addition to showing a "sudden increase to the outstanding Mortgage Princip[al] amount." (*Id.*). Though Plaintiff does not explicitly state which notice she is referring to in Count 1 of her Amended Complaint, the only notice identified in her pleadings is the one dated November 22, 2019, which informed her of the transfer of ownership of her loan. (Pl. Ex. 8). Defendants argue that among the TILA provisions cited by Plaintiff, only Section 1641(g) creates any sort of obligation related to disclosures to borrowers, and further argue that any claim by Plaintiff under this section is time-barred. (Def. Br. 10-12). The Court agrees with Defendants that Plaintiff's only arguably viable claim under the statute, based on Section 1641(g), is time-barred.

To begin, Defendants correctly assert that Sections 1641(a)-(d) do not provide independent causes of action. (Def. Br. 10). Section 1641(a) sets forth "prerequisites" for a party's ability to sue under Section 1641, while Section 1641(b) explains what suffices as "proof of compliance" with the statute's provisions. 15 U.S.C. § 1641(a)-(b). Sections 1641(c) and 1641(d) describe certain rights maintained by relevant parties. *Id.* § 1641(c)-(d). That said, Section 1641(g), in conjunction with 15 U.S.C. § 1640(a), does provide a private right of action. Section 1641(g) reads: "not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer," and lists several pieces of relevant information to include, such as the identity of the

new creditor and how to reach a representative of the new creditor. *Id.* § 1641(g). Section 1640(a) authorizes suits for damages for violations of Section 1641(g).

Still, the Court cannot consider any of Plaintiff's claims under Section 1641, as they are time-barred. Claims brought under TILA must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e); *see also Latouche* v. *Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 12-13 (2d Cir. 2018) (summary order) ("Private actions based on violations of TILA must be brought 'within one year from the date of the occurrence of the violation.' " (quoting 15 U.S.C. § 1640(e)); *Gonzalez* v. *J.P. Morgan Chase Bank, N.A.*, 228 F. Supp. 3d 277, 291 (S.D.N.Y. 2017))(same, in context of a *pro se* complaint). As Defendants correctly assert, the ownership of Plaintiff's mortgage was transferred on October 31, 2019. (Def. Br. 11; Pl. Ex. 8). The notice included in Plaintiff's pleadings is dated November 22, 2019, and Plaintiff admits that she received the notice on November 25, 2019. (Pl. Ex. 8). Yet Plaintiff waited until May 2021 to file her action. (Def. Br. 11; Dkt. #1). In short, the statute of limitations on Plaintiff's Section 1641 claims had already expired by the time Plaintiff filed this action.

**\*15** Although Plaintiff does not address Defendants' arguments on this point, the Court *sua sponte* considers whether the statute of limitations should be equitably tolled and concludes in the negative. "Equitable tolling is available in rare and exceptional circumstances, where the court finds that extraordinary circumstances prevented the party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he sought to toll." *Gonzalez*, 228 F. Supp. 3d at 291 (quoting *Grimes* v. *Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 286 (S.D.N.Y. 2011) (internal quotation marks omitted)). As potentially relevant here,

> [a] statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: [i] the defendant wrongfully concealed material facts relating to defendant's wrongdoing; [ii] the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and [iii] plaintiff exercised due diligence in pursuing the discovery of the claim

Case 1:25-cv-00991-GTS-TWD   Document 4   Filed 10/07/25   Page 60 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

during the period plaintiff seeks to have tolled.

*Id.* (quoting *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999) (internal quotation marks omitted)). Moreover, the application of equitable tolling requires "fraudulent conduct *beyond the nondisclosure itself.*" *Id.* (internal citation and quotation marks omitted) (emphasis in original). Here, no "extraordinary circumstances" exist that would warrant the application of equitable tolling, as Plaintiff alleges no facts to demonstrate that she was precluded from discovering the nature of the claim due to Defendants' concealment. *See Gonzalez*, 228 F. Supp. 3d at 292 ("There are no plausible allegations that any acts by the defendants prevented the plaintiff from accessing the courts to vindicate his rights."). The Court accordingly dismisses Count 1 of Plaintiff's Amended Complaint.

### b. Plaintiff Fails to State a Claim for a Violation of 12 C.F.R. § 1026.39

Plaintiff next alleges that Defendants are in violation of 12 C.F.R. § 1026.39. She generally reiterates the allegations she makes in support of her TILA claim, including allegations that the notice she received was "six months late" and did not accurately state the "name and address of the previous Mortgage Owner and Covered person." (Am. Compl. 15). Defendants point out that 12 C.F.R. § 1026.39 operates as an "implementing regulation" for 15 U.S.C. § 1641(g), and thus does not affect the time-bar issue. (Def. Br. 12). *See also Wright* v. *Green Tree Servicing LLC*, No. 14 Civ. 8493 (ALC), 2016 WL 4098404, at *3 (S.D.N.Y. July 25, 2016) (describing plaintiff's claims under TILA and "its implementing regulation, 12 C.F.R. § 1026.39"), *aff'd*, 685 F. App'x 67 (2d Cir. 2017) (summary order); *Rowe* v. *Cenlar FSB*, No. 19 Civ. 7278 (JMA) (AYS), 2021 WL 6065746, at *2 (E.D.N.Y. Dec. 22, 2021) (citing 12 C.F.R. § 1026.39(a)(1), (b) and describing the provision as the "regulatory vehicle through which TILA is implemented" (internal citation and quotation marks omitted)). There is no private right of action under the implementing regulation separate and apart from the statute; instead, the regulation offers a clarifying interpretation "promulgated through notice-and-comment rulemaking[.]" *Wright*, 2016 WL 4098404, at *3. Thus, even if Plaintiff could mount a claim under 12 C.F.R. § 1026.39, it would be time-barred due to the one-year statute of

limitations for TILA actions, and the Court dismisses Count 2 of the Amended Complaint. [10]

[10]  Defendants also argue that GSMC is not a "covered person" as articulated by 12 C.F.R. § 1026.39 because it "did not 'become the owner of an existing mortgage loan.' " (Def. Br. 12 (quoting 12 C.F.R. § 1026.39)). However, this statement appears at odds with Defendants' claim that "GSMC owned Plaintiff's mortgage loan between April and October 2019." (*Id.* at 3). The Court will not resolve this discrepancy on this motion, as Count 2 is dismissed for being time-barred irrespective of whether GSMC qualifies as a "covered person" under Section 1026.39.

### c. Plaintiff Fails to State a Claim for a Violation of 12 U.S.C. § 2605

**\*16**  The Court next addresses Plaintiff's claim in Count 3 that Defendants violated 12 U.S.C. § 2605. That statute pertains to the "[s]ervicing of mortgage loans and administration of escrow accounts[,]" and lists several relevant notice and disclosure requirements that servicers must make to borrowers. 12 U.S.C. § 2605. In connection with this claim, Plaintiff contends that Defendants maintain "control and influence" on Wall Street such that they should have been able to "demand" the correction of Plaintiff's mortgage statements. (Am. Compl. 15). Defendants deny that this statute applies to them in the first instance, given they are not mortgage servicers. They are correct, and Plaintiff fails to state a claim under 12 U.S.C. § 2605. As just noted, the provision relates to the servicing of mortgage loans and administration of escrow accounts. *See* 12 U.S.C. § 2605. Here, however, Plaintiff has not alleged that either GSMC or MTGLQ was the servicer of her mortgage loan at any point. (Def. Br. 13). Accordingly, even if GSMC or MTGLQ did own Plaintiff's loan for some period of time, neither was the loan's servicer; consequently, neither is subject to liability under 12 U.S.C. § 2605. The Court dismisses this claim.

### d. Plaintiff Fails to State a Claim for Negligence

In Count 5 of her Amended Complaint, Plaintiff alleges that Defendants are negligent for failing to satisfy a duty that they owed to her. (Am. Compl. 19). Specifically, Plaintiff claims that Karen Seymour, former General Counsel of

Case 1:25-cv-00991-GTS-TWD   Document 4   Filed 10/07/25   Page 61 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

Goldman Sachs, breached the "fiduciary duty" she owed to Plaintiff, a Goldman Sachs customer, by refusing to review Plaintiff's documentary evidence of alleged mortgage fraud. (*Id.*). [11] Plaintiff alleges that, instead of reviewing Plaintiff's account, Seymour "threatened" her "through the SPS lawyer Mr. Mitchell Scott Kurtz[.]" (*Id.*; *see also id.* at 7 ¶ 17 ("[T]here can be no valid, ethical reason that Ms. Seymour, as General Counsel, has ignored Mortgage Fraud Allegations by a Customer[.]")).

[11]   To review, Plaintiff alleges that she scheduled a meeting with Ms. Seymour, at which Ms. Seymour failed to appear, in December 2019. (Am. Compl. 6 ¶ 12). Plaintiff also sent an email to Ms. Seymour and Goldman Sachs's CEO, David Solomon, on December 16, 2019. (*Id.* at 7 ¶ 14).

"To establish a *prima facie* case of negligence under New York law, three elements must be demonstrated: [i] the defendant owed the plaintiff a cognizable duty of care as a matter of law; [ii] the defendant breached that duty; and [iii] plaintiff suffered damage as a proximate result of that breach." *Curley* v. *AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (citations omitted). With particular respect to the "duty of care" element, Plaintiff's argument appears to presuppose that Defendants' officers are obliged to meet with any customer who believes she has been the victim of fraud. (Am. Compl. 19). Alternatively, Plaintiff claims that Seymour herself was required to open an investigation into her claims of fraud. (*Id.*). However, the Court cannot find support for the notion that such duties exist for senior bank officers like Seymour. Though banks "do owe a general duty of care to their customers to conduct business reasonably," *Gorham-DiMaggio* v. *Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 298 (N.D.N.Y. 2008), *aff'd*, 421 F. App'x 97 (2d Cir. 2011) (summary order), this cannot logically extend to require the General Counsel of Goldman Sachs to speak personally with all customers with concerns about their accounts. The Amended Complaint and Plaintiff's opposition are replete with facts suggesting that Goldman Sachs did, in fact, consider Plaintiff's concerns, even if Defendants' officers did not directly respond. (*See, e.g.*, Am. Compl. 7 ¶ 15 (noting that Morreale "was following up on an email [Plaintiff] sent to Goldman Sachs Executives regarding Mortgage Loan concerns")).

Further, there is no evidence to suggest that Defendants would have a heightened duty of care that would encompass such a responsibility. *See Kirschner as Tr. of Millennium Lender*

*Claim Tr.* v. *J.P. Morgan Case Bank, N.A.*, No. 17 Civ. 6334 (PGG) (SLC), 2020 WL 9815174, at *16 (S.D.N.Y. Dec. 1, 2020) (" '[G]enerally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care.' " (quoting *Banque Arabe et Int'l D'Investissement* v. *Md. Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995))). The Court likewise agrees with Defendants that "[n]o contract, law or regulation" establishes the existence of a heightened duty of care encompassing the obligation described by Plaintiff. (Def. Br. 16).

**\*17**   Even if such a duty existed, Plaintiff fails to demonstrate the second element required to state a *prima facie* case for negligence: breach. Though Seymour did not meet with Plaintiff herself, Morreale, as counsel for Goldman Sachs, *did* speak with Plaintiff to address her concerns. (Am. Compl. 7 ¶ 15). Accordingly, since a representative of Goldman Sachs took reasonable care to review Plaintiff's concerns, Defendants fulfilled their duty, assuming that such a duty existed. Plaintiff does not make any arguments as to why Seymour would have been the only individual at Goldman Sachs who could have completed this task. To the extent Plaintiff suggests that Defendants' duty encompasses resolution of Plaintiff's mortgage fraud concerns, it would be duplicative of a variety of Plaintiffs' other claims — including breach of contract — and would thus not support an independent claim for negligence. *See, e.g.*, *Clarendon Nat. Ins. Co.* v. *Health Plan Administrators*, No. 08 Civ. 6279 (GBD), 2009 WL 3053736, at *4 (S.D.N.Y. Sept. 24, 2009) (dismissing negligence claims because "the allegations supporting the negligence claim are duplicative of the alleged breach of contract claim"); *see also Fixed Income Shares: Series M* v. *Citibank N.A.*, 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (dismissing negligence claims premised on same "alleged deficiencies ... that give rise to Plaintiffs' breach of contract claims").

### e. Plaintiff Fails to State a Claim for Breach of Fiduciary Duty

In Count 7, Plaintiff claims that Defendants breached a fiduciary duty they owed to Plaintiff. Plaintiff's claim rests on (i) Defendants' alleged hiring of SPS as a mortgage servicer in spite of its reputation for being "unethical" and (ii) Defendants' failure to respond effectively to Plaintiff's concerns about her "mortgage loan inaccuracies." (Am. Compl. 20-22). Defendants move to dismiss this claim on the basis that they do not have a fiduciary relationship with Plaintiff. (Def. Br. 19). The Court agrees.

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 62 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

Though the Court must credit Plaintiff's allegation that GSMC or MTGLQ owned her mortgage loan during some portion of the relevant time period, "it is 'well settled under New York law that a lender is not in a fiduciary relationship with a borrower, and thus a lender does not owe a borrower any special duties.' " *Miyamoto* v. *Bank of America, N.A.*, No. 19 Civ. 445 (FB) (ST), 2020 WL 5577730, at *3 (E.D.N.Y. Sep. 17, 2020) (quoting *Abraham* v. *Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 236 (E.D.N.Y. 2013)); *see also Iannuzzi* v. *Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 138 (E.D.N.Y. 2010) ("As a general matter, a lender is not a fiduciary of its borrower under New York law" (citation omitted)); *Barnett* v. *Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 390-91 (E.D.N.Y. 2014). Since Plaintiff fails to demonstrate that a fiduciary relationship exists with Defendants, she cannot state a claim for breach of fiduciary duty, and Count 7 must be dismissed.

### f. Plaintiff Fails to State a Claim for Mortgage Fraud

Plaintiff contends in Count 6 of her Amended Complaint that Defendants have committed mortgage fraud. To be clear, this claim of fraud arises not in the context of the Settlement Agreement, as to which Plaintiff has claimed fraudulent inducement, but rather in the context of Plaintiff's allegations that Defendants or her mortgage servicer artificially inflated her mortgage balance. This appears to be the core of Plaintiff's frustration with Defendants. (Am. Compl. 19-20). Plaintiff alleges that there were "significant ... inaccuracies" in the November notice, and suggests that Seymour and Solomon could not "explain nor justify" such inaccuracies. (*Id.* at 20). Further, Plaintiff claims that she called SPS on August 17, 2021, and spoke with "several employees" who told her that Goldman Sachs "issued a check for $42,808.09 and it was suddenly added to the Isenberg[s'] mortgage statement as if it was Escrow funding and demanding the Isenberg[s] pay." (*Id.*). According to Plaintiff, "[n]o one has produced a copy of the [$42,808.09] check[.]" (*Id.*). Plaintiff concludes by stating that "[m]ultiple account numbers combined with the extortion and coercion, gives rise to Money Laundering especially considering the significant numerical inaccuracies whereby, The Interest[ ] Bearing Princip[al] Amount increased from $515,896.94 to $617,975.00." (*Id.*). Defendants take issue with each of Plaintiff's allegations regarding instances of fraud. (*See, e.g.*, Def. Reply 4-7.) But the thrust of Defendants' argument for dismissal of this claim is that Plaintiff has not satisfied the heightened pleading

requirements of Rule 9(b), which requires claims of fraud be plead with particularity. (*Id.* at 4; *see also* Def. Br. 17-18). The Court again agrees.

**\*18**  " 'Under New York law, to state a claim for fraud a plaintiff must demonstrate: [i] a misrepresentation or omission of material fact; [ii] which the defendant knew to be false; [iii] which the defendant made with the intention of inducing reliance; [iv] upon which the plaintiff reasonably relied; and [v] which caused injury to the plaintiff[.]' " *Pipala* v. *JP Morgan Chase Bank NA*, No. 16 Civ. 3723 (VB), 2016 WL 7378979, at *2 (S.D.N.Y. Dec. 20, 2016) (quoting *Wynn* v. *AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)). As stated earlier, fraud claims are considered under " 'Rule 9(b) [of the Federal Rules of Civil Procedure], [which] requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.' " *Goonewardena*, 2019 WL 121677, at *7 (citation omitted). Furthermore, "a fraud claim must be supported by allegations 'that give rise to a strong inference of fraudulent intent,' " and a plaintiff can meet this standard by " '[i] alleging facts to show that [the] defendant[ ] had both motive and opportunity to commit fraud, or by [ii] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *PetEdge, Inc.*, 234 F. Supp. 3d at 491 (citation omitted).

Plaintiff's mortgage fraud claim is deficient for the same reasons previously discussed in the context of her fraudulent inducement claim. Plaintiff has not satisfied the heightened pleading standard of Rule 9(b): she has not "state[d] with particularity the circumstances constituting fraud[,]" nor has she adequately pleaded facts regarding scienter. Fed. R. Civ. P. 9(b). The Court will dismiss Count 6 of the Amended Complaint

### D. Plaintiff's Post-Settlement Claims Fail

Plaintiff also brings several claims that derive from Defendants' post-settlement conduct (the "Post-Settlement Claims"). These claims include (i) breach of the Settlement Agreement; (ii) violation of New York General Business Law § 349, New York's consumer protection statute; and (iii) perjury, based on Morreale's statements at one of the Court's conferences. For the reasons discussed below, the Court finds that the Post-Settlement Claims are inadequately stated and thus dismisses them.

### 1. Plaintiff Fails to State a Claim for Breach of the Settlement Agreement

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 63 of 76

Scalercio-Isenberg v. Goldman Sachs Mortgage Company, Not Reported in Fed. Supp....

2022 WL 3227875

As discussed earlier in this Opinion, Plaintiff alleges in Count 4 of her Amended Complaint that Defendants breached the Settlement Agreement. Plaintiff claims that "[t]he Contract was written and signed in Bad Faith by the Defendants, deceiving [her], and leading her to believe Goldman Sachs was going to talk to the Mortgage Servicer and demand they correct the Mortgage Statements and stop harassing [her]." (Am. Compl. 15). Plaintiff also contends that Defendants breached Sections 8 and 13 of the Settlement Agreement specifically. (*Id.* at 17). For substantially the same reasons upon which the Court found the Settlement Agreement to be valid and enforceable, *see supra* Discussion B, it rejects Plaintiff's claim for breach of contract.

### 2. Plaintiff Fails to State a Claim for a Violation of New York General Business Law § 349

In Count 8 of the Amended Complaint, Plaintiff contends that Defendants have violated New York General Business Law § 349. (Am. Compl. 22-23). Plaintiff describes Section 349 as a "broadly construed law designed to put consumers on the same footing as businesses," and alleges that Defendants used "deceptive business acts and practices in response to the mortgage fraud allegations" that she brought. (*Id.*). According to Plaintiff, Defendants' deceptive acts and practices prevented Plaintiff from receiving the "intended benefit[ ]" of the Settlement Agreement — namely, correcting her mortgage statements. (*Id.*). Separately, Plaintiff states that she experienced "severe emotional distress and significant financial damages" as a result of Defendants' "egregious" practices. (*Id.*). Defendants argue for dismissal of the claim for three reasons: (i) Section 349 requires plaintiffs to show that the conduct was consumer-oriented, and Plaintiff's mortgage issues were a private dispute; (ii) Plaintiff has not suffered injury; and (iii) the claim is barred as duplicative of Plaintiff's breach of contract claim. (Def. Br. 19-21). The Court agrees with Defendants as to their first and third arguments for dismissal.

**\*19** Section 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349. " 'To maintain a cause of action under Section 349, a plaintiff must show: [i] that the defendant's conduct is consumer-oriented; [ii] that the defendant is engaged in a deceptive act or practice; and [iii] that the plaintiff was injured by the practice.' " *Blockchain Luxembourg S.A.* v. *Paymium, SAS*, No. 18 Civ. 8612 (GBD), 2019 WL 4199902, at \*11 (S.D.N.Y. Aug. 7, 2019) (quoting *Heskiaoff* v. *Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir.

2017) (summary order)); *see also Wilson* v. *Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (same).

Plaintiff fails to state a claim under Section 349 for two main reasons. *First*, Plaintiff does not adequately allege that Defendants' actions were consumer-oriented, as Plaintiff fails to explain why the conduct described would have had a "broad impact on the public at large." *Edebali* v. *Bankers Std. Ins. Co.*, No. 14 Civ. 7905 (JS), 2016 WL 5956007, at \*3 (E.D.N.Y. Jan. 14, 2016). Here, even accepting as true Plaintiff's allegations about Defendants' deceptive actions, Plaintiff describes nothing "more than a private contractual dispute" relating to the Settlement Agreement. *Id.* Defendants state in their briefing that "[t]here can be nothing more private than a confidential settlement agreement between two parties relating to one mortgage loan." (Def. Br. 20). The Court agrees that Plaintiff's allegations describe an isolated dispute between two parties, not a widespread deceptive practice utilized and perpetuated by Goldman Sachs against the public.

*Second*, Plaintiff's claim under Section 349 is duplicative of her breach of contract claim. "[W]hen considering whether to dismiss a Section 349-claim as duplicative of a parallel breach-of-contract claim, a court inquires whether the act or practice giving rise to the Section 349-claim is misleading in a material respect separate and apart from the allegations of breach of contract." *42-50 21st St. Realty LLC* v. *First Central Savings Bank*, No. 20 Civ. 5370 (RPK) (RLM), 2022 WL 1004187, at \*10 (E.D.N.Y. Apr. 4, 2022) (internal citation and quotation marks omitted)). To a significant degree, Counts 4 (breach of contract) and 8 (violation of Section 349) of Plaintiff's Amended Complaint are premised on the same argument: that Defendants agreed to "resolve the Mortgage Servicer issues presented and to ensure the Mortgage statements were corrected[.]" (Am. Compl. 22; *see also id.* 15-16). Accordingly, since the Court cannot find a material difference between these allegations, Count 8 is dismissed as duplicative. *See Polk* v. *Del Gatto, Inc.*, No. 21 Civ. 129 (PAE), 2021 WL 3146291, at \*11 (S.D.N.Y. July 23, 2021) ("Because the Complaint does not adequately differentiate between the breach of contract and GBL § 349 claims, the Court dismisses the latter as duplicative.").

### 3. Plaintiff Fails to State a Claim for Perjury

Finally, Plaintiff contends that Morreale committed perjury during the parties' appearance before the Court on July 7, 2021, by stating: "they continue to say they're right, and I have not seen anything that says they're not right" in reference to Defendants' position on Plaintiff's mortgage

statements. (Am. Compl. 23; *see also* Dkt. #19 at 39-40). As alleged by Plaintiff, Morreale had seen the 2010 Quicken Loans Mortgage Refinance Contract (attached to Plaintiff's Amended Complaint as Exhibit 6), which should have apprised him of the correct mortgage statement and account information. (Am. Compl. 23). Defendants argue that there is no general civil cause of action for perjury, and that Defendants never made a false statement. (Def. Br. 21-22). The Court need not wade into the merits of this dispute, because it agrees that there is no private right of action for perjury. *See Orrigo* v. *Knipfing*, 564 F. Supp. 3d 273, 283 (E.D.N.Y. 2021) (" '[F]orgery and perjury are crimes and therefore do not give rise to civil causes of action.' " (citing *Luckett* v. *Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (internal alterations omitted)). Accordingly, Plaintiff's perjury claim is dismissed.

**E. The Court Denies Leave to Amend**

 **\*20**  The Court concludes by addressing whether to grant Plaintiff leave to amend. Federal Rule of Civil Procedure 15(a)(2) provides that a court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). That said, it is "within the sound discretion of the district court to grant or deny leave to amend." *Broidy Cap. Mgmt. LLC* v. *Benomar*, 944 F.3d 436, 447 (2d Cir. 2019). Leave may be denied where the proposed amendment would be futile. *See Olson* v. *Major League Baseball*, 447 F. Supp. 3d 174, 177 (S.D.N.Y. 2020). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action[.]" *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (finding amendment not futile where amended complaint would be "sufficient to withstand a motion to dismiss").

Here, the Court finds that further amendments to Plaintiff's pleading would be futile. Following a pre-motion conference in this case, the Court advised Plaintiff regarding her ability to amend her complaint in light of Defendants' pre-motion submissions and the parties' arguments. (*See* Dkt. #19 at 43-44). The Court allowed Plaintiff over two months to amend the complaint, and Plaintiff availed herself of the opportunity. Still, the Amended Complaint is deficient on all counts, and further amendment would be futile. "Where the problems with the causes of action are substantive and would not be cured with better pleading, repleading would be futile." *Tasaka*, 2022 WL 992472, at \*9 (citing *Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Many of Plaintiff's claims are barred by the explicit terms of the Settlement Agreement. Further, they rest on "an inaccurate view of the law, and thus cannot be repaired through amendment." *Knox* v. *Countrywide Bank*, 4 F. Supp. 3d 499, 514 (E.D.N.Y. 2014) (dismissing *pro se* plaintiff's claims and denying leave to amend). As to Plaintiff's fraud claims, Plaintiff has had two opportunities to comply with the requirements of Rule 9(b), and has not pleaded her allegations with the specificity required by the Rule. This is particularly clear as it relates to Plaintiff's deficient scienter allegations, which are contradicted by Plaintiff's own statements in her Amended Complaint and opposition, as well as Plaintiff's attachments. *See id.* ("The second fraud theory fails because of admissions contained in the complaint itself, and any amendment would necessarily conflict with those admissions."). Accordingly, the Court denies Plaintiff leave to amend and will dismiss her claims with prejudice.

**CONCLUSION**

For the aforementioned reasons, the Court GRANTS Defendants' motion to dismiss with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3227875

---

                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Murrey v. Minc, Not Reported in Fed. Supp. (2022)

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 65 of 76

2022 WL 1910127

2022 WL 1910127
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dr. Stewart Lucas MURREY, Plaintiff,

v.

Aaron MINC, an individual, Minc Law, a business
entity; Domingo J. Rivera, an individual; Rivera Law
Group, PLC a.k.a. Domingo J. Rivera, Attorney at
Law, PLC, a limited liability company; PRVT L.L.C.,
a limited liability company, Elizabeth Jordan, an
individual; Internet Reputation Control a.k.a. IRC, a
business entity; Anthony Will, an individual; Digital
Revolution LLC a.k.a. Reputation Resolutions, a business
entity; Brandyourself.com, Inc., a limited liability
company, Tom Vitolo, an individual; Christian Tyron,
an individual; and John Doe Numbers 1-10, Defendants.

21 Civ. 320 (AT) (JLC)
|
Signed 06/03/2022

**Attorneys and Law Firms**

Stewart Lucas Murrey, Santa Monica, CA, Pro Se.

Vincent Cox, Ballard Spahr LLP, Los Angeles, CA, Jacquelyn
Nicole Schell, Ballard Spahr LLP, New York, NY, for
Defendants.

**ORDER**

ANALISA TORRES, District Judge:

**\*1** Plaintiff *pro se*, Stewart Murrey, brings claims
against Defendants Aaron Minc, Minc Law, Domingo J.
Rivera, Rivera Law Group, PLC, PRVT L.L.C., Elizabeth
Jordan, Internet Reputation Control, Anthony Will, Digital
Revolution LLC, Brandyourself.com, Inc., Tom Vitolo,
Christian Tyron, and John Does 1–10 for violations of
the Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1962; California's unfair competition
law (the "UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*;
and California's statutory and common law right of publicity;
and claims for common law fraud and civil conspiracy. [1] On
December 22, 2020, Brandyourself.com, Inc., Tom Vitolo,
and Christian Tyron (the "Remaining Defendants") moved

to dismiss the first amended complaint (the "FAC"). *See*
Defs. Mot., ECF No. 63; FAC, ECF No. 9. For the reasons
stated below, the Remaining Defendants' motion to dismiss
is GRANTED.

[1]    On July 13, 2020, Plaintiff filed this action
in the Central District of California, suing
www.cheaterreport.com and Does 1 through 10
for defamation and violations of California's
statutory and common law right of publicity.
ECF No. 1. The Honorable Percy Anderson
dismissed the complaint for lack of subject matter
jurisdiction, and on August 3, 2020, Plaintiff
filed the FAC against Defendants. *See* FAC. On
December 18 and 28, 2020, Judge Anderson
dismissed the claims against all defendants other
than Brandyourself, Inc., Tom Vitolo, and
Christian Tyron for lack of personal jurisdiction or
failure to timely complete service. ECF Nos. 62
at 12, 66. On January 13, 2021, Judge Anderson
ordered the action transferred to this district, but
declined to rule on the pending motion to dismiss.
ECF No. 75 at 6. The case was then assigned to the
undersigned. 2/10/2021 Docket Entry.

**BACKGROUND** [2]

[2]    The following facts are taken from the FAC, which
the Court accepts as true for purposes of this
motion. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d
Cir. 2014).

Beginning in late 2016, a series of allegedly defamatory
comments about Plaintiff were posted on the website
www.cheaterreport.com (the "Website"), along with
photographs taken from Plaintiff's personal website, dating
profiles, and social media platforms. FAC ¶ 24. These posts
"consumed" all other search engine results for Plaintiff's
name, which "severely harm[ed] his reputation and end[ed]
his ability to earn money." *Id.* ¶ 25. The comments on the
Website ultimately led to Plaintiff's being arrested twice, once
in 2017 and once in 2018, and Plaintiff's filing of two false
arrest lawsuits, which were subsequently settled. *Id.* ¶ 32.

From 2017 to 2019, Defendants and others "solicited and
received" thousands of dollars from Plaintiff to "remove
online libel and rehabilitate [his] online reputation." *Id.* ¶¶
28, 31, 59–60. Plaintiff alleges that although Defendants and

Murrey v. Minc, Not Reported in Fed. Supp. (2022)

2022 WL 1910127

others represented to him that they had no connection to the Website, they were actually in cahoots with the Website, "work[ing] illegally with other individuals and business entities operating and maintaining [the Website]" and giving "kickbacks to the Website's operators. *Id.* ¶¶ 28–31, 68, 87–89.

**DISCUSSION**

I. Legal Standard

**\*2** To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[ ] and a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

Moreover, *pro se* litigants are entitled to "special solicitude," and the Court shall construe a *pro se* "complaint to raise the strongest claims that it suggests." *Williams v. Priatno,* 829 F.3d 118, 122 (2d Cir. 2016) (quoting *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011)). Nonetheless, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)).

II. Analysis

A. RICO Claims

RICO "sets forth four specific prohibitions aimed at different ways in which a pattern of racketeering activity may be used to infiltrate, control, or operate 'a[n] enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.' " *RJR Nabisco, Inc. v. European Cmty.,* 136 S. Ct. 2090, 2097 (2016) (alteration in original) (quoting 18 U.S.C. § 1962). To plead a civil RICO claim under any of § 1962's subsections, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through either a pattern of racketeering activity or the collection of an unlawful debt. *See H.J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 232 (1989); *Lundy v. Catholic Health Sys. of Long Island, Inc.,* 711 F.3d 106, 119 (2d Cir. 2013) (citation omitted); *see also RJR Nabisco,* 136 S. Ct. at 2105.

RICO defines "racketeering activity" as the commission of certain criminal acts under state and federal law, including wire fraud under 18 U.S.C. § 1343 and extortion under 18 U.S.C. § 1951. 18 U.S.C. § 1961(1); *see also Liang v. Home Reno Concepts, LLC,* 803 F. App'x 444, 447 (2d Cir. 2020). Here, Plaintiff's RICO allegations are based on defamation, wire fraud, and extortion. *See* FAC ¶¶ 1, 44, 52, 67; Pl. Opp'n at 17, ECF No. 87.

Because "it is firmly established that defamation ... do[es] not provide the requisite predicate for RICO violations," *Hollander v. Pressreader, Inc.,* No. 19 Civ. 2130, 2020 WL 2586189, at \*4 (S.D.N.Y. May 30, 2020) (citation omitted), Plaintiff's allegations that Defendants published defamatory statements about him cannot serve as a predicate act for his RICO claim, FAC ¶¶ 52, 99.

Moreover, Plaintiff cannot support his RICO claim with predicate acts of wire fraud because he has not alleged wire fraud with sufficient particularity. The heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to RICO claims predicated on fraud. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir. 1992). Therefore, Plaintiff must "specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent[,] and plead those events which give rise to a strong inference that [each] defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Jus Punjabi, LLC v. Get Punjabi US, Inc.,* 640 F. App'x 56, 58 (2d Cir. 2016) (quotation marks and citations omitted). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987).

**\*3** Plaintiff claims that Defendants and others (1) "intentionally flood[ed] the internet with misinformation that misdirects anyone reasonably searching for them to waste his or her time and resources and return to the state of despair that is, for those involved in this pattern of organized crimes, most profitable," FAC ¶ 34 (emphasis omitted); (2) intentionally misrepresented "on [their] website [and/or] to Plaintiff directly" that they "had nothing to do with," "strongly did not like," and "had no contact and or connections with" the Website "nor anyone and or any entity involved in operating and maintaining" the Website, *id.* ¶¶ 87–89; (3) "intentionally concealed from Plaintiff that they would work with and transact with individuals and entities responsible for operating and maintaining the [Website] ... to induce Plaintiff to pay for 'removal services,' " *id.* ¶ 94; and (4) failed to uphold a promise to act in "good faith" and with "due diligence," *id.* ¶ 115.

These allegations do not "adequately specify the statements [Plaintiff] claims were false or misleading ... [or] state when and where the statements were made." *McLaughlin*, 962 F.2d at 191. Plaintiff also does not identify the particular statements each Defendant made. *Cf. McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08 Civ. 392, 2009 WL 2132439, at *5 (E.D.N.Y. July 10, 2009). Even Plaintiff's most specific allegation, that Defendants communicated with Plaintiff "via multiple email, texts, and telephone" from February 2017 until August 2019, and "continued to intentionally misrepresent to Plaintiff that they had no connection with, much less did not support nor transact with those who host, operate and or maintain [the Website]," FAC ¶ 99, does not specify the fraudulent statements, which Defendant made the statement, or how each statement was made, *see Jus Punjabi*, 640 F. App'x at 58. Therefore, Plaintiff has failed to properly allege wire fraud as a predicate act. *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004); *see also Cont. Transp. Servs., Inc. v. New Era Lending LLC*, No. 17 Civ. 8224, 2018 WL 11226077, at *3 (S.D.N.Y. Oct. 26, 2018).

Finally, Plaintiff has not sufficiently alleged extortion. To demonstrate that Defendants engaged in extortion, Plaintiff must allege that Defendants "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by ... extortion or attempt[ed] or conspire[d] so to do, or commit[ted] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951; *see also McLaughlin*, 962 F.2d at 194. Extortion is defined as the "obtaining of

property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2); *Entrelatas Americanas S.A. v. Soler*, No. 19 Civ. 3658, 2020 WL 9815186, at *10 (S.D.N.Y. Feb. 3, 2020), *aff'd*, 840 F. App'x 601 (2d Cir. 2020), *as amended* (Jan. 7, 2021) (citation omitted). "[F]atal" to an extortion claim is "[t]he absence of allegations of force, violence or fear." *Entrelatas Americanas*, 2020 WL 9815186, at *10 (collecting cases).

Here, Plaintiff does not allege any force or violence. Instead, he appears to allege that Defendants used fear, stating that "the 'removal business' enterprise component of the [alleged scheme] receives payments for removals of said lethal defamations." FAC ¶¶ 28, 68. To the extent that Plaintiff is referring to a fear of reputational harm from allegedly defamatory statements, such a fear is insufficient to state an extortion claim under RICO. *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137 (E.D.N.Y. 2010). But, Plaintiff's claims, when construed liberally, could be seen as an attempt to allege that victims of Defendants fear the economic loss that would result from the defamatory statements. A fear of economic loss can sustain a claim for extortion if the fear is that "nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit." *DeFalco v. Bernas*, 244 F.3d 286, 313 (2d Cir. 2001) (citation omitted). The absence or presence of fear of economic loss "must be considered from the perspective of the victim, not the extortionist," and the plaintiff must show "that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *Id.* (citation omitted).

**\*4** Plaintiff has not sufficiently alleged an economic fear. Plaintiff does not claim that Defendants prevented him from going to other brand management firms to remove the defamatory statements, or that Plaintiff feared looking elsewhere because he believed Defendants would harm him. *See United States v. Capo*, 817 F.2d 947, 953 (2d Cir. 1987) (holding that fear of economic loss was not established where the victims were free to achieve their goals through other channels); *see also* FAC ¶ 106 (acknowledging the existence of brand management firms not involved in the alleged scheme). In fact, Plaintiff claims that he was not aware that Defendants had any connection to the Website when he contracted with them, FAC ¶ 28, and, therefore, he could not have reasonably believed that Defendants would harm him if he did not hire them, *see Capo*, 817 F.2d at 951. Although Plaintiff argues in his opposition brief that "[D]efendants

Murrey v. Minc, Not Reported in Fed. Supp. (2022)

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 68 of 76

2022 WL 1910127

wrongfully communicated to [P]laintiff that if he did not pay them for their 'online reputation services', his life, work and ability to earn money would be forever decimated by the anonymous defamation and ever-present threat of [the Website], thus instilling fear of harm if [P]laintiff did not pay their fee and hire him," Pl. Opp'n at 19, no such threat is alleged in the FAC. Therefore, Plaintiff has not sufficiently alleged extortion.

Because Plaintiff has failed to allege any predicate acts, he has failed to state a RICO claim as well as a claim for RICO conspiracy. *See Entretelas Americanas S.A.*, 2020 WL 9815186, at *7; *First Cap. Asset Mgmt.*, 385 F.3d at 182. Accordingly, the Remaining Defendants' motion to dismiss Plaintiff's RICO claims is GRANTED.

### B. State Law Claims

Plaintiff also brings state law claims for fraudulent misrepresentation, violation of the UCL, violation of California's right of publicity, and civil conspiracy. *See* FAC.

First, because Plaintiff's claim for fraud is predicated on the same allegations discussed above, Plaintiff fails to state a claim for fraud under the heightened pleading standards of Rule 9(b). FAC ¶¶ 86–97; *see also Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 319 (S.D.N.Y. 2009).

Next, Plaintiff's claims for a violation of the UCL, which prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof. Code § 17200, also fail. Plaintiff alleges a UCL violation based on the conduct underlying Remaining Defendants' alleged RICO violations, as well as wiretapping, criminal eavesdropping, and trespass in order to eavesdrop. FAC ¶ 110. As discussed above, Plaintiff has not sufficiently alleged any predicate acts for a RICO violation, and the FAC contains no allegations that would support a claim based on wiretapping or eavesdropping by Defendants. Therefore, Plaintiff has not sufficiently alleged that Defendants engaged in unlawful conduct. And, because Plaintiff has not pleaded fraud with particularity and his allegations under the "unfair" prong sound in fraud, he also fails to allege that Defendants engaged in either unfair or fraudulent conduct. FAC ¶ 111; *see also Silver v. Stripe Inc.*, No. 20 Civ. 8196, 2021 WL 3191752, at *7 (N.D. Cal. July 28, 2021); *Harris v. LSP Prod. Grp., Inc.*, No. 18 Civ. 2973, 2021 WL 2682045, at *13 n.6 (E.D. Cal. June 30, 2021).

Plaintiff's claim for violation of the California right of publicity, based on the use of his name and image on posts on the Website fails as well. FAC ¶¶ 121–127. Claims based on the common law or statutory right of publicity require the plaintiff to show that the *defendant* "appropriated the plaintiff's name or likeness for commercial purposes." *Cross v. Facebook, Inc.*, 222 Cal. Rptr. 3d 250, 266–67 (Cal. App. Div. 2017) (quoting *Perfect 10, Inc. v. Google, Inc.*, No. 04 Civ. 9484, 2010 WL 9479060, at *13 (C.D. Cal. July 30, 2010), *aff'd*, 653 F.3d 976 (9th Cir. 2011)). Therefore, Defendants would be liable only insofar as they personally posted about Plaintiff, and Plaintiff makes no non-conclusory allegations that Defendants did so. *See* FAC ¶ 52 (alleging generally, without factual support or specifying which Defendants acted, that Defendants "aggressively publish[ed] defamatory and knowingly false statements about him"); Pl. Opp'n at 26 (suggesting that Defendants are aware of the "anonymous" posters of the defamatory material, an allegation which does not appear in the FAC).

**\*5** Finally, Plaintiff's civil conspiracy claim also fails. Under both New York and California law, civil conspiracy is not an independent tort; it requires a separate tortious act. *See Doe v. Merck & Co.*, 803 F. App'x 559, 561 (2d Cir.); *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal. 1994). As Plaintiff has not sufficiently stated any tortious acts, his conspiracy claim fails as well.[3]

---

[3]    Although Plaintiff originally brought a claim for defamation, ECF No. 1, he retracted that claim in the FAC.

Moreover, even if Plaintiff had sufficiently pleaded an underlying tort, he does not sufficiently allege an agreement, which is a necessary component of a conspiracy claim. *See R.B. Dev., Co. v. Tutis Cap. LLC*, No. 12 Civ. 1460, 2018 WL 7076023, at *10 (E.D.N.Y. Nov. 14, 2018). Plaintiff makes no non-conclusory allegations that Defendants had a meeting of the minds with each other or with the rest of those involved in the alleged scheme. *See, e.g.*, FAC ¶¶ 76–85, 98–108; *see also Oceanside Organics v. Cty. of San Diego*, No. 15 Civ. 854, 2018 WL 1156431, at *5 (S.D. Cal. Mar. 5, 2018); *Kesner v. Dow Jones & Co., Inc.*, No. 20 Civ. 3454, 2021 WL 256949, at *28 (S.D.N.Y. Jan. 26, 2021).

Accordingly, the Remaining Defendants' motion to dismiss Plaintiff's state law claims is GRANTED.

Murrey v. Minc, Not Reported in Fed. Supp. (2022)

2022 WL 1910127

### C. Leave to Amend

Plaintiff, in the event the Court dismisses his claims, moves for leave to file a second amended complaint. Pl. Opp'n at 27–28. Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). *Pro se* litigants "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (citation omitted). Under this liberal standard, a motion for leave to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Plaintiff argues in support of his request that "clear facts establishing a pattern of anonymous defamation and extortion" by Defendants and others can be alleged. Pl. Opp'n at 27. The Remaining Defendants contend that Plaintiff has now had several opportunities to plead his claims and cannot do so, and that there is "a strong aroma of bad faith" in Plaintiff's claims, which are "made without factual support." Def. Reply at 8, ECF No. 88.

Although the Court does not find that Plaintiff acted in bad faith, *see Fontoine v. Permanent Mission of Chile to United Nations*, No. 17 Civ. 10086, 2019 WL 2482374, at *6 (S.D.N.Y. June 14, 2019) (explaining that courts "consistently reject" "conclusory allegation[s] of bad faith" (citation omitted)); *see also Cmty. Ass'n Underwriters of Am., Inc. v. Main Line Fire Prot. Corp.*, No. 18 Civ. 4273, 2020 WL 5089444, at *3 (S.D.N.Y. Aug. 28, 2020), the Court shall not grant Plaintiff leave to amend at this time because it cannot evaluate whether such an amendment would be futile, *see Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004); *see also* ECF No. 96. Plaintiff has neither provided a proposed second amended complaint, nor set forth the facts he would include in the second amended complaint.

**\*6** Accordingly, Plaintiff's request to amend the FAC is DENIED without prejudice to renewal.

### CONCLUSION

For the reasons stated above, the Remaining Defendants' motion to dismiss is GRANTED. Plaintiff's motion for leave to amend is DENIED without prejudice to renewal. By **July 6, 2022**, Plaintiff may move to file a second amended complaint, with an exhibit containing the proposed second amended complaint.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1910127

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Joseph v. JRF Income Tax Business Services, Not Reported in Fed. Supp. (2021)**

2021 WL 3516421

2021 WL 3516421
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Anderson JOSEPH, Plaintiff,

v.

JRF INCOME TAX BUSINESS SERVICES, Defendant.

Anderson Joseph, Plaintiff,

v.

McDonald's Restaurant, Defendant.

Anderson Joseph, Plaintiff,

v.

North Shore University Hospital, Defendant.

Anderson Joseph, Plaintiff,

v.

Social Security Office, Defendant.

Anderson Joseph, Plaintiff,

v.

T-Mobile, Defendant.

Anderson Joseph, Plaintiff,

v.

Department of the Treasury Internal
Revenue Service, Defendant.

Anderson Joseph, Plaintiff,

v.

Great Neck Plaza Village of, Defendant.

Anderson Joseph, Plaintiff,

v.

Help to Adjust Counseling,
Anger Management, Defendant.

Anderson Joseph, Plaintiff,

v.

New York State Insurance Fund, Defendant.

Anderson Joseph, Plaintiff,

v.

Capital One Bank, Defendant.

Anderson Joseph, Plaintiff,

v.

Charra Nalini, Defendant.

Anderson Joseph, Plaintiff,

v.

Ctown Supermarket, Defendant.

Anderson Joseph, Plaintiff,

v.

Lantern Diner, Defendant.

21-CV-3869 (PKC) (PK), 21-CV-3870 (PKC)
(PK), 21-CV-3872 (PKC) (PK), 21-CV-3873
(PKC) (PK), 21-CV-3874 (PKC) (PK), 21-

Joseph v. JRF Income Tax Business Services, Not Reported in Fed. Supp. (2021)

2021 WL 3516421

CV-3876 (PKC) (PK), 21-CV-3877 (PKC) (PK), 21-
CV-3878 (PKC) (PK), 21-CV-3879 (PKC) (PK), 21-
CV-3880 (PKC) (PK), 21-CV-3881 (PKC) (PK),
21-CV-3882 (PKC) (PK), 21-CV-3883 (PKC) (PK)

|

Signed 08/10/2021

**Attorneys and Law Firms**

Anderson Joseph, Queens Village, NY, Pro Se.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

 **\*1** Plaintiff Anderson Joseph filed these 13 *pro se* actions on
June 8, 2021 under 42 U.S.C. § 1983 ("Section 1983"). [1] The
actions are consolidated solely for the purpose of this Order.
Plaintiff's requests to proceed *in forma pauperis* ("IFP")
pursuant to 28 U.S.C. § 1915 are granted. For the reasons
discussed below, all 13 Complaints are dismissed.

[1]   The Court notes that in recent months, Plaintiff
has filed more than 20 other cases against various
individuals, organizations, and entities, all but
one of which was dismissed for failure to state
a claim pursuant to 28 U.S.C. § 1915(e)(2)(B).
*See Joseph v. Supreme Ct. of the State of N.Y.*,
No. 21-CV-1685 (PKC) (PK); *Joseph v. Legal
Aid Soc'y*, No. 21-CV-1686 (PKC) (PK); *Joseph
v. N.Y.C. Police Dep't*, No. 21-CV-1687 (PKC)
(PK); *Joseph v. Kirby Forensic Psychiatric Ctr.*,
No. 21-CV-1688 (PKC) (PK); *Joseph v. Dep't of
Probation*, No. 21-CV-1689 (PKC) (PK); *Joseph v.
Nassau Cnty. Probation*, No. 21-CV-1690 (PKC)
(PK); *Joseph v. Row Hotel*, No. 21-CV-1691 (PKC)
(PK); *Joseph v. Children's Rescue Fund*, No. 21-
CV-1692 (PKC) (PK); *Joseph v. Landing Fam.
Shelter*, No. 21-CV-1693 (PKC) (PK); *Joseph v.
Spring Fam. Residence*, No. 21-CV-1694 (PKC)
(PK); *Joseph v. Hollis Fam. Residence*, No. 21-
CV-1695 (PKC) (PK); *Joseph v. MTA NYC Transit*,
No. 21-CV-1696 (PKC) (PK); *Joseph v. Stark*, No.
21-CV-2136 (PKC) (PK); *Joseph v. Jamaica Hosp.
Med. Ctr.*, No. 21-CV-2137 (PKC) (PK); *Joseph
v. Mount Sinai Queens*, No. 21-CV-2139 (PKC)
(PK); *Joseph v. NYU Langone Med. Bus. Off.*,
No. 21-CV-2140 (PKC) (PK); *Joseph v. Queens
Hosp. Ctr.*, No. 21-CV-2141 (PKC) (PK); *Joseph v.

*Wells Fargo Bank*, No. 21-CV-2810 (PKC) (PK);
*Joseph v. TD Bank*, No. 21-CV-2811 (PKC) (PK);
*Joseph v. Ridgewood Sav. Bank*, No. 21-CV-2812
(PKC) (PK); *Joseph v. CMJ Mgmt. Inc.*, No. 21-
CV-2813 (PKC) (PK); *Joseph v. Chase Bank*, No.
21-CV-2814 (PKC) (PK); *Joseph v. Bank of Am.*,
No. 21-CV-2816 (PKC) (PK).

**LEGAL STANDARD**

A complaint must plead facts sufficient to "state a claim
to relief that is plausible on its face." *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 570 (2007). Although all allegations
contained in the compliant are assumed to be true, this
tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal,*
556 U.S. 662, 678 (2009). A document filed *pro se* is to
be liberally construed, and "a *pro se* complaint, however
inartfully pleaded, must be held to less stringent standards
than formal pleadings drafted by lawyers." *Ceara v. Deacon,*
916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*,
551 U.S. 89, 94 (2007)); *see McEachin v. McGuinnis,* 357
F.3d 197, 200 (2d Cir. 2004) ("[A] court is obliged to construe
[*pro se*] pleadings liberally, particularly when they allege civil
rights violations."). "If [a] liberal reading of the complaint
'gives any indication that a valid claim might be stated,' the
Court must give the plaintiff an opportunity to amend the
complaint." *Nelson-Charles v. U.S. Dep't of Educ.*, No. 19-
CV-1616 (PKC) (PK), 2019 WL 1675999, at \*2 (E.D.N.Y.
Apr. 16, 2019) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112
(2d Cir. 2000)).

 **\*2**  Nevertheless, under 28 U.S.C. § 1915(e)(2)(B), a district
court shall dismiss an IFP action where it is satisfied that
the action "(i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief." 28
U.S.C. § 1915(e)(2)(B). "An action is frivolous when either:
(1) the factual contentions are clearly baseless, such as when
allegations are the product of delusion or fantasy; or (2) the
claim is based on an indisputably meritless legal theory."
*Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d
Cir. 1998) (internal quotation marks and citation omitted).

**BACKGROUND**

In his Complaint against **JRF Income Tax Business Services
("JRF")**, Plaintiff alleges that on February 21, 2020, he called
JRF to inquire about his income taxes and spoke with Mr.

2021 WL 3516421

Joseph Francois, who "d[id]n't have any information about either [Plaintiff] or [his] wife," prompting Plaintiff to ask Mr. Francois if he "has a license to do taxes[.]" (No. 21-CV-3869, Dkt. 1, at 3–4.) Plaintiff alleges that Mr. Francois became "mad" and cursed at him. (*Id.* at 4.) As a result, Plaintiff "felt disrespect and discrimination at the same time" and noted that Mr. Francois's "office is too small for business." (*Id.*) Plaintiff claims that he felt stressed and sad, and he seeks $3 million in monetary damages for pain and suffering. (*Id.* at 4–5.)

In his Complaint against **McDonald's Restaurant**, Plaintiff alleges that on May 19, 2016, he went to a McDonald's location in West Hempstead, New York and discovered that "the McDonalds [was] using [his] ideas from [a previous] complaint, things like breakfast all day and a better customer service because before the customer service was very bad." (No. 21-CV-3870, Dkt. 1, at 3–4.) Plaintiff alleges that he was verbally abused and "discriminated for no reason." (*Id.* at 4.) Plaintiff alleges that he felt depressed and sad, and he seeks unspecified monetary damages for discrimination and pain and suffering. (*Id.* at 4–5.)

In his Complaint against **North Shore University Hospital ("North Shore")**, located in Manhasset, New York, Plaintiff alleges that while in police custody on December 6, 2013, he was taken to the North Shore emergency department for treatment to a cut on his right hand. (No. 21-CV-3872, Dkt. 1, at 3–4.) Plaintiff alleges that his injury required surgery, but that the doctor did not give him anesthesia, so he "felt the sensation of the pain very badly" and "after the surgery [he] kept on giving blood until [he] arrive[d] to Rikers Island." (*Id.* at 4.) Plaintiff alleges that he suffered from "injuries, stressful depression[,] and sleep disorder," and he seeks $500 million in damages for pain and suffering. (*Id.* at 4–5.)

In his Complaint against the **"Social Security Office,"** Plaintiff alleges that on May 23, 2016, March 19, 2021, and other occasions, the Social Security Office discriminated against and disrespected him. (No. 21-CV-3873, Dkt. 1, at 3–4.) Plaintiff alleges that he experienced bad customer service, including waiting "1 to 2 hours over the phone" before being informed that he did not qualify for benefits and waiting "for 8 hours" at the office without anyone serving him. (*Id.* at 3–4.) Plaintiff alleges that he experienced depression and pain, and he seeks unspecified money damages. (*Id.* at 4–5.)

In his Complaint against **T-Mobile**, Plaintiff alleges that during a phone call on May 19, 2016, T-Mobile customer service "treat[ed] [him] as [he] sa[id] in [his previous]

complaint and us[ed] [his] idea for a better service and [he] need[s] to get paid for that." (No. 21-CV-3874, Dkt. 1, at 3–4.) Plaintiff alleges that he experienced depression, stress, and emotional pain, and he seeks unspecified money damages for discrimination and pain and suffering. (*Id.* at 4–5.)

**\*3** In his Complaint against the **Department of Treasury Internal Revenue Service ("IRS")**, Plaintiff alleges that since 2012, a Florida-based company did his taxes, so he is not responsible for them, and "any time [he] called IRS over the phone the agents disrespected [him] because they d[idn]'t have any answers for [him]." (No. 21-CV-3876, Dkt. 1, at 4.) Plaintiff alleges that the IRS charged him $5,000 to "pay back," made him wait "1 to 2 hours" on the phone, and "abuse[d] [him] verbally [and he] felt discriminated and [dis]respcted." (*Id.*) Plaintiff alleges that felt depression and stress, and he seeks $100 million in damages for pain and suffering. (*Id.* at 4–5.)

In his Complaint against **"Great Neck Plaza Village Of"** [2] **("Great Neck")**, Plaintiff alleges that on August 10, 2016, he was verbally abused and "discriminated at work as a community organizer" because a driving instructor for the "city government office in Great Neck hung up the phone in [his] face several times" when he was "telling them ... that [Great Neck] was not safe to drive." (No. 21-CV-3877, Dkt. 1, at 3–4.) Plaintiff alleges that he felt depressed and verbally abused, and he seeks unspecified money damages for discrimination and pain and suffering. (*Id.* at 4–5.)

[2]     The Village of Great Neck is located in Nassau County, New York. *See* https://www.greatneckvillage.org/ (last visited July 27, 2021).

In his Complaint against **Help to Adjust, Anger Management ("Help to Adjust")**, a private counseling center, [3] Plaintiff alleges that his probation officer sent him for weekly counseling sessions, including on June 29, 2017, where the counselor asked questions about his life and December 6, 2013 arrest, and he was required to get drug tested. (No. 21-CV-3878, Dkt. 1, at 3–4.) Plaintiff states that he "felt discriminated [against] because [the counselor] was using [him] to better her job position and [he] didn't get paid for it[,] and after her interview with [him], [he] always felt dizziness and emotional stress." (*Id.* at 4.) Plaintiff alleges that he felt stress, and he seeks $3 million in damages for pain and suffering. (*Id.* at 5.)

Joseph v. JRF Income Tax Business Services, Not Reported in Fed. Supp. (2021)

2021 WL 3516421

3

Help to Adjust is a counseling center that offers general therapy, marriage and relationship counseling, and anger management counseling. *See* Help to Adjust Counseling & Anger Management, http://www.valleystreamtherapist.com/ (last visited on July 27, 2021).

In his Complaint against **New York State Insurance Fund ("NYSIF")**, Plaintiff alleges that on June 6, 2016 and April 28, 2021, he was discriminated against and verbally abused over the phone by an NYSIF employee, who denied him information. (No. 21-CV-3879, Dkt. 1, at 3–4.) Plaintiff alleges that he felt depression, stress, and emotional pain, and he seeks unspecified money damages for discrimination and pain and suffering. (*Id.* at 4–5.)

In his Complaint against **Capital One Bank ("Capital One")**, Plaintiff alleges that from 2015 until April 9, 2021, including on November 5, 2020, "Capital One Bank [was] always changing [his] balance and took [his] money illegally." (No. 21-CV-3880, Dkt. 1, at 3–4.) Plaintiff alleges that he called customer service to "let them know" and they made him wait "a good 1 to 2 [hours]" and "discriminate[d] [against him] over the phone." (*Id.* at 4.) Plaintiff alleges that he felt depression and stress, and he seeks $500 million in money damages for discrimination and pain and suffering. (*Id.* at 4–5.)

In his Complaint against **Charra Nalini**, Plaintiff alleges that he was injured in a car accident while he was a driving instructor at Nalini's driving school, and that on May 26, 2016, Nalini, "refused to give [him] information about [ ] car insurance." (No. 21-CV-3881, Dkt. 1, at 3–4.) Plaintiff also alleges that he called Nalini to ask for his last paycheck, but she hung up on him. (*Id.* at 4.) Plaintiff seeks unspecified money damages for pain and suffering. (*Id.* at 5.)

**\*4** In his Complaint against **CTown Supermarket ("CTown")**, Plaintiff alleges that on June 9, 2021,[4] employees at a CTown located in Jamaica, New York, verbally abused, threatened, and treated him badly, prompting Plaintiff to call the police "for discrimination." (No. 21-CV-3882, Dkt. 1, at 3–4.) Plaintiff alleges that he felt stress and "emotional injury" and that CTown "need[s] to stop experiments on [him]." (*Id.*) Plaintiff seeks $500 million in money damages for discrimination. (*Id.* at 5.)

4

The Court notes that this action was filed on June 8, 2021, the day *before* this alleged event.

Finally, in his Complaint against **Lantern Diner**, located in West Hempstead, New York, Plaintiff alleges that on June 6, 2016, he "went to Lantern Diner and [ ] saw the Diner servers treat [him] as [he said] in [his] complaint, but the Diner us[ed] [his] idea and [he] need monetary [sic] for it." (No. 21-CV-3883, Dkt. 1, at 3–4.) Plaintiff attaches materials related to a state court action in which he alleges Lantern Diner discriminated against him. (Dkt. 1-2.) Plaintiff alleges that he felt depression and stress, and he seeks unspecified money damages for discrimination and pain and suffering. (No. 21-CV-3883, Dkt. 1, at 4–5.)

## DISCUSSION

### I. 42 U.S.C. § 1983

Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). To state a claim under Section 1983, a plaintiff must allege that the conduct at issue was "committed by a person acting under color of state law" and that the conduct deprived the plaintiff "of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)).

"[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v.*

2021 WL 3516421

*Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citation omitted). However, the Second Circuit has identified three main tests for determining when the actions of a "nominally private entity are attributable to the state" for purposes of Section 1983 liability:

> (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

*Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration in original) (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Id.* (citations omitted).

*5 Here, Plaintiff's claims against JRF, McDonald's, North Shore, T-Mobile, Help to Adjust, Capital One, Charra Nalini, CTown and Lantern Diner fail because they are all private entities beyond the reach of Section 1983 liability. Plaintiff does not allege that any of these entities acted under color of state law, and there are no facts in the Complaints that demonstrate, even on a liberal reading, that the actions of these Defendants may be "fairly attributable" to the state. Therefore, the Complaints must be dismissed. *See Boothe v. Rossrock Funds II LP*, No. 16-CV-900 (PKC), 2017 WL 2271360, at *8 (E.D.N.Y. May 23, 2017) (dismissing Section 1983 claims against private corporations, including a bank, because none were "State actors for purposes of 42 U.S.C. § 1983" and the amended complaint "utterly fail[ed] to allege that [the] [d]efendants' actions are attributable to the State" (citation omitted)); *Anthony v. Med. Staff at Inst.*, 409 F. Supp. 3d 102, 105 (E.D.N.Y. 2016) ("A private hospital is generally not considered a state ... actor.") (collecting cases); *Schneiderman v. N. Shore Univ. Hosp.*, No. 13-CV-5939, 2013 WL 6564184, at *2 (E.D.N.Y. Dec.

11, 2013) ("North Shore University Hospital is a private hospital facility.")[5]; *Brown v. Chase Bank*, No. 13-CV-5309 (WFK) (LB), 2013 WL 5537302, at *2 (E.D.N.Y. Oct. 7, 2013) (dismissing complaint against private corporations, including banks, and private individuals who "do not act under color of state law within the meaning of 42 U.S.C. § 1983"); *White v. St. Joseph's Hosp.*, 369 F. App'x 225, 226 (2d Cir. 2010) (summary order) ("[P]rivate actors and institutions, such as the hospitals, ... named as defendants in [the plaintiff]'s original complaint, are generally not proper § 1983 defendants because they do not act under color of state law." (citing *Sullivan*, 526 U.S. at 49–50)).

5      North Shore is part of the Northwell Health system and is the teaching hospital for the Donald and Barbara Zucker School of Medicine at Hofstra/Northwell. *See* About Us, https://nsuh.northwell.edu/about (last visited July 27, 2021).

Furthermore, Plaintiff does not provide any facts to support his conclusory allegations of discrimination by these Defendants. A complaint that offers nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or that "tenders naked assertions devoid of further factual enhancement" is insufficient. *Iqbal*, 556 U.S. at 678 (alteration, internal quotation marks, and citations omitted). Accordingly, even on a liberal reading, these 13 Complaints must also be dismissed for failing to state a claim.

In addition, Plaintiff's medical malpractice claim against North Shore fails because the Court does not have jurisdiction over this state law claim. "A claim sounds in medical malpractice when the challenged conduct 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.' " *Sha v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 99-CV-3233 (AKH), 2000 WL 1760883, at *1 (S.D.N.Y. Nov. 30, 2000) (quoting *Weiner v. Lenox Hill Hospital*, 673 N.E.2d 914 (1996)), *aff'd sub nom. Sha (Engelhardt) v. Mem'l Sloan Kettering Cancer Ctr.*, 29 F. App'x 788 (2d Cir. 2002). Plaintiff's Complaint against North Shore relates to medical treatment provided to him and therefore can be read as a claim for medical malpractice. Medical malpractice claims "arise under state law, and a federal court generally will not have original jurisdiction over the[se] claims unless complete diversity exists," meaning "no plaintiff and no defendant are citizens of the same state." *Urena v. Wolfson*, No. 09-CV-1107 (KAM) (LB), 2010 WL 5057208, at *13 (E.D.N.Y. Dec. 6, 2010). Here, Plaintiff and

Case 1:25-cv-00991-GTS-TWD    Document 4    Filed 10/07/25    Page 75 of 76

Joseph v. JRF Income Tax Business Services, Not Reported in Fed. Supp. (2021)

2021 WL 3516421

North Shore are both citizens of New York; thus complete diversity and diversity jurisdiction do not exist. *See* 28 U.S.C. § 1332.

Finally, Plaintiff's actions against the Social Security Office, IRS, Great Neck, and NYSIF must be dismissed because allegations that Plaintiff was treated poorly, disrespected, or received bad customer service simply do not rise to the level of federal constitutional or statutory violations. Furthermore, Plaintiff does not provide any facts to support his conclusory allegations of discrimination by these Defendants. As previously stated, a complaint that offers nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or that "tenders naked assertions devoid of further factual enhancement" is insufficient. *Iqbal*, 556 U.S. at 678 (alteration, internal quotation marks, and citations omitted). Accordingly, even on a liberal reading, these Complaints must be dismissed for failing to state a claim upon which relief can be granted.

## II. Denial of Leave to Amend

**\*6** The Court has a duty to give a *pro se* plaintiff the opportunity to amend his complaint if a "liberal reading of the complaint 'gives any indication that a valid claim might be stated[.]' " *Nelson-Charles*, 2019 WL 1675999, at \*2 (quoting *Cuoco*, 222 F.3d at 112). However, where it would be futile to do so because the claims are fundamentally invalid, the Court may deny the plaintiff this opportunity. *See Cuoco*, 222 F.3d at 112 ("The problem with [the plaintiff]'s causes of action is substantive; better pleading will not cure it. Repleading would thus be futile."); *accord Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (summary order). The Court finds that it would be futile to allow Plaintiff to re-plead the claims asserted in these 13 actions, and therefore declines to grant him the opportunity to file amended complaints in any of these actions.

## III. Filing Injunction

The federal courts have limited resources. Frequent frivolous filings diminish the ability of the federal courts to manage their dockets for the efficient administration of justice. "The district courts have the power and the obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel." *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) (internal quotation marks and citations omitted).

In light of Plaintiff's litigation history, which includes, to date, the filing of over 33 complaints, all but one of which have been dismissed *sua sponte*, he is ORDERED TO SHOW CAUSE by written Affirmation, **within 14 days** of the entry of this Order, why he should not be barred from filing any future IFP actions in the United States District Court for the Eastern District of New York without first obtaining permission from the Court to do so.

If Plaintiff fails to show cause **within 14 days** of the entry of this Order, or should Plaintiff's affirmation fail to set forth good cause why an injunction should not be entered, Plaintiff will be barred from filing any further IFP actions in this Court without first obtaining permission from the Court. *See Hong Mai Sa v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) ("If a litigant has a history of filing 'vexatious, harassing or duplicative lawsuits,' courts may impose sanctions, including restrictions on future access to the judicial system." (citation omitted)); *In re Sassower*, 20 F.3d 42, 44 (2d Cir. 1994) ("With respect to civil litigation, courts have recognized that the normal opportunity to initiate lawsuits may be limited once a litigant has demonstrated a clear pattern of abusing the litigation process by filing vexatious and frivolous complaints.").

## CONCLUSION

The Complaints filed in the above-captioned 13 cases are dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). Plaintiff is ORDERED TO SHOW CAUSE by written Affirmation, **within 14 days** of the entry of this Order, why he should not be barred from filing any further *in forma pauperis* actions in this Court without first obtaining permission from the Court to do so. Plaintiff is directed to file only one Affirmation in response to the Court's order to show cause and should reference the following case number on the face of the Affirmation: 21-CV-3869.

All further proceedings shall be stayed until Plaintiff's time to file his written Affirmation has expired.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith, and therefore IFP status is denied for purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

2021 WL 3516421

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3516421

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.